## Case No. 22-2895

### UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
*Appellee,*

v.

STEVEN J. MONACO,
*Appellant.*

———————————————————

*On appeal from Judgment in the*
*United States District Court for the District of New Jersey*
*Case No. 1:19-cr-00716-RBK*
*Sat Below: Robert B. Kugler, U.S.D.J.*

———————————————————

**BRIEF OF APPELLANT STEVEN J. MONACO**

Eric T. Kanefsky, Esq.*
Kevin J. Musiakiewicz, Esq.*
Philip Morrow, Esq.

**CALCAGNI & KANEFSKY LLP**
One Newark Center
1085 Raymond Blvd., 14th Floor
Newark, New Jersey 07102
T. 862.397.1796
eric@ck-litigation.com
*Attorneys for Appellant Steven J. Monaco*


*Applications for admission forthcoming*

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................1

STATEMENT OF THE ISSUES PRESENTED…………………………..…………..2

STATEMENT OF THE CASE................................................................4

    *Monaco's Relatively Minor Role in the Sale of Compounding Medications* .......4

    *The Government's Theories* .................................................................5

    *The Government Identifies Wong as a Key Witness and Previews Her Testimony in its Opening Statement* ......................................................................7

    *The Government Announces that It Does Not Intend to Call Wong Just Before the Close of its Case*...........................................................................7

    *The Government's Inherently Biased Witnesses* .................................8

    *The Glaring Inconsistencies in the Government's Case* ...................10

    *The Exculpatory Evidence Contained in Wong's 302* ......................11

    *The District Court's Refusal to Admit Wong's 302* ...........................12

    *The Cataclysmic Impact of the District Court's Decision to Exclude the 302*...15

    *The Jury's Telling Inability to Reach a Unanimous Verdict*.............16

    *The District Court Imposes an Inexplicably Disproportionate and Patently Unreasonable Sentence*....................................................................18

SUMMARY OF ARGUMENT .............................................................22

ARGUMENT .............................................................................................25

I.    The District Court Erred in Refusing to Admit the 302 into Evidence.........25

A. The District Court Erred in Refusing to Admit the 302 under Rule 804 ......25

1.  Wong Was "Unavailable" withing the Meaning of Rule 804(a)(5)(B) ...26

2.  The 302 Was Sufficiently Trustworthy ....................................................30

B. The District Court Erred in Refusing to Admit the 302 under Rule 807 ......34

C. The District Court's Exclusion of the 302 Was Not Harmless Error............35

II.   The District Court Erred in Imposing a 14-year Custodial Sentence............39

A. The District Court Erred in its Interpretation and Application of the
Guidelines ....................................................................................................39

1. The District Court Erred in Interpreting, Calculating, and Applying the
Loss Amount...........................................................................................40

2. The District Court Erred in Applying a 4-Point Aggravating Role
Enhancement ..........................................................................................43

3. The District Court Erred by Applying a 2-Point Sophisticated Means
Enhancement ..........................................................................................45

B. The Sentence Imposed Is Procedurally and Substantively Unreasonable .....47

1.  The District Court Abused its Discretion by Refusing to Meaningfully
Consider § 3553(a)(6)..............................................................................48

2.  The Sentence Imposed Is Substantively Unreasonable............................49

CONCLUSION .........................................................................................................55

COMBINED CERTIFICATIONS............................................................................56

# TABLE OF AUTHORITIES

## CASES

*Carpenter v. Dizio*, 506 F. Supp. 1117 (E.D. Pa. 1981) ...........................................28

*Feaster v. United States*, 631 A.2d 400 (D.C. 1993) ...............................................27

*Government of Virgin Islands v. Mills*, 956 F.2d 443 (3d Cir. 1992) .....................35

*Hill v. Laeisz*, 435 F.3d 404 (3d Cir. 2006) .............................................................35

*In re Drake*, 786 F. Supp. 229 (E.D.N.Y. 1992) ......................................................32

*Rodriguez v. Hyman*, No. CIV. 08-4239 RBK/KMW,
  2013 WL 1222644 (D.N.J. Mar. 25, 2013) ...........................................................26

*Taylor v. Illinois*, 484 U.S. 400 (1988) ....................................................................36

*United States v. Adair*, 38 F.4th 341 (3d Cir. 2022) ...................................43, 44, 45

*United States v. Arthur*, 949 F.2d 211 (6th Cir. 1991) ............................................30

*United States v. Begin*, 696 F.3d 405 (3d Cir. 2012) ...............................................48

*United States v. Bell*, 947 F.3d 49 (3d Cir. 2020) ....................................................39

*United States v. Berrios*, 676 F.3d 118 (3d Cir. 2012) ............................................32

*United States v. Boscarino*, 437 F.3d 634 (7th Cir. 2006) .......................................49

*United States v. Caldwell*, 760 F.3d 267 (3d Cir. 2014) ..............................25, 30, 31

*United States v. Casseus*, 282 F.3d 253 (3d Cir. 2002) ...........................................35

*United States v. Dickler*, 64 F.3d 818 (3d Cir. 1995) ..............................................41

*United States v. Flenoid*, 949 F.2d 970 (8th Cir. 1991) ...............................26, 27, 28

*United States v. Flores-Mejia*, 759 F.3d 253 (3d Cir. 2014) (en banc) ..................48

*United States v. Foster*, 128 F.3d 949 (6th Cir. 1997) .............................................36

*United States v. Fountain*, 792 F.3d 310 (3d Cir. 2015) .................................. 45, 46

*United States v. Friedman*, 658 F.3d 342 (3d Cir. 2011) ................................ 34, 35

*United States v. Gall*, 552 U.S. 38 (2007) .......................................................... 47, 48

*United States v. Green*, 617 F.3d 233 (3d Cir. 2010) ................................................25

*United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (en banc) ..............................39

*United States v. Harden*, 893 F.3d 434 (7th Cir. 2018)...........................................35

*United States v. Hayes*, 762 F.3d 1300 (11th Cir. 2014) ........................................54

*United States v. Jimenez*, 513 F.3d 62 (3d Cir. 2008) .............................................39

*United States v. Keltner*, 147 F.3d 662 (8th Cir. 1998) ...........................................33

*United States v. Kirschner*, 995 F.3d 327 (3d Cir. 2021) ........................................47

*United States v. Kleyman*, No. 14-CR-598, 2015 WL 6739113,
  (D.N.J. Nov. 4, 2015)...........................................................................................41

*United States v. Levinson*, 543 F.3d 190 (3d Cir. 2008)...........................................47

*United States v. Lowery*, 135 F.3d 957 (5th Cir. 1998).................................... 36, 37

*United States v. Mathis*, 264 F.3d 321 (3d Cir. 2001) .............................................35

*United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007).......................................41

*United States v. Milchin*, No. CR 17-00284-1, 2020 WL 4475902,
  (E.D. Pa. Aug. 4, 2020)........................................................................................51

*United States v. Musaibli*, No. 18-20495, 2022 WL 17832696,
  (E.D. Mich. Dec. 21, 2022)..................................................................................33

*United States v. Mussare*, 405 F.3d 161 (3d Cir. 1998) ..........................................32

*United States v. Naqib*, 56 F.3d 798 (7th Cir. 1995) ...............................................35

*United States v. Olhovsky*, 562 F.3d 530 (3d Cir. 2009) .........................................50

*United States v. Paguio*, 114 F.3d 928 (9th Cir. 1997) .................................... 27, 38

*United States v. Parker*, 462 F.3d 273 (3d Cir. 2006) ..................................... 49, 52

*United States v. Peterson*, 101 F.3d 375 (5th Cir. 1996)................................. 41, 42

*United States v. Quay*, 841 F. App'x 388 (3d Cir. 2021) ........................................48

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997)........................................41

*United States v. Schaefer*, 291 F.3d 932 (7th Cir. 2002).......................................41

*United States v. Seligsohn*, 981 F.2d 1418 (3d Cir. 1992).....................................49

*United States v. Smith*, No. 19-2063, 2021 WL 4129523
 (3d Cir. Sept. 10, 2021)................................................................... 45, 47

*United States v. Spurlock*, 121 F.3d 701 (4th Cir. 1997) ........................................29

*United States v. Sullivan*, No. 5:09-CR-302-FL-1, 2010 WL 5437243
 (E.D.N.C. Nov. 17, 2010) ........................................................................28

*United States v. Thevis*, 84 F.R.D. 57 (N.D. Ga. 1979)...........................................32

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (en banc) ..................... 47, 49

*United States v. Xue*, 42 F.4th 355 (3d Cir. 2022)....................................................40

*Walden v. Georgia-Pac. Corp.*, 126 F.3d 506 (3d Cir. 1997) ................................25

*Zola v. Gordon*, No. 86-4790, 1993 WL 247821 (S.D.N.Y. June 30, 1993) ..........28

**STATUTES**

18 U.S.C. § 3553(a) ................................................................... 47, 48, 49

**OTHER AUTHORITIES**

U.S.S.G. § 2B1.1 cmt. 9(B) ......................................................................45

U.S.S.G. § 2B1.1(b)(10) ...........................................................................46

U.S.S.G. § 3B1.1...........................................................................................43

U.S.S.G., Ch. 5, Pt. A..................................................................................40

**RULES**

Fed. R. Evid. 804 ........................................................... 25, 26, 30

Fed. R. Evid. 807 ......................................................... 34

**TREATISES**

2 McCormick on Evid. § 253 (8th ed.)...................................................27

## STATEMENT OF JURISDICTION

This is a direct appeal in a criminal case from the October 3, 2022 judgment of the United States District Court for the District of New Jersey. (Appx0001-0009).[1] The district court had jurisdiction under 18 U.S.C. § 3231. Steven J. Monaco ("Monaco") timely filed a notice of appeal on October 7, 2022. (Appx0010). This Court has jurisdiction under 28 U.S.C. § 1291.

### STATEMENT OF RELATED CASES AND PROCEEDINGS

Monaco was indicted alongside co-defendants Dr. Daniel Oswari ("Oswari"), Dr. Michael Goldis ("Goldis"), and Aaron Jones ("Jones"), all of whom pled guilty before Monaco's trial. To date, Oswari, Goldis, and Jones have not appealed their convictions or sentences. The indictment named Richard Zappala ("Zappala") as a co-conspirator. Zappala was charged by information in a separate case (No. 17-CR-416) and pled guilty. To date, Zappala has not appealed his conviction or sentence. William Hickman ("Hickman") was charged by indictment in a separate case (No. 19-CR-191) and is awaiting sentencing. Jason Chacker ("Chacker") was charged by information in a separate case (No. 19-CR-718) and pled guilty. To date, Chacker has not appealed his conviction or sentence.

---

[1] Citations to the Appendix filed contemporaneously with this brief are identified with "Appx_." Citations to "Tr. at _" are to the trial transcript. Citations to "PSR, ¶_" are to the Presentence Report filed on September 6, 2022.

## STATEMENT OF THE ISSUES PRESENTED

**I.    Did the district court err by refusing to admit the exculpatory statement of Julie Wong ("Wong") into evidence under Federal Rule of Evidence 804?**

Raised:  Monaco raised this issue in an application to the district court on April 12, 2022.  (*See* Appx0445-0449).

Ruled:  The district court denied Monaco's application in an oral ruling on April 12, 2022.  (*See* Appx0477-0480).

**II.    Did the district court err by refusing to admit the exculpatory statement of Wong into evidence under Federal Rule of Evidence 807?**

Raised:  Monaco raised this issue in an application to the district court on April 12, 2022. (*See* Appx0445-0449).

Ruled:  The district court denied Monaco's application in an oral ruling on April 12, 2022. (*See* Appx0477-0480).

**III.    Whether the district court's refusal to admit the exculpatory statement of Wong under Rules 804 and/or 807 was reversible error?**

Raised:  Harmless error claims arise on appeal following conviction; this claim was not raised below.

**IV.    Did the district court err in applying the 18-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J)?**

Raised:   Monaco objected to the imposition of this enhancement in his written sentencing submission and at the sentencing hearing. (*See* Appx0758-0762, Appx0764-0767, Appx0907-0908).

Ruled:  The district court overruled Monaco's objection during the sentencing hearing.  (*See* Appx0767-0768).

**V.    Did the district court err in applying the 4-level aggravating role enhancement pursuant to U.S.S.G. § 3B1.1?**

Raised:   Monaco objected to the imposition of this enhancement in his written sentencing submission and at the sentencing hearing.  (*See* Appx0744-0746, Appx0749-0751, Appx0902-0905).

Ruled:  The district court overruled Monaco's objection during the sentencing hearing.  (*See* Appx0751-0752).

**VI.    Did the district court err in applying the 2-level sophisticated means enhancement pursuant to U.S.S.G. § 2B1.1?**

Raised: Monaco objected to the imposition of this enhancement in his written sentencing submission to the sentencing court and at the sentencing hearing.  (*See* Appx0735-0737, Appx0740-0742, Appx0900-0902).

Ruled:  The district court overruled Monaco's objection during the sentencing hearing.  (*See* Appx0743-0744).

**VII.    Did the district court abuse its discretion by failing to meaningfully consider 18 U.S.C. § 3553(a)(6)?**

Raised:   Monaco argued in his written sentencing submission and at the sentencing hearing that imposing the Guidelines sentence recommended by Probation would result in unwarranted sentencing disparities with other defendants found guilty of similar conduct. (*See* Appx0787-0792, Appx0927-0929).

Ruled:  The district court refused to consider the sentences of similarly situated defendants identified by Monaco. (*See* Appx0801-0802).

## VIII. Whether the 14-year custodial sentence imposed is substantively reasonable?

Raised: Monaco argued in his written sentencing submission and at the sentencing hearing that the district court should impose a sentence substantially below the Guidelines range. (*See* Appx0787-0796, Appx0912-0930).

Ruled: The district court sentenced Monaco to a term of imprisonment within the Guidelines range. (*See* Appx0798-0803).

## STATEMENT OF THE CASE

### *Monaco's Relatively Minor Role in the Sale of Compounding Medications*

On June 6, 2020, Hickman pled guilty to Counts 1 and 28 of the indictment in *United States v. William Hickman*, No. 19-cr-191 (RBK): conspiracy to commit wire fraud and health care fraud and conspiracy to commit money laundering.[2] According to the Government, Hickman marketed compounded medications and recruited co-conspirators, including Zappala, to enlist "New Jersey public employees and others to fraudulently obtain compounded medications from Compounding Pharmacy that the patients did not need, often without a doctor seeing the patients or determining that the medications were medically necessary." The

---

[2] *See* United States Attorney's Office, District of New Jersey, *Leader of $50 Million Health Care Fraud Conspiracy Targeting State Health Benefits Programs Pleads Guilty* (June 6, 2020), available at https://www.justice.gov/usao-nj/pr/leader-50-million-health-care-fraud-conspiracy-targeting-state-health-benefits-programs

Compounding Pharmacy—Central Rexall ("Rexall")—paid Hickman over $26 million and Zappala received "40 to 45" percent of the commissions on sales he generated under Hickman. (Appx0114).

Because Hickman was the "master distributor" for Rexall, Zappala later negotiated an agreement directly with Hickman and recruited pharmaceutical sales representatives, including Monaco, to work under him. (Appx0112-0115). By the Government's own account, Zappala was the "leader" of the alleged conspiracy at the heart of this matter. (Appx0676).

### *The Government's Theories*

The Government prosecuted Monaco on the principal theory that he engaged in a scheme to pay certain medical professionals to prescribe compound medications sold by Rexall (the "Compound Medication Scheme"). (Appx0075-0078). At the core of this theory was the Government's contention that Monaco made cash payments to Dena Rabinowitz ("Rabinowitz"), an onsite phlebotomist, who retained 50% of the payment and gave the balance to Dr. Oswari to induce Oswari to prescribe Rexall products (the "Oswari Scheme"). (Appx0078-0081). Additionally, the Government maintained that Monaco (i) made cash payments for the benefit of Chacker, a physician's assistant, to write scripts for Rexall products (*see* Appx0082), and (ii) provided Zappala with health insurance information for certain of Monaco's family members so that compound medication scripts could be written for them.

Those scripts were issued and signed by Goldis, another doctor with whom, unbeknownst to Monaco, Zappala had a separate arrangement, or Goldis' medical assistant, Aaron Jones, who forged Goldis' signature.  (*See* Appx0082-0083).

The Compound Medication Scheme accounted for 17 of the 18 counts against Monaco in the indictment (Counts 1 through 8 and 14 through 22), including counts charging health care fraud, wire fraud, and conspiracy to commit those frauds.  (*See* Appx0039-0060).  More importantly, the Compound Medication Scheme was, as the Government represented to the jury, "the real moneymaker here."  (Appx0608).  It accounted for the *entire* loss amount of $4,692,945.30 attributed to Monaco, which was the driving force for the 14-year prison sentence imposed by the district court.  (*See* PSR, ¶ 58).

The Government also prosecuted Monaco on the theory that he conspired with Oswari to violate the Anti-Kickback Statute and Travel Act by having his then employer, Accu Reference Medical Laboratories ("Accu Reference"), pay for Rabinowitz to provide onsite phlebotomy services to Oswari when, in fact, she was performing work for Oswari's practice in exchange for Oswari sending all his lab work to Accu Reference (the "Lab Work Scheme").  (Appx0072-0073).  The Government never introduced any evidence of, and the district court therefore never found that there was, a loss attributable to the Lab Work Scheme.  (*See* Appx0768-0771).

### *The Government Identifies Wong as a Key Witness and Previews Her Testimony in its Opening Statement*

From the very outset of the trial, the Government touted Wong, a former receptionist for Oswari's office, as a pivotal witness in proving Monaco's involvement in the Compound Medication Scheme. In addition to identifying Wong as a witness in its pre-trial submissions, the Government vowed in its opening statement that the jury would hear from Wong that "she was aware of the cash payments at the time and helped put the cash payments in Oswari's desk drawer." (Appx0080). The Government also asserted in its opening that Wong was paid by Zappala to "talk to patients, and if patients agreed, [she] would get the prescription signed by Dr. Oswari." (Appx0081). As the Government framed it, Wong was an integral part of what "became really an office project" to identify patients with insurance plans covering the compound medicine and get prescriptions signed by Oswari. (Appx0080). In fact, the Government advised the district court and defense counsel that the jury would hear from Wong on the very first day of testimony. (*See* Appx0087-88).

### *The Government Announces that It Does Not Intend to Call Wong Just Before the Close of its Case*

Though the Government did not call Wong on the first day of testimony, it continued to give Monaco's trial counsel, Gerard Egan ("Egan"), good reason to believe that she would eventually take the stand. On the day before the trial

commenced, Judge Kugler explained to the parties that it was his "practice" at the end of each day to "ask each side who they expect their witnesses the following day to be . . . so that you're not wasting time all night preparing for someone who is not coming in until next week." (Appx0067-00684). "[P]er [that] protocol," Egan reiterated, at the close of the third day of trial (Thursday, April 7, 2022), his expectation that Wong would ultimately be called as a witness. (Appx0341-0343 ("Yesterday, as per the protocol . . . I was told Dr. Oswari would finish, and then it would be Dena Rabinowitz, Julie Wong, not necessarily in that order, but Julie Wong, the lady, Luz Bagley and this gentleman here.")). The Government did not correct him or indicate otherwise. (Appx0341-0343).

By the time the trial resumed the following Monday (April 11, 2022), however, the Government reversed course. Despite opening its case with a preview of the crucial testimony it promised the jury Wong would provide, the Government stated in response to an inquiry from the district court as to who would be the Government's next witness, that it was prepared to rest after the cross-examination of the witness on the stand (Special Agent Galloway) and, thus, no longer intended to call Wong. (*See* Appx0440-41("[W]e decided not to call her.")).

### The Government's Inherently Biased Witnesses

The Government instead built its case-in-chief entirely upon a parade of other witnesses, who, unlike Wong, were ineluctably biased against Monaco. By the time

of the trial, Zappala, Oswari, Chacker, and Goldis had all pled guilty and agreed to cooperate. (*See* Appx0148-0151, Appx0156-0157, Appx0161-0166, Appx0204-0209, Appx0246-0249, Appx0256, Appx0345-0349, Appx0353-0354, Appx0359-0360, Appx0407-0411). Therefore, they were highly motivated to provide historical accounts favorable to the Government and, in turn, minimize their own exposure at the time of sentencing. In fact, Zappala, the Government's star witness, admitted that he had been investigated and cooperated to avoid prosecution in connection with schemes completely unrelated to Monaco, including paying off two other doctors—Dr. David Hassman and Dr. Mark Alexander—to induce them to write prescriptions for compound medications and other products. (*See* Appx0155-0161).

Rabinowitz conceded that she was cooperating with the Government because the FBI had told her from the outset that "they had evidence that [she] was involved" in the Compound Medication Scheme and had accepted cash payments related to the scripts at issue. (Appx0320-0321, Appx0330 (acknowledging she "knew" that she had "violated criminal laws")). She also acknowledged that after she and her lawyer met with the FBI, she "got immunity" in exchange for assisting the Government in its prosecution of Monaco. (Appx0330-0332).

Chacker's parents, Scott and Sondre Chacker, were obviously incentivized to do whatever they could to corroborate their son's testimony and enhance the value of his cooperation. (*See* Appx0382-0383, Appx0387-0388). Despite his son being

a licensed medical professional who had previously issued prescriptions for him, Scott Chacker claimed to have relied on Monaco when agreeing to receive the compound medications. (*See* Appx0377-0381, Appx0383-0385).

Through the testimony of Special Agent Scott Stefanowicz, the Government introduced into evidence a spreadsheet purporting to show the loss amounts attributable to each group of charges. (*See* Appx0420-0426). Special Agent Brandon Galloway likewise testified as to the flow of monies to and from Monaco and his limited liability company. (*See* Appx0437-0440).

As such, Wong would have been the only witness to provide an independent and unbiased account of critical communications and events concerning the Oswari component of the Compound Medication Scheme.

### *The Glaring Inconsistencies in the Government's Case*

In addition to the inherent bias, the Government's case was plagued by glaring inconsistencies and holes, particularly with respect to the cash payments purportedly made by Monaco. Zappala testified that he made cash payments to Wong and merely surmised, based on purported discussions with Monaco, that Monaco was "taking care of" Rabinowitz. (Appx0107-0108, Appx0174-0176). Oswari conceded that Monaco never paid him any money directly and that he never saw Monaco give money to Rabinowitz. (*See* Appx0268). And Daisylynn Hindermeyer, a medical assistant who worked in Oswari's office for a very short period, testified that the

cash Rabinowitz purportedly received from Monaco was in exchange for Rabinowitz setting up meetings between Monaco and Oswari, not for the issuance of scripts for compound medicines. (*See* Appx0195-0198).

Rabinowitz was the only witness who testified that she was paid by Monaco, and she was obviously looking to protect her own interests. (*See* Appx0301-0303). In fact, she acknowledged on cross that she never even mentioned Zappala to the FBI agents because she knew that he had already pled guilty. (*See* Appx0331). Therefore, there was only value to her in incriminating Monaco.

### The Exculpatory Evidence Contained in Wong's 302

The Court need look no further than Wong's interview statement to the FBI on March 5, 2019 (the "302") to understand why the Government ultimately elected not to call her to the stand. (*See* Appx0061-0065). Wong's 302 contains a wealth of exculpatory evidence that completely undermines the Government's narrative and refutes the most critical aspects of the testimony given by its witnesses.

The 302 confirms that the Compound Medication Scheme was driven by Zappala. Wong was adamant that she "didn't deal with [Monaco]." (Appx0062). Rather, all her interactions were with Zappala. It was Zappala that: (i) "first offered WONG one hundred and fifty dollars for each prescription that went through" and later "agree[d] to pay WONG two hundred dollars per prescription after finding out RABINOWITZ was receiving two hundred dollars per prescription"; (ii) "wanted

WONG to also promote pain creme"; and (iii) "provided WONG with these prescription forms that would already have the specific supplement the patient was going to receive checked off as well as the amount of refills." (Appx0062) (capitalization in original).  Wong also noted that "[l]ater on, [she] saw more of [Zappala] in the office" than Monaco.  (Appx0063).

More importantly, Wong stated that: (i) it was Zappala that "***paid both WONG and RABINOWITZ once per month***"; (ii) "RABINOWITZ was giving money to OSWARI"; (iii) "RABINOWITZ would sometimes give WONG an envelope of cash and ask WONG to place it in OSWARI's desk"; (iv) she does not know if Monaco "was paying RABINOWITZ"; and (v) she does not know "if [Monaco] knew whether or not OSWARI was being paid."  (Appx0063) (emphasis added).   In other words, she told the FBI that the source of the cash payments to Oswari and his staff was Zappala, not Monaco, and created significant uncertainty regarding Monaco's involvement.

### *The District Court's Refusal to Admit Wong's 302*

Upon learning the Government no longer intended to call Wong, Egan made an immediate application under Federal Rules of Evidence 804 and 807 for the admission of Wong's 302 through the FBI agent who prepared the statement and was present in the courtroom.  (*See* Appx0445-0449).  In support of that application, Egan explained that, notwithstanding the Government's assurances that it would call

Wong on its case-in-chief, he made diligent efforts to subpoena Wong and secure her testimony shortly before the trial commenced. Those efforts included Egan twice personally visiting the address for Wong provided by the Government on March 27, 2022 to serve a subpoena, knocking on the door, and leaving a business card with a message for Wong to call him; calling the phone number for Wong on the 302 and leaving a message; and sending a retired federal employee to Wong's home on April 2, 2022 to make another attempt at personal service. (Appx0445-0446, Appx0452-0453, Appx0463-0466, Appx0468-0472). The process server testified that the door to what he understood to be Wong's home was answered by a gentleman who proclaimed not to know Wong or her whereabouts. (*See* Appx0468-0471). When Egan suggested that the Government could assist in locating Wong given that she was clearly avoiding the defense's efforts to locate her, the Government refused to do so and vigorously opposed the application. (*See* Appx0453-0454, Appx0476-0477).

Given the import of the 302, the district court could have mitigated the prejudice to Monaco resulting from the Government's purposely belated decision not to call Wong on its case and Egan's inability to secure her appearance by admitting the statement into evidence. Instead, the district court bent over backwards to find reasons to deny the application.

Though the district court gave Monaco "the benefit of the doubt" and concluded that Wong's statement to the FBI was against her penal interest within the meaning of Rule 804, it held that Wong was not "unavailable" because Egan had not done enough to secure her appearance. In so finding, the district court placed particular emphasis on Egan's failure to have acted to find and serve Wong since first learning at 2:00 p.m. on the prior afternoon that Wong would not be called by the Government:

> The testimony in the record before me is that Mr. Egan tried twice on March 26 to visit Ms. Wong. And no one answered the phone. He did not leave a subpoena. He did leave his card, asking her to contact him about the case.
>
> He did attempt to call her cell phone but that cell phone number is at least three years old, so we don't even know if that's really her cell phone number.
>
> Then, the process server visited once on April 2nd. A male answered the door. We have no evidence whatsoever that the process server even asked this male who he was. I'm assuming the name on the subpoena is to Julie Wong. I'm assuming that he asked for Julie Wong. There person living there may not have known Ms. Wong by that name since that's really not her name. But I'll assume for the purpose of this argument that pretty much everybody went by Julie Wong.
>
> These two attempts are not reasonable attempts to secure her presence at court. ***The defense has known since at least 2:00 p.m. yesterday that the government was not going to call her as a witness. I'm surprised that they didn't make efforts after 2:00 p.m. yesterday and all night long, if she's such an important witness, to secure***

14

> *her appearance here today by way of a subpoena, but*
> *they didn't.*

(Appx0477-0479) (emphasis added).

The district court also held that the 302 lacked the indicia of trustworthiness required by Rules 804 and 807. Despite conceding that "the FBI accurately wrote down what [Wong] said" (Appx0448-0449), the district court concluded that the 302 was not sufficiently trustworthy solely because *other* witnesses who had testified acknowledged that they lied in *their* statements to the FBI:

> As I said earlier today, many of the witnesses who have testified have acknowledged that they lied to the FBI in their initial statements. I have no—I cannot conclude under the totality of the circumstances that this particular statement was made under the circumstances of trustworthiness. Accordingly, the application is denied.

(Appx0480).

### *The Cataclysmic Impact of the District Court's Decision to Exclude the 302*

The trial court's refusal to admit the 302 into evidence effectively gutted Monaco's defense. As Egan urged in support of the application, Wong "is so critical to this case" and her statements in the 302 were "probably the reason [the defense] chose to go to trial." (Appx0446, 0452). As a part of Oswari's staff and a participant in the Compound Medication Scheme, Wong had first-hand knowledge of important facts. (*See* Appx0061-0063) (acknowledging that she was the receptionist for Oswari, a recipient of cash payments, and involved in identifying patients with

coverage for compound medications and preparing scripts for Oswari's signature). And, as the district court acknowledged, Wong "was originally supposed to be a witness and there's been a lot of testimony about her[.]" (Appx0452). Most importantly, her statements to the FBI refuted the testimony of the Government's witnesses and seriously undermined their credibility, corroborated Monaco's version of key events, and identified Zappala as the source of the cash payments to Wong, Rabinowitz, and Oswari. (*See* Appx0061-00633).

As a result, Monaco was forced to take the stand to testify on his own behalf (*see* Appx0489-0590), and call a series of character witnesses (Kimberly Nyscyzota, Kurtis Johnson, Vladimir Roudik, and Michael Monaco) with no knowledge of information related to the alleged schemes and nothing of meaningfully persuasive value to add to the record. (*See* Tr. at 656-664).

### *The Jury's Telling Inability to Reach a Unanimous Verdict*

The communications between the jury and the district court and the timeline of the deliberations make clear that deciding Monaco's fate was an incredibly close call.

At 2:35 p.m. on the first full day of deliberations (April 14, 2022), the jury sent a note to Judge Kugler advising that one juror was refusing to analyze the evidence because he was swayed heavily by the fact that the Government's case was built upon the testimony of cooperators. (*See* Appx0685, 0721 (Court Ex. C-2) ("***We***

*the jury cannot reach a unanimous decision on most of the counts*.  How long does the jury have for deliberations *if one individual refuses to analyze the evidence and is using the fact that there are plea agreements to sway his verdicts*?") (emphasis added)).  In response, the district court issued a modified *Allen* charge and directed the jury to continue to deliberate for as long as they needed.  (*See* Appx0687-0688).  But just 30 or so minutes later, the jury sent a second note to Judge Kugler with the same message: "*We will not be coming to a unanimous verdict because one . . . juror stated he will not . . . be open to changing his mind on all . . . counts.*  He is not using an open mind at all." (Appx0690, 0722 (Court Ex. C-3) (emphasis added)).

It was only after the trial court spoke privately with the foreperson (*see* Appx0692-0693), the district court instructed the jury to "make another effort to try to come to a unanimous agreement on all the counts in this case" (Appx0697), alternate jurors were subbed in to replace jurors who were scheduled to be out of the country and had a death in the family (*see* Appx0699-0704), and the new panel returned the following week and "start[ed] over again from the very beginning" (Appx0699), that the jury rendered a guilty verdict on all counts against Monaco. (*See* Appx0706-0715).

### *The District Court Imposes an Inexplicably Disproportionate and Patently Unreasonable Sentence*

In the Pre-sentencing Investigation Report ("PSR") submitted to the district court in advance of sentencing, Probation determined that the total offense level applicable to Monaco under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") was 37, with a criminal history category of I, and recommended that Monaco receive a sentence within the Guidelines range of 210 to 262 months—or 17.5 to 21.8 years—in prison. (*See* PSR, ¶¶ 127, 157). For purposes of determining the applicable offense level, Probation grouped together Counts One (conspiracy to commit health care fraud and wire fraud), Counts Two through Eight and Count Fourteen (health care fraud), and Counts Fifteen through Twenty-two (wire fraud) ("Count Group One") because they all related to the Compound Medication Scheme from which the entire loss amount attributable to Monaco was derived. (*Id.*, ¶ 97).

Probation concluded that the base level offense applicable to Count Group One was 7 pursuant to U.S.S.G. §§ 2X1.1(a) and 2B1.1(a)(1), and that ***an increase of 18 levels*** was warranted under U.S.S.G. § 2B1.1(b)(1)(J) because Monaco was responsible for a loss and restitution amount of $4,692,945.30. That figure purportedly represented what Express Scripts paid for "medically unnecessary prescriptions for compound medications." (*Id.*, ¶¶ 52-53, 88, 99-100). Probation attributed $1,905,812.06—or more than 40%—of that loss amount to prescriptions

for compound medications written by Oswari (*see id.*, ¶ 52(b)), and $2,030,243.94 to the separate scheme between Zappala, Goldis, and Jones with which Monaco had no involvement.  (*See id.*, ¶¶ 52(c), (d)).

Probation also recommended—and the Government fully endorsed—the application of five additional enhancements totaling 12 levels: (i) 2 points under U.S.S.G. § 2B1.1(b)(7)(B)(i) because Monaco was convicted of a federal health care offense involving a Government health care program and the loss to the Government health care program exceeded $1 million; (ii) 2 points under U.S.S.G. § 2B1.1(b)(10) because Monaco's offense "involved sophisticated means;" (iii) 4 points under U.S.S.G. § 3B1.1(a) because Monaco was an "organizer" or "leader" of criminal activity involving five or more people; (iv) 2 points under U.S.S.G. § 3B1.3 because Monaco abused a position of trust as a sales representative; and (v) 2 points under U.S.S.G. § 3C1.1 for obstruction of justice because Monaco purportedly "made numerous false statements" in his trial testimony.  (*Id.*, ¶¶ 101-06).

Consistent with its approach throughout the trial, the district court gave Probation and the Government the benefit of nearly every decision with respect to sentencing.

First and foremost, the district court flatly rejected Monaco's objections concerning the loss amount related to the Compound Medication Scheme.[3] Specifically, the district court refused to account for the fact that upwards of $2 million in losses related to a separate scheme between Zappala, Goldis, and Jones, despite acknowledging that "Mr. Monaco wasn't getting paid" for those prescriptions, because it was "reasonably foreseeable to Mr. Monaco that Mr. Zappala was submitting prescriptions on his own to Dr. Goldis . . . ." (Appx0767).

The district court similarly refused to consider record evidence substantiating that many of the medications upon which the loss amount was based were medically necessary and/or provided some therapeutic benefit. The district court specifically held that the Government had no obligation to "disprove there's a medical necessity and all that kind of stuff" to hold Monaco responsible for the entire loss amount merely because, in its view, Oswari was "clear" that he "did this for the money[.]" (Appx0767-0768).

The district court also rejected Monaco's objections to the other proposed enhancements with the sole exception of the enhancement for abuse of trust. Most notably for the purpose of this appeal, the district court held that the 4-point aggravating role enhancement applied, ignoring Zappala's leading role in the

---

[3] The district court declined to include the alleged loss of $303,385.45 that the Government attributed to the Lab Work Scheme because the Government failed to identify any record evidence substantiating it. (*See* Appx0768-0771).

scheme (*see* Appx0751) (noting that Zappala's role in the scheme was "really not relevant" to Monaco's role), and that Zappala's negotiated plea agreement included only a 3-point enhancement based on Zappala's role in the schemes. (*See* Appx0751-0752 (the district court "really [did not] care" what level enhancement was applied to Zappala)). The district court likewise found that the 2-point sophisticated means enhancement applied even though (i) the schemes were simplistic and easily detected by law enforcement, and (ii) the plea agreements for Monaco's co-conspirators in the so-called "sophisticated" scheme did not contain the same enhancement. (*See* Appx0736, Appx0743-0744).

Finally, the district court declined to deviate from the Guidelines notwithstanding compelling reasons to do so, including that Monaco is a first-time, non-violent offender. In so ruling, the district court refused to compare Monaco to his co-conspirators because they had already pled guilty and had different loss amounts "and other different factors" driving their sentences. (*See* Appx0801). The court also flatly refused to consider the disparity that a sentence within the Guidelines would create with the sentences of any of the similarly situated defendants cited by Monaco merely because the district court did not preside over those trials and did not have access to the PSRs of those defendants. (*See* Appx0801-0802). Citing the "serious" nature of the case and the need for general and specific deterrence, the district court instead "was of the firm belief that a sentence within

the guidelines is necessary" and sentenced Monaco to 14 years of imprisonment on Counts 1 and 15 through 22 to be served concurrently with 5 years of imprisonment on Counts 2 through 8, 14 and 23. (Appx0802-0807).

The 14-year custodial sentence is grossly disproportionate to the sentences ultimately imposed on Monaco's co-defendants even after accounting for the downward adjustments they received for cooperation and acceptance of responsibility:

| Defendant | Loss Amount Per PSR | Sentence |
|---|---|---|
| Monaco | $4,692,945.20 | 168 months in prison (Appx0802) |
| Zappala | $4,692,945.20 | 5 years of probation (Appx0845) |
| Oswari | $1,905,812.06 | 15 months in prison (Appx0831) |
| Goldis | $992,326.62 | 10 months in prison (Appx0824) |
| Chacker | $365,414.14 | 3 years of probation (Appx0839) |
| Jones | $1,037,917.31 | 24 months in prison (Appx0817) |

## **SUMMARY OF ARGUMENT**

To sustain the conviction or the sentence of Monaco on this procedural and factual record would be a grave miscarriage of justice. The district court denied Monaco of his right to a fair trial and stripped him of the ability to present his principal defense by bending over backwards to exclude Wong's exculpatory statements on critical issues, including that Zappala was the source of payments to Oswari and his staff. The district court found that Wong was not "unavailable" within the meaning of Rule 804 even though Monaco's trial counsel made diligent efforts to serve Wong with a subpoena before the trial commenced and, by

previewing Wong's testimony in its opening statement and twice representing that Wong would be among the Government witnesses who would testify during the next day of trial, the Government gave him every reason to believe that Wong's appearance had been secured and she would eventually take the stand.  The district court likewise held that Wong's statements to the FBI were not sufficiently trustworthy under Rule 807 even though Wong's 302 had overwhelming indicia of trustworthiness and the district court had previously deemed 302s to be inherently trustworthy in a related matter.  Wong had no relationship with Monaco or incentive to exonerate him; her statements were completely self-inculpatory, based on first-hand knowledge gained as a receptionist in Oswari's office, and incredibly detailed; and her account of key events was corroborated by the testimony of the Government's own witnesses.

These clearly erroneous evidentiary rulings would have had a monumental impact on the outcome of the trial.  As confirmed by the record, the jury was deadlocked and headed toward a mistrial because at least one juror was unpersuaded by the biased, self-serving testimony of the cooperators. Wong's independent account would have cast even more doubt on the Government's case and tipped the scales even further in Monaco's favor.  At the very least, it is impossible to say with any degree of certainty or conviction that admission of the 302 in Wong's absence would not have influenced the jury to reach a different result.

The devastating impact of these flawed rulings was then compounded by equally egregious errors plaguing Monaco's sentencing.  In a similarly cavalier approach, the district court ignored substantial record evidence requiring a significant reduction in the loss amount attributed to Monaco and the corresponding 18-level enhancement, as well as the rejection of the 4-level aggravating role and 2-level sophisticated means enhancements.

Even more troubling, the district court refused to entertain the argument that sentencing Monaco within the recommended Guidelines range would create an irreconcilable disparity with both the sentences imposed on similarly situated defendants and the then recommended sentences for his co-conspirators.  Instead, the district court indiscriminately imposed a custodial sentence of 14 years that (i) is 3 to 5 times greater than defendants convicted after trial for far more pervasive and harmful fraudulent conduct, (ii) 15 times greater than the sentences imposed on Oswari and Goldis, who issued the scripts that directly led to the loss amounts, and (iii) inexplicably disproportionate to the ***probationary*** sentence recently imposed on Zappala, who made five times more than Monaco, shared the same exact loss amount and, at a minimum, played an "equally important" role in the alleged schemes.  As such, Monaco's sentence is procedurally and substantively unreasonable and must be vacated.

# **ARGUMENT**

## I.    The District Court Erred in Refusing to Admit the 302 into Evidence.

***Standard of Review.*** When the trial court ruling is based on the legal interpretation of the Federal Rules of Evidence, this Court "'exercise[s] plenary review[.]'" *United States v. Caldwell*, 760 F.3d 267, 274 (3d Cir. 2014) (quoting *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010)). This Court applies an abuse of discretion standard to a trial court's ruling to exclude evidence. *See Walden v. Georgia-Pac. Corp.*, 126 F.3d 506, 517 (3d Cir. 1997); *see also Caldwell*, 760 F.3d at 274 ("We review a district court's evidentiary rulings for an abuse of discretion").

### A.    The District Court Erred in Refusing to Admit the 302 under Rule 804.

The statement against interest exception to the hearsay rule provides that an out-of-court statement is admissible if the declarant is "unavailable," and the statement is one that:

> (A)    a reasonable person in the declarant's position would have made only if the person believed it be true because, when made, it was so contrary the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B)    is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3). "A declarant is considered to be unavailable as a witness if the declarant . . . (5) is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure: (B) the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4)." Fed. R. Evid. 804(a)(5)(B).

Though the district court properly concluded that the statements in the 302 were against Wong's penal interest (Appx0478 (acknowledging that "the purported statement to the FBI by Ms. Wong that she had been paid for the scripts could implicate her in this conspiracy")), the district court abused its discretion in concluding that "the defendant has not demonstrated unavailability" (Appx0479), and that the 302 was not sufficiently trustworthy. (*See* Appx0480).[4]

### 1.  Wong Was "Unavailable" withing the Meaning of Rule 804(a)(5)(B).

"Producing a recalcitrant or transitory witness at trial often is a difficult task." *United States v. Flenoid*, 949 F.2d 970, 973 (8th Cir. 1991). Though there are no bright lines rules concerning the sufficiency of a party's attempt to locate a missing witness, *see Rodriguez v. Hyman*, No. CIV. 08-4239 RBK/KMW, 2013 WL 1222644, at *2 (D.N.J. Mar. 25, 2013) (Kugler, J.), it is well-established that "[a]

---

[4] While the district court limited its analysis of trustworthiness to Rule 807, that issue is addressed under Rules 804 and 807 here.

good faith attempt to locate and subpoena the witness satisfies the proponent's obligation to demonstrate that the witness is unavailable." *Flenoid*, 949 F.2d at 972.

Relevant authority further instructs that the defense has a lower burden to demonstrate unavailability than the Government. *See*, *e.g.*, *Feaster v. United States*, 631 A.2d 400, 411 (D.C. 1993) ("[B]ecause there is no Confrontation Clause barrier at issue here, the unavailability requirement only imposes a general duty of reasonableness and good faith efforts on the part of the defense to secure the witness' presence at trial[.]"); 2 McCormick on Evid. § 253 (8th ed.) ("For witnesses testifying against the accused, the prosecution must demonstrate a substantial effort, described as a 'good-faith effort.' A lesser showing may be adequate as to other witnesses in criminal and in civil cases, where confrontation requirements do not apply."). In that regard, the application of Rule 804(b)(3) "is to some extent asymmetrical between defense and prosecution." *United States v. Paguio*, 114 F.3d 928, 934 (9th Cir. 1997) (noting that an "accused's right to present witnesses in his own defense may be implicated where an absent declarant's testimony is improperly excluded from evidence").

The record establishes that Monaco's trial counsel made reasonable, good faith efforts to secure Wong's attendance. Weeks before the trial began, Egan twice visited Wong's last known address and left his business card with a message for her to call him, Egan called the telephone number for Wong appearing on the 302 and

left a message, and a process server attempted to personally serve her and spoke to the gentleman who answered the door as to her whereabouts.  (*See* Appx0445-0446, Appx0452-0453, Appx0463-0466, Appx0468-0472).   These efforts exceed those deemed to be sufficient in other matters.  *See*, *e.g.*, *Flenoid*, 949 F.2d at 971-72 (defense counsel "made reasonable efforts" to locate witness where he directed marshals to serve subpoena at witness's last known address, "made other attempts" to contact the witness at that address, and "exhausted all other leads" as to the witness's whereabouts); *Carpenter v. Dizio*, 506 F. Supp. 1117, 1123 (E.D. Pa. 1981) (proponent used reasonable means where his attorney sent "numerous letters, certified and uncertified to declarant's last known address," placed "[n]umerous phone calls . . . to that address," personally visited that address, and "questioned a neighbor as to his whereabouts"); *Zola v. Gordon*, No. 86-4790, 1993 WL 247821, at *2 (S.D.N.Y. June 30, 1993) (declarant was unavailable after proponent was unable to identify declarant's address, driving record, or current vehicle information in order to locate him through state Department of Motor Vehicle searches); *United States v. Sullivan*, No. 5:09-CR-302-FL-1, 2010 WL 5437243, at *4 (E.D.N.C. Nov. 17, 2010) (witness was unavailable where government issued form requesting service of process, ascertained last known address from probation officer, and service of process was made to that address but marshal was unable to locate witness), *report and recommendation adopted*, 2010 WL 5437242 (E.D.N.C. Dec.

27, 2010).

As important, the Government not only referenced Wong in its pre-trial witness list, but also identified her as key witness and previewed her testimony in its opening statement (*see* Appx0080-0081, Appx0087-0088), and advised the district court and Monaco's trial counsel that she would eventually be called on its case-in-chief until returning from a four-day recess—during which additional efforts could have been made to subpoena her—and announcing to the contrary. (*See* Appx0341-0343, Appx0440-0441). Even assuming these representations were not purposefully misleading and strategic, they gave Monaco's trial counsel firm reason to believe that Wong's appearance had already been secured and was certain. *See United States v. Spurlock*, 121 F.3d 701 (4th Cir. 1997) (rejecting defense argument that the government had failed to show a witness was unavailable because "there was no attempt to subpoena [the witness] until a week before trial and the subpoena was never served" on the grounds that the government "had no reason to fear" the witness would fail to testify at trial and the marshals searched for the witness when he did not appear).

Yet, despite the Government effectively pulling the rug out from under Monaco just before resting its case, the district court faulted Monaco's trial counsel for his failure to take further efforts to secure Wong's appearance between late that afternoon and the resumption of the trial the following morning. (*See* Appx0478

("I'm surprised that they didn't make efforts after 2:00 p.m. yesterday and all night long . . . to secure her appearance here today by way of subpoena[.]")).[5]

### 2.      The 302 Was Sufficiently Trustworthy.

Rule 804(b)(3)(B) "does not require that *the information within the statement* be clearly corroborated; it requires only that there be corroborating circumstances that clearly indicate trustworthiness of *the statement itself*." *Caldwell*, 760 F.3d at 289 (internal citation and quotation marks omitted) (emphasis in original). "This requirement reflects the concern that a third party with less risk of prosecution will fabricate a confession to exculpate the guilty party." *Id.* (citation omitted). Corroboration is measured by the "totality of the circumstances." *Id.* A trial court abuses its discretion "when it refuses to allow into evidence statements that are corroborated by other substantial evidence." *United States v. Arthur*, 949 F.2d 211, 216-17 (6th Cir. 1991).

In this instance, the district court failed to conduct any analysis of the relevant circumstances or compare the statements contained in the 302 to corroborating evidence in the record. Rather, it deemed the 302 to be untrustworthy based on a single irrational assumption—that Wong must have lied to the FBI because other

---

[5] If the district court truly believed that Monaco's trial counsel should have taken further efforts to serve Wong, it could have briefly adjourned the trial and given him the opportunity to do so rather than force Monaco to immediately proceed with his defense without the benefit of critical exculpatory evidence.

witnesses testified that they failed to tell investigators the truth.  (*See* Appx0480).

That conclusion is belied by the rationale the district court applied in a related matter.  When another defendant in the Rexall scheme appeared for sentencing and sought to introduce certifications from patients to challenge the loss amount, the district court found the certifications to be unreliable compared to 302s, emphasizing that: "The problem is it's a serious crime to lie to an FBI agent[;]" and "I have to assume that when they're speaking to the FBI knowing that if they like, they're subject to serious penalties, they're probably going to be more careful in what they say . . . ."  (Appx0811-0815) (transcript from sentencing of Kristie Massuci).  In other words, the district court determined that 302s are inherently trustworthy in connection with that sentencing but reached the exact opposite conclusion when ruling on Monaco's application to admit the 302.

The district court's ruling as to trustworthiness also defies the facts and the law.  Wong had *no* relationship with Monaco.  *See Caldwell*, 760 F.3d at 289-90 (emphasizing that the lack of a relationship between the declarant and proponent is an important factor to be considered).  According to her 302, Wong knew Monaco "as [a] pharmaceutical representative[ ] who came into OSWARI's office" but she "didn't deal with [him]."  (Appx0062).  Therefore, she had no incentive to lie to the FBI to protect him.

The statements in the 302 were "'self-inculpatory and not simply self-serving attempts to deflect criminal liability.'"  *United States v. Berrios*, 676 F.3d 118, 129 (3d Cir. 2012) (quoting *United States v. Mussare*, 405 F.3d 161, 168 (3d Cir. 1998)). As the district court observed, Wong admitted to the FBI that she engaged in the very conduct at the heart of all the Rexall prosecutions—accepting payments from Zappala to identify patients with coverage for compound medications and preparing scripts for Oswari's signature without Oswari ever conducting a medical examination.  (*See* Appx0062).

The 302 contains a high degree of specificity.  *See In re Drake*, 786 F. Supp. 229, 234-35 (E.D.N.Y. 1992) (302 was reliable because, among other reasons, statements were "very specific"); *United States v. Thevis*, 84 F.R.D. 57, 65 (N.D. Ga. 1979) ("[T]he vast detail provided in the statement vouches for its reliability."), *aff'd*, 665 F.2d 616 (5th Cir. 1982).  Based on her personal knowledge as the receptionist and a participant in the illicit conduct, Wong detailed the amount and timing of the payments by Zappala to her and Rabinowitz, the process for getting scripts signed by Oswari, the insurers covering compound medications, her discussions with Zappala concerning what medications should be prescribed, and information concerning patient-specific prescriptions.  (*See* Appx0061-0062).

Finally, and perhaps most importantly, many of the statements in the 302 were corroborated by evidence already in the trial record. *See United States v. Keltner*, 147 F.3d 662, 670-71 (8th Cir. 1998) (302 found to be reliable because, among other reasons, "portions of . . . [the] statement were supported by evidence introduced at trial and corroborating testimony from the victims"). Most notably, Wong's statements that she and Rabinowitz were paid to identify patients with applicable coverage and prepare scripts, and that portions of the payments to Rabinowitz were placed in a drawer for Oswari, *see* (Appx0062-00633), are consistent with and were corroborated by the testimony of both Rabinowitz and Oswari. (*See* Appx0218-0219, Appx0299-0303).

Given these overwhelming indicia of trustworthiness, the district court abused its discretion in not admitting the 302 under Rule 804.[6]

---

[6] The district court could have addressed its purported concerns about trustworthiness and preserved Monaco's right to a fair trial by hearing testimony from the FBI agent who prepared the statement and was present at trial (*see* Appx0446). *See*, *e.g.*, *United States v. Musaibli*, No. 18-20495, 2022 WL 17832696, at *6-7 (E.D. Mich. Dec. 21, 2022) (holding that the admission of the 302s "would serve the interests of justice by allowing defendant to put before the jury the evidentiary record to support his defenses" and compelling the government to produce the FBI agents who interviewed the witnesses and prepared the statements to test their veracity and establish foundation for admission of 302s).

### B.    The District Court Erred in Refusing to Admit the 302 under Rule 807.

Rule 807—the residual exception—provides that "a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804" if:

(1)    the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

(2)    it is more probative on the point for which it is offered than any other evidence the proponent can obtain through reasonable efforts.

Even if the district court were correct in concluding that Wong was not "unavailable" within the meaning of Rule 804, the district court nevertheless erred by not admitting the 302 under Rule 807 because these elements are easily satisfied here.

The 302 is "supported by sufficient guarantees of trustworthiness" for the reasons previously stated.  Fed. R. Evid. 807(a)(1).  And there is no doubt that the 302 was "more probative on the point for which it [was] offered than any other evidence [Monaco] could have obtain[ed] through reasonable efforts."  Fed. R. Evid. 807(a)(2).  Wong's statements represented *__the only evidence__*—other than Monaco's own testimony—that the payments to Wong and Rabinowitz (and, in turn, Oswari)

came from Zappala, not Monaco.[7]  (*See* Appx0062-0063).

## C.   The District Court's Exclusion of the 302 Was Not Harmless Error.

An error in an evidentiary ruling is harmless only "when 'it is highly probable that the error did not affect the result.'"  *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011) (quoting *Hill v. Laeisz*, 435 F.3d 404, 420 (3d Cir. 2006)).  "'High probability requires that [this Court] have a sure conviction that the error did not prejudice the defendants.'"  *United States v. Casseus*, 282 F.3d 253, 256 (3d Cir. 2002) (quoting *United States v. Mathis*, 264 F.3d 321, 342 (3d Cir. 2001)); *see also United States v. Harden*, 893 F.3d 434, 451 (7th Cir. 2018) ("A court's erroneous exclusion of evidence is harmless '[o]nly if we are convinced that the error did not influence the jury or had a very slight effect, and can so say with fair assurance.'") (quoting *United States v. Naqib*, 56 F.3d 798, 805 (7th Cir. 1995)).  The Sixth Amendment of the United States Constitution affords a defendant the right "to present … evidence in his defense" and rebut the Government's evidence.  *Government of Virgin Islands v. Mills*, 956 F.2d 443, 445 (3d Cir. 1992) (citing

---

[7] The notice requirement under Rule 807(b) is not an issue on this appeal because the district court properly waived it.  (*See* Appx0479 ("As to the residual exception rule, we'll overlook the fact that there was no notice given.  The Rule 807(b) permits me to waive the advanced written notice requirement for good cause and excuse of a lack of an earlier notice.  I can do that because according to defense counsel he didn't know until 2:00 p.m. yesterday that [Wong] was not going to be called by the government.")).

*Taylor v. Illinois*, 484 U.S. 400, 409 (1988)).  This right is "an essential attribute of our adversary system of justice."  *Taylor*, 484 U.S. at 408.

Courts applying this standard have vacated judgments of conviction and remanded for a new trial when the excluded exculpatory evidence so much as ***could*** have had an impact on the jury's verdict.  *See*, *e.g.*, *United States v. Foster*, 128 F.3d 949, 954-56 (6th Cir. 1997) (reversing based on the district court's refusal to admit exculpatory grand jury testimony under Rule 804 because the other evidence against the defendant was circumstantial, the defendant "was facing a substantial sentence," and the Sixth Circuit could not "say ***for certain*** that these transcripts would not have influenced the jury to acquit") (emphasis added); *United States v. Lowery*, 135 F.3d 957, 959-60 (5th Cir. 1998) (effect of district court's exclusion of potentially exculpatory evidence was not "insubstantial" because it "tied" the defendant's hands and "left [him] with little more than the ability to make unsubstantiated and . . . unprovable claims on the witness stand").

Application of this standard commands the same result here.  The impact that the admission of the 302 could have had on the jury verdict and Monaco's fate is clear and profound.

The 302 would have squarely refuted the testimony, and impeached the credibility, of the Government's key witnesses.  For example, while Zappala and Rabinowitz testified that Monaco was responsible for paying Rabinowitz (*see*

Appx0108, Appx0301-0302), Wong told the FBI that the payments to both her and Rabinowitz (and, in turn, Oswari) were made by Zappala.    (*See* Appx0063). Likewise, while Oswari and Rabinowitz testified that Monaco instructed them as to how to fill out the scripts (*see* Appx0220-0221, Appx0313-0314), Wong stated that Zappala provided her with "prescription forms that would already have the specific supplement the patient was going to receive checked off as well as the amount of refills." (Appx0062).  The exclusion of the 302 left Monaco with nothing more than his own unsubstantiated testimony as to these critical components of the Compound Medication Scheme. [8]  *See Lowery*, 135 F.3d at 959-60.

In addition, Wong presented an entirely different narrative concerning the respective roles and involvement of Monaco and Zappala.  She told the FBI that "didn't deal with" Monaco and that it was Zappala who determined the amount she would be paid per script, pushed her to write scripts for the most profitable compounds, and visited the office more frequently.  (*See* Appx0062-0063).

The 302 also would have exposed material flaws in the Government's case. Specifically, it would have enabled the jury to at least question, if not understand, why the Government reneged on its promise during opening statements to call Wong as one of its first witnesses, (*see* Appx0080-0081), and ultimately elected to rest

---

[8] While the defense acknowledges that the 302 relates only to the Oswari-based component of the Compound Medication Scheme, that component accounted for more than 40% of the total loss amount and was the central focus of the trial.

without her taking the stand. (*See* Appx0440-0441, Appx0453). In addition, it would have rebuffed important aspects of the Government's legal theories and the charges on which it proceeded to trial. (*See*, *e.g.*, Appx0045 (Indictment, ¶ 16) ("It was further part of the conspiracy that defendant STEVEN MONACO and others ***paid and caused the payment of cash kickbacks*** and other benefits ***to defendant DANIEL OSWARI*** and others for prescriptions signed by OSWARI and filled by Compounding Pharmacy 1 and Compounding Pharmacy 2.")) (emphasis added).

More to the point, the admission of the 302 would have cast significant doubt over a case that was already hanging in the balance. As the record confirms, the jury was hung and headed toward a mistrial because a juror was unpersuaded by the biased testimony upon which the Government's presentation was predicated. (*See* Appx0685-0691). Thus, it is impossible to conclude that the independent, exculpatory statements of Wong would not have caused a different result. *See Paguio*, 114 F.3d at 935 (holding that refusal to admit exculpatory statement under Rule 804 was reversible error because a hung jury at the defendant's first trial "persuades us that the case was close and might have turned on this evidence").[9]

---

[9] The admission of the 302 also would have had a monumental impact on sentencing. By way of example, it would have nearly halved the loss amount attributable to Monaco and undermined the notion that he played an aggravating role.

## II. The District Court Erred in Imposing a 14-year Custodial Sentence.

### A. The District Court Erred in its Interpretation and Application of the Guidelines.

***Standard of Review.*** This Court "exercise[s] plenary review over a district court's interpretation of the Guidelines." *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc), *cert. denied*, 552 U.S. 848 (2007). Accordingly, a district court's "interpretation and application" of a provision of the Guidelines to the undisputed facts is subject to "de novo" review. *United States v. Bell*, 947 F.3d 49, 54 (3d Cir. 2020).

This Court reviews "factual findings relevant to the Guidelines for clear error[.]" *Grier*, 475 F.3d at 570. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal marks omitted). "If the district court makes clearly erroneous factual findings in determining the applicable Guidelines range, the resulting sentence will generally be unreasonable and a remand will be required unless either the doctrines of plain error or harmless error apply to preserve the imposed sentence." *United States v. Jimenez*, 513 F.3d 62, 85 (3d Cir. 2008).

### 1.    The District Court Erred in Interpreting, Calculating, and Applying the Loss Amount.

The loss amount was the single most determinative factor with respect to sentencing.  It alone accounted for an 18-level enhancement from a base level offense of 7 to an adjusted offense level of 25, *see* PSR, ¶ 58, and, in turn, prompted a ten-fold increase in the Guidelines range from 0 to 6 months to 57 to 71 months of imprisonment.  *See* U.S.S.G., Ch. 5, Pt. A (Sentencing Table).  Yet even though calculating a loss amount requires a "deeper analysis" before inferring a defendant intended to cause a particular loss, *United States v. Xue*, 42 F.4th 355, 361 (3d Cir. 2022), the district court failed to consider record evidence that necessitated substantial reductions in the loss amount attributable to Monaco.

First and foremost, the district court failed to consider record evidence that prescriptions written by Oswari—which, again, accounted for more than 40% of Monaco's loss amount—were medically necessary.  Oswari specifically testified that he "believe[d] . . . some of the compound medicine, was medically necessary," and that the pain medications served as an option for patients who had "tried opioids and weren't doing very well on them."  (Appx0254-0255).  Moreover, Oswari prescribed compound medications for patients of whom Monaco had no knowledge. (*See* Appx0219-0221, Appx0224-0230, Appx0236-0237, Appx0255, 0268).  The record also reflects that patient exams were conducted on, and medical necessity was implicitly determined for, certain family members and friends of Monaco who

received compound medication prescriptions, including Scott Chacker (Appx0379-0380), Sondre Chacker (Appx0389-0390, Appx0393-0394), Steven Lerner (Appx0488), Linda Lerner (Appx0481-0482), Linda Lerner's daughter (Appx0484-0485), and Leanne Norris. (Appx0389-0390).

The district court nevertheless refused to even entertain the defense's arguments as to medical necessity, holding that:

> ***It's not necessary that the Government disprove there's a medical necessity*** and all that kind of stuff in order for Mr. Monaco to be responsible for these prescriptions.

(Appx0767-0678) (emphasis added).

The law clearly provides otherwise. It is universally accepted that, "[a]s always, the burden is on the government to establish what services were not medically necessary." *United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997); *see also United States v. Kleyman*, No. 14-CR-598, 2015 WL 6739113, at *3 (D.N.J. Nov. 4, 2015); *United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007); *United States v. Jones*, 475 F.3d 701, 705-06 (5th Cir. 2007).  In other words, the "loss" must be tied to criminal conduct.  *See United States v. Schaefer*, 291 F.3d 932 (7th Cir. 2002) (reversing loss calculation where court failed to make explicit findings that all losses were result of criminal conduct); *United States v. Dickler*, 64 F.3d 818, 830-31 (3d Cir. 1995) (agreeing with other circuits that relevant conduct for loss calculation must be criminal); *United States v. Peterson*, 101 F.3d 375, 385

(5th Cir. 1996) (if the relevant conduct is not limited to conduct that is criminal, a defendant could be more severely punished by "having their guideline range increased for activity which is not prohibited by law but is merely morally distasteful or viewed as simply wrong by the sentencing court").

Additionally, the district court disregarded the absence of any evidence that Monaco was involved in the separate scheme between Zappala, Goldis, and Jones, which accounted for approximately 43% ($2,030,243) of the total loss amount. Goldis testified that he dealt with and took instructions from only Zappala, and "[did] not recognize" Monaco in the courtroom. (Appx0398, Appx0401-0407, Appx0411). Meanwhile, Zappala admitted to having paid Jones to "get prescriptions signed," (Appx0126-0127, Appx0160), and to obtaining patient information from sources independent of Monaco without Monaco's knowledge and concealing his payments to Goldis by labeling them as fees for speaking engagements. (*See* Appx0158-0159). But despite acknowledging that Monaco did not receive a dime from the Goldis scheme (*see* Appx0767 (Monaco "wasn't getting paid")), the district court attributed the entire related loss amount to Monaco merely because "it was reasonably foreseeable to Mr. Monaco that Mr. Zappala was submitting prescriptions on his own to Dr. Goldis[.]" (Appx0767). Such a tenuous rationale does not suffice.

## 2.    The District Court Erred in Applying a 4-Point Aggravating Role Enhancement.

The imposition of a four-level aggravating role enhancement under U.S.S.G. § 3B1.1 with respect to the Compound Medication Scheme represents another instance in which the district court abused its discretion by overstating the record evidence and Monaco's role in the alleged schemes. Monaco was not "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." PSR, ¶ 104.

Although the Guidelines do not define "organizer," "leader," "manager," or "supervisor," this Court recently clarified these roles and held that the multi-factor test in the commentary is "not controlling." *United States v. Adair*, 38 F.4th 341, 350-54 (3d Cir. 2022). In so holding, this Court explained that an "'organizer' is a person who generates a coherent functional structure for coordinated criminal activity," while a "'leader' is a person is a high-level directive power or influence over criminal activity." *Id.* at 354. "[A] defendant who meets the definition of an 'organizer' or 'leader' qualifies for the four-point enhancement." *Id.* A "manager" or "supervisor" are persons "with oversight over operations or other persons." *Id.* at 352 n.16-17. They are subject to a three-point enhancement. *See* U.S.S.G. § 3B1.1.

The record evidence firmly established that Zappala, not Monaco, was the "organizer" or "leader" of the Compound Medication Scheme. By way of example Zappala: (i) was the "point person" with Heritage, the predecessor to Rexall

(Appx0096); (ii) negotiated a deal to sell for Rexall directly with Hickman, the "master distributor," and recruited Monaco to work underneath him (Appx0110-0115, Appx0154-0155, Appx0160); (iii) retained the entire commission for prescriptions he originated and kept "half" the commission for prescriptions originated by Monaco (Appx0101); (iv) came up with the idea to give Rabinowitz money for prescriptions (*see* Appx0218-0219); (v) advised Oswari, Rabinowitz, and Wong regarding what compound medications would yield the greatest return (*see* Appx0106, 0108); (vi) organized an entirely separate scheme with Goldis without Monaco's knowledge and concealed his payments to Goldis in the form of fees "for lectures that did not happen" (Appx0158-0159, Appx0411, Appx0413-0414, Appx0524); (vii) paid two others doctors with whom Monaco had no involvement—Drs. Alexander and Hassam—under sham "rent" and "speaker" arrangements (Appx0158-0160); (viii) was the entry point and conduit for payments to the participants (*see* Appx0438 (Zappala's LLC paid out approximately $1 million to "other entities" similar to the LLC owned by Monaco)); and (ix) ultimately received approximately five times more in commissions than Monaco.[10]  (*See* Appx0436-0439).

---

[10] Had Wong's 302 been admitted, the record would have further reflected that Zappala made payments to Wong and Rabinowitz, frequented Oswari's office, and provided the staff with pre-filled scripts for Oswari's signature.  (Appx0061-0063).

This evidence supports the conclusion that it was Zappala, not Monaco, who generated a coherent functional structure for coordinated criminal activity and had high-level directive power or influence over the activity. *See Adair*, 38 F.4th at 354. Even the Government could not help but concede in its closing that Zappala was a "leader."[11]  (Appx0676).  As such, the district court's application of the four-point enhancement was clear error.

### 3.    The District Court Erred by Applying a 2-Point Sophisticated Means Enhancement.

The Guidelines "prescribe a two-point enhancement if an offense 'involve[s] sophisticated means ***and*** the defendant intentionally engaged in or caused the conduct constituting sophisticated means.'" *United States v. Smith*, No. 19-2063, 2021 WL 4129523, at *3 (3d Cir. Sept. 10, 2021) (emphasis in original). "Sophisticated means" means "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. 9(B).  In other words, the offense conduct of the individual defendant being sentenced must be demonstrative of a "'greater level of planning or concealment than a typical fraud of its kind.'" *Smith*, 2021 WL 4129523, at *3 (quoting *United States v. Fountain*, 792 F.3d 310, 319 (3d Cir. 2015)).

---

[11] Despite identifying Zappala as a "leader," the Government sought only a three-point aggravating role enhancement at the time of his sentence. *See United States v. Zappala*, No. 17-cr-416 (D.N.J.), ECF No. 4 (Zappala Plea Agreement).

The Application Notes suggest that the use of fictitious entities, corporate shells, and offshore financial accounts are indicative of sophisticated means. *See id.* Courts may also consider factors like "the duration of the scheme, the number of participants, the use of multiple accounts, and the efforts to avoid detection." *Fountain*, 792 F.3d at 319.

Here, there was not a sufficient factual basis in the record to distinguish Monaco's offense conduct with a "typical" healthcare fraud and justify a two-level enhancement under U.S.S.G. § 2B1.1(b)(10).  While the district court focused on the presence of "three separate schemes"—"[t]he Oswari scheme, the Chacker scheme, and the Goldis-Jones-Mansor scheme"—there is no evidence in the record that Monaco participated in the Goldis scheme and the other schemes lack the hallmarks of sophistication.   Monaco utilized a single, New Jersey-based limited liability company, not "multiple" or "offshore" financial accounts, to receive and disburse funds.  (Appx0437-0439).  The commissions issued to Monaco's entity were not concealed but rather publicly recorded on 1099s, and Monaco paid tax on those monies.  (*See* Appx0556).  And though the Government blindly contended that all the medications prescribed were medically unnecessary, the patients received compounds that Oswari believed would provide some benefit.  (*See* Appx0254-0255).   More to the point, the offense conduct—payments in exchange for prescribing compounding medications—is representative of the most common type

of healthcare fraud. *Smith*, 2021 WL 4129523, at *3. That is precisely why the

Government did not seek a sophisticated means enhancement in its plea agreements

Goldis, Jones, Chacker, Oswari, *or* Zappala. (Appx0736).

For these reasons, the Government failed to meet its burden and the district

court abused its discretion in applying the enhancement to only Monaco. *See United*

*States v. Kirschner*, 995 F.3d 327, 336-37 (3d Cir. 2021) ("[T]he government *always*

bears the burden of proving by a preponderance of the evidence that the facts support

a sentencing enhancement, and the defendant does not have to prove the negative to

avoid the enhance sentence[.]") (citations and quotations omitted) (emphasis in

original).

### B. The Sentence Imposed Is Procedurally and Substantively Unreasonable.

***Standard of Review.*** Appellate review of the reasonableness of a sentence is

a two-stage process. *See United States v. Tomko*, 562 F.3d 558, 567-68 (3d Cir.

2009) (en banc). It begins by "ensur[ing] that the district court committed no

significant procedural errors," such as "failing to consider the § 3553(a) factors" or

"failing to adequately explain the chosen sentence[.]" *Id.* (quoting *United States v.*

*Gall*, 552 U.S. 38, 51 (2007)). "If a district court's procedure passes muster, '[this

Court] then, at stage two, consider[s] its substantive reasonableness." *Id.* (quoting

*United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008)). The abuse-of-

discretion standard applies to procedural and substantive reasonableness inquiries.

*See* Gall, 552 U.S. at 50.

### 1.   The District Court Abused its Discretion by Refusing to Meaningfully Consider § 3553(a)(6).

"A sentence is procedurally unreasonable when the court does not meaningfully consider a sentencing factor." *United States v. Quay*, 841 F. App'x 388, 390-91 (3d Cir. 2021) (citing *Tomko*, 562 F.3d at 567-68). A sentencing court's "[f]ailure to give meaningful consideration to any [colorable sentencing] argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing." *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) (quoting *United States v. Begin*, 696 F.3d 405, 411 (3d Cir. 2012)).

Through their memorandum and at the sentencing hearing, Monaco's former counsel argued extensively that a sentence significantly below the Guideline range of 17.5 to 22 years calculated in PSR was necessary "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In support of that argument, Monaco's counsel cited to dozens of cases from the District of New Jersey and other federal districts for the propositions that (i) individuals charged with similar conduct had recently received sentences well below five years following guilty pleas, (ii) sentences between 20 to 36 months have been imposed in large healthcare fraud schemes, (iii) even a sentence of 5 to 7 years would be disproportionate to Monaco's

conduct, and (iv) sentences approaching or exceeding 15 years are warranted for only the most serious and harmful offenses. (*See* Appx0927-0929).

But the district court refused to consider that argument at all solely because it did not "have the benefit of having presided at those trials," "have the benefit of having read the presentence investigation reports in those cases," "know what the offenses levels [or] Criminal History Categories were," or "know the facts of those cases." (Appx0801-0802).

That is reason enough to remand for resentencing. "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) (citing *United States v. Seligsohn*, 981 F.2d 1418, 1428 (3d Cir. 1992)); *see also United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("[T]he kind of 'disparity' with which § 3553(a)(6) is concerned is unjustified difference across judges (or districts) rather than among defendants to a single case.").

## 2.    The Sentence Imposed Is Substantively Unreasonable.

A remand and resentencing are warranted also because "no reasonable sentencing court would have imposed the same sentence on [Monaco] for the reasons the district court provided." *Tomko*, 562 F.3d at 568. A 14-year custodial sentence for a first-time, non-violent offender is far "greater than necessary," 18 U.S.C. §

3553(a), and grossly disproportionate by every conceivable measure. *See United States v. Olhovsky*, 562 F.3d 530, 552 (3d Cir. 2009), *as amended* (May 5, 2009) (explaining that the "'overarching principle' of parsimony that Congress included in § 3553 directs the court" to impose a sentence that is sufficient "but not greater than necessary").

Had the district court considered Section 3553(a)(6) and the arguments presented on Monaco's behalf, as it should have, the disparity resulting from the sentence imposed would have been glaringly obvious and could have been avoided. As Monaco's counsel underscored, his sentence is ***three times to five times greater*** than sentences imposed on defendants convicted after trial for far more egregious fraudulent conduct. (*See*, *e.g.*, Appx0850 (*United States v. Akpan*, No. 4-cr-1160 (S.D.N.Y.) (durable medical equipment supplier was sentenced to 3 years in prison following trial for healthcare fraud scheme where he fraudulently billed Medicare/Medicaid for equipment that was never requested by or provided to the patients)); (Appx0856 (*United States v. Volkes*, No. 14-cr-574 (E.D. Pa.) (high-level executive at reverse pharmaceutical distributor was sentenced to 5 years in prison after trial for fraud that spanned 16 years and involved the theft of approximately $100 million from over 13,000 clients)).

A 14-year custodial sentence also is on par with sentences imposed for the most serious and harmful offenses. *See*, *e.g.*, *United States v. Milchin*, No. CR 17-00284-1, 2020 WL 4475902, at *2 (E.D. Pa. Aug. 4, 2020) (168 month sentence of defendant convicted of offenses including health care fraud was "earned" by the defendant "leading a conspiracy to flood the community with highly addictive opiates," preying on drug-addicted individuals, and committing crimes which "likely led to several drug overdoses"); (Appx0864 (*United States v. Kwasnik*, No. 17-cr-52 (D.N.J.) (attorney sentenced to 18 years on money laundering conviction for fraudulently depleting client trust accounts totaling $13.2 million between 2008 and 2011)); (Appx0871 (*United States v. Fini*, No. 19-cr-75 (D.N.J.) (man sentenced to nearly 20 years for receiving over 1,000 images and videos of child sexual abuse over two-year period)); (Appx0878 (*United States v. Rivera*, No. 17-cr-50 (E.D.N.Y.) (Latin King gang member sentenced to approximately 18 years for murder of student basketball star)); (Appx0885 (*United States v. Kluger*, No. 12-cr-213 (D.N.J.) (attorney sentenced to 12 years for his participation in "one of the longest-running insider trading schemes ever prosecuted," where he made millions of dollars from insider trading by passing along to a trading friend confidential information he obtained from his position at various law firms and concealed the

scheme through the use of throwaway phones)).[12]

The disparity is more apparent and pronounced when Monaco's sentence is compared to the sentences imposed on his co-conspirators. *See Parker*, 462 F.3d at 278 ("[A] sentencing court may reasonably consider sentencing disparity of co-defendants in this application of [the § 3553(a)] factors."). While Monaco acknowledges that there are material distinctions between him and his co-conspirators, his sentence is as nearly ***fifteen times greater*** than the sentences imposed on Oswari and Goldis, who, as licensed physicians, made the ultimate decision to issue the scripts and caused substantial losses. The loss amount attributed to Oswari ($1,905,812.06), (*see* PSR, ¶ 52(b)), was nearly half the amount attributed to Monaco, yet Oswari was sentenced to only 15 months in prison. (*See* Appx0831). Likewise, the loss amount attributed to Goldis was nearly $1 million ($992,326.62), (*see* PSR, ¶ 52(c)), and he was sentenced to just 10 months in prison. (*See* Appx0824).

A comparison of Monaco's sentence to the sentence recently imposed on Zappala brings the gross disproportion and corresponding injustice into even sharper focus. There are admittedly material differences between Monaco and Zappala with

---

[12] *See* United States Attorney's Office, District of New Jersey, *Lawyer Gets Record Prison Sentence – 12 Years – In Insider Trading Scheme That Used Information Stolen From Preeminent Law Firms* (June 4, 2012), available at: https://www.justice.gov/archive/usao/nj/Press/files/Kluger,%20Matthew%20and%20Bauer,%20Garrett%20Sentencing%20News%20Release.html

respect to sentencing, including that Zappala received credit for his acceptance of responsibility and his cooperation.

But they share *the same exact loss amount* ($4,692,945.30) (*see* PSR, ¶ 52(e)), which, for Monaco, resulted in an 18-level enhancement. (*See id.* ¶¶ 52-53, 88, 99-100). Moreover, there is substantial record evidence that Zappala's conduct was more egregious and extensive that Monaco. By way of example, the record demonstrates that Zappala:

- negotiated the ability to sell Rexall medications directly with the Hickman, the "master distributor," and hired Monaco to work underneath him (Appx0110-0115, Appx0154-0155, Appx0160);

- paid Monaco only "half" the commission for prescriptions Monaco originated but kept the entire commission for prescriptions that he originated (Appx0101);

- researched what supplements and insurance plans paid the most (*see* Appx0103);

- engaged in separate schemes with Goldis, Hassman, and Alexander (*see* Appx0155-0161); and

- earned five times as much as Monaco in commissions related to the schemes at issue in this case (Appx0437-0439) (approximately $1.5 million compared to "just under $350,000" paid to Monaco's entity).

At the very least, Monaco and Zappala had, as the district court acknowledged, "equally important roles." (Appx0751).

Nevertheless, the district court sentenced Zappala to 5 years of *probation*.

(Appx0845). That is, despite playing at least "equally important" roles and allegedly causing the same exact loss amount, Monaco will be spending the next 14 years in a federal penitentiary while Zappala will serve roughly one-third of that time as probation and be confined to the comforts of his own home for just 12 months. No amount of cooperation credit or other distinguishing considerations can justify such a monumental disparity.[13]

The law and the interests of justice demand that Monaco's sentence be vacated and that the matter be remanded for re-sentencing.

---

[13] Appellate courts have vacated similarly lenient sentences of white-collar defendants in fraud cases, even where the defendants have pled guilty and cooperated with the government. *See, e.g., United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014) ("In a number of opinions—some involving defendants who provided substantial assistance to the government—we have explained that general deterrence is an important factor in white-collar cases, where the motivation is greed. In those same opinions, we have set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others.").

## <u>CONCLUSION</u>

For all the foregoing reasons, this Court should vacate the judgment of conviction and remand for a new trial, or, alternatively, vacate the sentence and remand for re-sentencing.

Respectfully submitted,

*/s/ Philip Morrow*
Eric T. Kanefsky, Esq. (NJ Atty ID: 024292002)*
Kevin J. Musiakiewicz, Esq. (NJ Atty ID: 035801997)*
Philip Morrow, Esq. (NJ Atty ID: 296162019)
**CALCAGNI & KANEFSKY LLP**
One Newark Center
1085 Raymond Blvd., 14th Floor
Newark, New Jersey 07102
T. 862.397.1796
eric@ck-litigation.com
*Attorneys for Appellant Steven J. Monaco*

*\*Applications for admission forthcoming*

June 23, 2023

## COMBINED CERTIFICATIONS

1.      This brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B)(i), because it contains 12,309 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5), (6), because it has been prepared in a proportionally spaced typeface using Word for Microsoft Office 365 in 14-point Times New Roman type style.

2.      Philip Morrow, one of the attorneys whose name appears on this brief, is a member of the bar of this Court.

3.      The text of this electronic brief is identical to the text in the paper copies.

4.      A virus detection program, (the Internxt Virus Scanner), has been run on the electronic version of this brief, and no virus has been detected.

5.      By filing this brief, the appendix, and related papers electronically, I will be causing all counsel of record to be severed electronically through this Court's electronic-filing system.


Dated: June 23, 2023                    */s/ Philip Morrow*
                                        Philip Morrow, Esq.