No. 22-2895

IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————————

UNITED STATES OF AMERICA

v.

STEVEN MONACO,
Appellant

Appeal from a Final Judgment in A Criminal Case of the United
States District Court for the District of New Jersey (Crim No. 19-
716). Sat Below: Honorable Robert B. Kugler, U.S.D.J.

———————————————————————————————

BRIEF FOR APPELLEE

———————————————————————————————

VIKAS KHANNA
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515
Attorney for Appellee
970 Broad Street
Newark, New Jersey 07102-2535

On the Brief:

STEVEN G. SANDERS
Assistant U.S. Attorney
(973) 645-2846

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

TABLE OF ABBREVIATIONS.................................................................... x

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE .................................................................... 1

    I.    Monaco Leads Two Health Care Fraud Conspiracies...................... 2

        A.    The ARML Kickback Scheme ................................................. 2

        B.    The Compound Prescription Scheme ...................................... 4

                1.    Monaco And Zappala Bribe Oswari To Write 300 Prescriptions For Compound Medications.................... 6

                2.    Monaco Ropes His Family Into The Scheme ................ 7

    II.    Procedural History ........................................................................ 10

        A.    The Indictment. ................................................................... 10

        B.    The Trial. ............................................................................. 11

                1.    The Evidentiary Ruling .............................................. 12

                2.    The Defense Case. ..................................................... 13

                3.    The Deliberations And Verdict ................................... 14

        C.    The PSR ............................................................................... 15

        D.    Sentencing Submissions. ..................................................... 16

        E.    Sentencing .......................................................................... 17

SUMMARY OF ARGUMENT ................................................................. 21

ARGUMENT ........................................................................... 22

I.  Judge Kugler Did Not Abuse His Discretion By Excluding An
    FBI-302 Summarizing Julie Wong's Out-Of-Court Assertions.
    Even If He Did, Any Error Was Harmless. ................................ 22

    A.  Background........................................................................ 22

    B.  Analysis. .......................................................................... 24

        1.  Monaco Fails To Offer Any Hearsay Exception
            Covering The FBI Agent's Out-Of-Court
            Assertions. ............................................................ 24

        2.  Judge Kugler Did Not Abuse His Discretion In
            Finding That Wong Was Available. ........................... 27

        3.  The 302 Lacked Sufficient Guarantees of
            Trustworthiness. ..................................................... 32

    C.  Any Error Was Plainly Harmless............................................ 36

II. Monaco's 168-Month Sentence Is Procedurally and
    Substantively Reasonable. ...................................................... 40

    A.  Judge Kugler Did Not Clearly Err In Calculating
        The Advisory Guidelines Range ............................................ 40

        1.  Loss Amount ........................................................ 40

        2.  Aggravating Role. .................................................. 45

        3.  Sophisticated Means. ............................................. 47

    B.  Judge Kugler Did Not Commit Plain Procedural
        Error By Considering And Rejecting Monaco's
        Unwarranted Disparity Argument. ......................................... 49

    C.  Monaco Has Not Shown That His Bottom-Of-The-
        Range Sentence Is Substantively Unreasonable .................... 51

CONCLUSION ........................................................................ 55

# TABLE OF AUTHORITIES

**Cases** <u>Page(s)</u>

*Butler v. Indianapolis Metro. Police Dep't*,
    Civil No. 07-1103, 2009 WL 2092416 (S.D. Ind. July 13, 2009) ............... 30

*Copperweld Steel Co. v. Demag-Mannesmann-Bohler*,
    578 F.2d 953 (3d Cir. 1978) ............................................ 25

*In re High Fructose Corn Syrup Antitrust Litig.*,
    156 F. Supp. 2d 1017 (C.D. Ill. 2001) ................................. 26

*Johnson v. Lamas*,
    850 F.3d 119 (3d Cir. 2017) ........................................... 39

*Kirk v. Raymark Indus., Inc.*,
    61 F.3d 147 (3d Cir. 1995) ............................................ 28

*Kost v. Kozakiewicz*,
    1 F.3d 176 (3d Cir. 1993) ............................................. 26

*Lippay v. Christos*,
    996 F.2d 1490 (3d Cir. 1993) .......................................... 25

*Mancini v. Northampton Cnty.*,
    836 F.3d 308 (3d Cir. 2016) .........................................26, 28

*U.S. v. Adair*,
    38 F.4th 341 (3d Cir. 2022) ........................................... 45

*U.S. v. Adames*,
    56 F.3d 737 (7th Cir. 1995) ........................................... 34

*U.S. v. Booker*,
    543 U.S. 220 (2005) ................................................... 40

*U.S. v. Boscarino*,
    437 F.3d 634 (7th Cir. 2006) .......................................... 54

*U.S. v. Bradley*,
    145 F.3d 889 (7th Cir. 1998) .......................................... 34

*U.S. v. Bright*,
    353 F.3d 1114 (9th Cir. 2004) ................................................... 44

*U.S. v. Buncich*,
    20 F.4th 1167 (7th Cir. 2021) ................................................... 50

*U.S. v. Caballero*,
    277 F.3d 1235 (10th Cir. 2002) ................................................ 32

*U.S. v. Cooper*,
    437 F.3d 324 (3d Cir. 2006) ..................................................... 49

*U.S. v. Cox*,
    54 F.4th 502 (7th Cir. 2022) ..................................................... 30

*U.S. v. Davenport*,
    775 F.3d 605 (3d Cir. 2015) ..................................................... 37

*U.S. v. Diaz-Osuna*,
    Crim. No. 13-13, 2016 WL 9450414 (S.D. Miss. Apr. 16, 2016) ............... 34

*U.S. v. Dragon*,
    471 F.3d 501 (3d Cir. 2006) ..................................................... 49

*U.S. v. Dullum*,
    560 F.3d 133 (3d Cir. 2009) ..................................................... 41

*U.S. v. Echols*,
    574 F. App'x 350 (5th Cir. 2014) .............................................. 43

*U.S. v. Edet*,
    No. 08-10287, 2009 WL 552123 (5th Cir. Mar. 5, 2009) ......................... 42

*U.S. v. Fisher*,
    502 F.3d 293 (3d Cir. 2007) ..................................................... 40

*U.S. v. Flores-Mejia*,
    759 F.3d 253 ................................................................ 40, 49, 50

*U.S. v. Fountain*,
    792 F.3d 310 (3d Cir. 2015) .................................................. 47, 48

*U.S. v. Gantt,*
  679 F.3d 1240 (10th Cir. 2012) ................................................. 51

*U.S. v. Gladden,*
  __ F.4th __, 2023 WL 5281836 (11th Cir. Aug. 17, 2023) ......................... 42

*U.S. v. Green,*
  617 F.3d 233 (3d Cir. 2010) .................................................22, 27

*U.S. v. Greenidge,*
  495 F.3d 85 (3d Cir. 2007) ..................................................... 52

*U.S. v. Greenspan,*
  923 F.3d 138 (3d Cir. 2019) .................................................... 36

*U.S. v. Grier,*
  475 F.3d 556 (3d Cir. 2007) .................................................... 40

*U.S. v. Gunter,*
  462 F.3d 237 (3d Cir. 2006) .................................................... 40

*U.S. v. Handerhan,*
  739 F.3d 114 (3d Cir. 2014) .................................................... 52

*U.S. v. Hao Sun,*
  354 F. App'x 295 (10th Cir. 2009) .............................................. 32

*U.S. v. Helbling,*
  209 F.3d 226 (3d Cir. 2000) .................................................... 36

*U.S. v. Hoffecker,*
  530 F.3d 137 (3d Cir. 2008) ................................................... 1, 6

*U.S. v. Ilarraza,*
  963 F.3d 1 (1st Cir. 2020) ..................................................... 46

*U.S. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen
& Helpers of Am., AFL-CIO,*
  803 F. Supp. 740 (S.D.N.Y. 1992) .............................................. 32

*U.S. v. Jackson,*
  467 F.3d 834 (3d Cir. 2006) .................................................... 49

v

*U.S. v. Jimenez,*
    513 F.3d 62 (3d Cir. 2008) ....................................................... 43

*U.S. v. Kemp,*
    500 F.3d 257 (3d Cir. 2007) ................................................... 38

*U.S. v. King,*
    454 F.3d 187 (3d Cir. 2006) ................................................... 52

*U.S. v. Kizzee,*
    877 F.3d 650 (5th Cir. 2017) .................................................. 30

*U.S. v. Kluger,*
    722 F.3d 549 (3d Cir. 2013) ................................................... 52

*U.S. v. Lacerda,*
    958 F.3d 196 (3d Cir. 2020) .......................................... 50, 51, 53

*U.S. v. Lessner,*
    498 F.3d 185 (3d Cir. 2007) ................................................... 51

*U.S. v. Mackey,*
    117 F.3d 24 (1st Cir. 1997) .................................................... 26

*U.S. v. Mathis,*
    264 F.3d 321 (3d Cir. 2001) ................................................... 36

*U.S. v. Musaibli,*
    Crim. No. 18-20495, 2022 WL 17832696 (E.D. Mich. Dec. 21, 2022) ....... 27

*U.S. v. Newton,*
    369 F.3d 659 (2d Cir. 2004) ................................................... 39

*U.S. v. Nucera,*
    67 F.4th 146 (3d Cir. 2023) .......................................... 27, 34, 35

*U.S. v. Olaniyi-Oke,*
    199 F.3d 767 (5th Cir. 1999) .................................................. 30

*U.S. v. Opitz,*
    704 F. App'x 66 (3d Cir. 2017) ............................................... 43

*U.S. v. Ortiz,*
    125 F.3d 630 (8th Cir. 1997) ............................................................25, 26

*U.S. v. Paguio,*
    114 F.3d 928 (9th Cir. 1997) ................................................................. 39

*U.S. v. Paladino,*
    401 F.3d 471 (7th Cir. 2005) ................................................................. 38

*U.S. v. Parker,*
    462 F.3d 273 (3d Cir. 2006) ...............................................................53, 54

*U.S. v. Rodriguez,*
    40 F.4th 117 (3d Cir. 2022) ................................................................... 46

*U.S. v. Shaw,*
    891 F.3d 441 (3d Cir. 2018) ................................................................... 39

*U.S. v. Simmons,*
    70 F.4th 1086 (8th Cir. 2023) ................................................................ 35

*U.S. v. Smith,*
    No. 19-2063, 2021 WL 4129523 (3d Cir. Sept. 10, 2021) ........................... 47

*U.S. v. Sorokin,*
    570 F. App'x 217 (3d Cir. 2014) ............................................................. 44

*U.S. v. Stadtmauer,*
    620 F.3d 238 (3d Cir. 2010) ................................................................... 33

*U.S. v. Statham,*
    581 F.3d 548 (7th Cir. 2009) ................................................................. 54

*U.S. v. Steffen,*
    641 F.2d 591 (8th Cir. 1981) ................................................................. 30

*U.S. v. Strothers,*
    77 F.3d 1389 (D.C. Cir. 1996) ............................................................... 46

*U.S. v. Tomko,*
    562 F.3d 558 (3d Cir. 2009) ................................................................... 28

*U.S. v. Tomko*,
   436 F. Supp. 2d 493 (E.D.N.Y. 2006) ..................................................... 28

*U.S. v. Vitillo*,
   490 F.3d 314 (3d Cir. 2007) ..................................................... 41

*U.S. v. Weicksel*,
   375 F. App'x 261 (3d Cir. 2010) ..................................................... 54

*U.S. v. Wilson*,
   281 F. App'x 96 (3d Cir. 2008) ..................................................... 32

*U.S. v. Wright*,
   363 F.3d 237 (3d Cir. 2004) .............................................. 31, 33

*U.S. v. Yancy*,
   725 F.3d 596 (6th Cir. 2013) ..................................................... 46

*Unicolors, Inc. v. Urb. Outfitters, Inc.*,
   686 F. App'x 422 (9th Cir. 2017) ..................................................... 29

*Upstate Shredding, LLC v. Northeastern Ferrous, Inc.*,
   Civil No. 12-1015, 2016 WL 865299 (N.D.N.Y. Mar. 2, 2016) ................ 34

*Williams v. United Dairy Farmers*,
   188 F.R.D. 266 (S.D. Ohio 1999) ..................................................... 28

*Williamson v. U.S.*,
   512 U.S. 594 (1994) ..................................................... 36

*Yith v. Maxim*,
   No. 22-15154, 2023 WL 1462838 (9th Cir. Feb. 2, 2023) ...................... 29

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ..................................................... 26

## <u>Statutes</u>

18 U.S.C. § 371 ..................................................... 11

18 U.S.C. § 1343 ..................................................... 10

18 U.S.C. § 1347 ................................................................. 10

18 U.S.C. § 1349 ................................................................. 10

18 U.S.C. § 1952(a)(2) ......................................................... 11

18 U.S.C. § 3553(a) ................................................... 18, 19, 49

28 U.S.C. § 515 ................................................................ i, 55

N.J.S.A. 2C:21-10 .............................................................. 11

## Rules & Sentencing Guidelines

Fed. R. Evid. 801(a) ............................................................ 25

Fed. R. Evid. 801(c) ............................................................ 25

Fed. R. Evid. 802 ............................................................... 24

Fed. R. Evid. 803(8)(A)(ii) .................................................... 26

Fed. R. Evid. 804 ............................................................... 27

Fed. R. Evid. 804(a)(5)(B) ..................................................... 28

Fed. R. Evid. 804(b)(3) ............................................... 22, 23, 24

Fed. R. Evid. 805 ............................................................... 25

Fed. R. Evid. 807(a)(2) ..................................................... 24, 27

Fed. R. Evid. 1101(d)(3) ....................................................... 33

U.S.S.G. § 2B1.1 ............................................................... 41

U.S.S.G. § 2B1.1(b)(1)(J) ................................................... 15, 41

U.S.S.G. § 2B1.1(b)(7)(B)(i) ................................................... 15

U.S.S.G. § 2B1.1(b)(10) ........................................................ 15

U.S.S.G. § 2B1.1(b)(10)(C) ..................................................... 47

U.S.S.G. § 3B1.1(a) ........................................................ 15, 45

U.S.S.G. § 3B1.3 ......................................................................... 16

U.S.S.G. § 3C1.1 ......................................................................... 16

U.S.S.G. § 6A1.3(a) ..................................................................... 33

U.S.S.G. § 2X1.1(a) ..................................................................... 15

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Appx | refers to the Appendix submitted by Defendant. |
| DB | refers to Defendant's Brief. |
| Dkt. | Refers to a docket entry in D.N.J. Crim. No. 19-716. |
| PSR | refers to the Presentence Report, filed under seal by the United States. |
| SAppx | refers to the Supplemental Appendix submitted by the United States. |

## STATEMENT OF THE ISSUES

I.    A.    Did the District Court properly exercise its discretion by excluding an FBI-302 summarizing statements from an available witness that lacked sufficient guarantees of trustworthiness?

B.    If not, was any error harmless where overwhelming evidence proved Defendant's guilt and the declarant's statements, even if true, were a "snowflake in a blizzard"?

II.    Is Defendant's 168-month sentence—the very bottom of the advisory Guidelines range—procedurally and substantively reasonable?

## STATEMENT OF RELATED CASES

Codefendants Daniel Oswari, Michael Goldis, and Aaron Jones pled guilty and were sentenced Dkt. 32-35, 48-53, 103-07, 175-76, 214-17. None appealed. Coconspirators Richard Zappala and Jason Chacker pled guilty and were sentenced. D.N.J. Crim. No. 17-416, Dkt. 2-5, 34-35; D.N.J. Crim. No. 19-718, Dkt. 1-5, 32-33. Neither appealed. William Hickman, with whom Zappala conspired, pled guilty and awaits sentencing. D.N.J. Crim. No 19-191, Dkt. 123-26. The United States knows of no other related cases.

## STATEMENT OF THE CASE

Defendant Steven Monaco's brief summarizes the evidence in a light most favorable to him. Indeed, "after reading his brief one might wonder what had been going on here and what he did to warrant his conviction." *U.S. v. Hoffecker*, 530 F.3d 137, 146 (3d Cir. 2008). The Government here summarizes the overwhelming evidence that proved Monaco's guilt.

## I.    MONACO LEADS TWO HEALTH CARE FRAUD CONSPIRACIES.

In 2013, Monaco was an experienced medical sales representative employed by Accu-Reference Medical Laboratories ("ARML"). SAppx166, 314-18, 354, 696-99, 1543-99. ARML tested blood and urine samples sent in by doctors. SAppx264-65, 319, 704. Between 2013 and 2015, ARML warned Monaco not to "offer, pay, solicit, or receive bribes [or] kickbacks … to or from any source," which "is a crime[.]" SAppx1430, 1437; *see* SAppx329-39; *see also* SAppx1430-31 (similar for services covered by Medicare and Medicaid). Monaco knew it was illegal to bribe doctors for referring blood samples and for writing prescriptions without examining the patient. SAppx753-54 ,1437, 1451. Yet he led two separate conspiracies that flouted the compliance training he had received and violated numerous federal criminal statutes. Monaco's misconduct caused $4.6 million in losses, while he reaped $386,000 in illicit commissions.

### A.    The ARML Kickback Scheme.

In 2013, Daniel Oswari ran a family medical practice in Hamilton, New Jersey. SAppx75, 173. As a physician, Oswari owed his patients a fiduciary duty to make correct diagnoses and offer treatment free from the influence of promised financial remuneration. SAppx173-74. Oswari breached that duty, and ultimately lost his medical license, by accepting corrupt payments from Monaco and (as set forth in Section B below) prescribing unnecessary medications at Monaco's request. SAppx175-76. He pleaded guilty to conspiring with Monaco and others to commit health care fraud and violate the Anti-Kickback statute and cooperated with the Government. SAppx176-80.

In late 2013, Monaco called on Oswari, SAppx174-75, 261-62, 699-700, proposing an illicit quid-pro-quo arrangement, SAppx180-85, 264-65. ARML would hire Dena Rabinowitz (Oswari's medical assistant) as a phlebotomist to operate a blood-draw station inside Oswari's office. SAppx180, 260-63, 700. But Rabinowitz would continue to assist Oswari with his office work, SAppx181, 263, 265, even though Monaco knew the law prohibited such arrangements, SAppx1439-40; *see* SAppx706, 753. In return, Monaco asked Oswari to refer to ARML all blood and urine samples (including for patients covered by Medicare and Medicaid), SAppx181, 250, 265, 701, even though he hadn't used ARML before, SAppx264. As Oswari explained, "I didn't have to pay [Rabinowitz's] salary, and she would help me out doing some of my office work for me." SAppx182, 265. Monaco, in turn, received a commission for each sample Oswari referred to ARML. SAppx182, 250, 755.

Both parties fulfilled their end of the corrupt bargain. On November 26, 2013, Monaco had Rabinowitz sign an employment agreement with ARML in which she agreed to provide phlebotomy services to Oswari and promised (falsely) not to perform any other services. SAppx1249-52; *see* SAppx264-68, 321-20. Rabinowitz, however, spent only 5% of her time drawing blood; she spent the other 95% performing office work for Oswari, effectively giving him a free employee. SAppx162-66, 347-48, 263, 268. In turn, between 2013 and 2016, Oswari referred all blood and urine samples to ARML. SAppx250, 264-65, 291. ARML submitted claims (often electronically) to insurance plans located outside New Jersey. SAppx339-40. ARML received $303,385.45 in insurance

3

payments for testing Oswari's samples, with Medicare paying 43 of those claims, SAppx342-45, 1428-29. Monaco earned $36,406.25 in commissions on top of his ARML salary. SAppx315-17, 343, 1428.

### B.    The Compound Prescription Scheme.

Richard Zappala was a laboratory representative who also marketed compound medications, SAppx64-66, *i.e.*, made-to-order pills or creams with doctor-specified ingredients, SAppx54, 187, 550-51. In 2013, Zappala worked for Pennsylvania-based Heritage Pharmaceuticals ("HP"), where he marketed prescription pain and scar creams. SAppx66-67. Zappala moved his business to Louisiana-based Central Rexall Drugs ("CRD"), which received substantially higher insurance reimbursements than Heritage and so generated higher commissions. SAppx84-86. From the start, Monaco worked with Zappala to market HP and CRD compound medicines.

Monaco and Zappala knew certain compound medicines were very lucrative. SAppx64-65. A single prescription sometimes cost approximately $20,000. SAppx576, 1949. Through trial and error, they discerned which insurance plans covered them and which ones garnered the largest reimbursement. SAppx72-75. One such plan covered New Jersey government employees and teachers, SAppx77, 83, 189, 272, 462, for which Express Scripts was the prescription benefits administrator, SAppx2154-55; *see* SAppx58-59, 584. Express Scripts would not have paid a claim had it known the prescriber had: received a cash payment to sign a prescription; never examined a patient;

or issued the prescription with no determination of medical necessity. SAppx59-60, 2154-55.

Between 2013 and 2016, Monaco conspired with Zappala to obtain medically unnecessary prescriptions, often by bribing doctors and patients. SAppx64-96.[1] That led Express Scripts to make **$4,692,945.30** in unnecessary insurance reimbursements. SAppx59-60, 574-78, 2049, while netting Zappala $2,378,628.91 in commissions, SAppx2117, 2122. Of that amount, Zappala paid Monaco **$347,557.92**, SAppx2125, per their commission-splitting agreement, which allowed Zappala to keep 100% of the commission he himself generated, SAppx67-68, 72-73, 82-86, 584-85, 589.

Zappala received his share of the CRD commissions from William Hickman. SAppx81-87, 2119. Both Zappala and Monaco set up LLCs to receive (and pay) commissions. SAppx72-73, 592-93. Thus, Zappala paid Monaco by checks drawn on a KLZ Health and Beauty LLC account and made payable to SJM/SMJ Consulting LLC. *E.g.*, SAppx1787, 1791, 1793, 1818-20, 1824-26, 1830-32, 1836-40, 1844-50, 1928-39. Zappala also created monthly reports calculating Monaco's share of the commissions. SAppx106-117, 1601-27, 1787-93, 1818-26, 1830-40, 1843-50, 1928-39.

---

[1] Zappala pleaded guilty to health care fraud conspiracy and agreed to cooperate with the Government. In his first meeting with the FBI (*i.e.*, before he was signed up as a cooperator), Zappala admitted his guilt and discussed Monaco's role. SAppx117-21.

### 1. Monaco And Zappala Bribe Oswari To Write 300 Prescriptions For Compound Medications.

Monaco first turned to Oswari, who was knee-deep in the ARML kickback scheme. SAppx72, 186-88, 270-71. Monaco offered Oswari cash to prescribe compound medications because Monaco would earn commissions from them. SAppx187, 756. Zappala and Monaco instructed Rabinowitz and Wai "Julie" Wong (the receptionist Oswari hired after ARML began paying Rabinowitz) to identify patients whose insurance would pay for compound medications. SAppx76-78, 188-90, 271-73. They were given blank prescription forms with specific compounds already checked off and instructed to select the maximum number of refills (11) to maximize Zappala's and Monaco's commissions. SAppx86-88, 93, 188-90, 192, 272-74, 2108 (blank form).

Rabinowitz and Wong brought Oswari prescription forms with patient biographical and insurance information already filled out. SAppx192. Asked why he repeatedly signed them, Oswari consistently answered, "Because I was getting paid to write these prescriptions." SAppx194. When asked by whom, he responded, "Steven Monaco." *Id.*; *accord* SAppx199, 203, 205, 207, 208-09, 210, 211, 212. Oswari signed approximately 300 prescriptions without examining the patient or making a determination of medical necessity. SAppx192-214, 1024-191.

Monaco paid Oswari and Rabinowitz approximately $20,000 in cash to write these prescriptions—$200 per prescription to be split evenly between Oswari and Rabinowitz. SAppx78-79, 189-90, 251, 254, 274. At the same time, Zappala paid Wong $100 per prescription. SAppx77-78, 300-01. Approximately

once per month, Monaco visited the office and handed Rabinowitz cash as payment for the previous month's prescriptions. Rabinowitz kept half and put the other half in an envelope in Oswari's desk. SAppx190, 236, 276-78; *see* SAppx166-67 (a third receptionist saw an envelope with cash in it).

Text messages and financial records revealed the corrupt arrangement in action. For example, on August 21, 2015, Zappala issued a check to Monaco for $24,233.93 for "July Comp." SAppx1787; *see* SAppx762, 767. Nine days later, Rabinowitz texted to ask Monaco when he was coming. Monaco responded, "Coming up today." SAppx280-81. That same day, Monaco withdrew $1490 in cash. SAppx1789. Similarly, on September 23, 2015, Zappala wrote Monaco a $28,963.72 check for "August comp." SAppx1791. Two days later, Rabinowitz asked if Monaco was coming and whether the payment would be lower than last month. Monaco responded, "Helllllll no." SAppx281-82, 2098. Monaco then withdrew $2800 in cash. SAppx281-82, 766-67, 1792; *accord* SAppx2096 (Oct. 21, 2015 [Monaco]: Spoke to rich today. Hopefully seeing him next Friday or Monday. Then I'll text u and come in.").

### 2.    Monaco Ropes His Family Into The Scheme.

Not content with the commissions from Oswari's prescriptions, Monaco Next turned to his family. He offered to pay his cousins (Jason Chacker and Lauren Meloscia) and uncles and aunts (Scott and Sondre Chacker and Steve and Linda Lerner) to receive compound medicines. SAppx375-81, 91-93, 386-

87, 463, 521. Monaco was "very excited" to learn that Sondre's[2] insurance plan covered New Jersey state employees and teachers. SAppx383, 519-20. Monaco also promised to compensate family members for inviting their friends to receive compound medications, claiming (falsely) that he was promoting a multi-level marketing program. SAppx463, 484-85, 513, 520-22.

Monaco obtained insurance information from his family and the friends they had recruited and gave it to Jason, a licensed physician's assistant who was authorized to sign prescriptions. SAppx369-70, 374-75, 381, 463, 521, 669-70, 683-85. Monaco had Jason sign prescriptions for compound medicines for people who were not his patients, whom he had not examined, or both, in exchange for a share of Monaco's commissions. Jason also agreed to receive compound medications in return for payment, at the expense of his own insurance carrier. SAppx375-77, 379-81, 1232, 2104. Jason wanted to help his cousin and best friend since childhood and stood to earn money for doing so. SAppx377, 379, 443.

In return for the money Monaco promised, Jason signed ten prescriptions for people who were not his patients and without any determination of medical necessity. SAppx380-97, 1222-31. Some of the prescriptions Monaco gave Jason bore a "Legal Note" representing that "I have reviewed my patient's medical record(s) and determine the items I have ordered are medically necessary. I verify I had a face to face examination with the above patient."

---

[2] Because three witnesses with the surname "Chacker" testified, this Brief uses their first names to avoid confusion.

SAppx2108; *see* SAppx391-92, 407, 414, 1225; *accord* SAppx88, 1205 (same for Oswari).

Monaco paid Jason in cash (which Monaco said would be untraceable), with an $1800 check made payable to Jason's wife (Lilly) in an effort to conceal its purpose, and with tickets to Philadelphia Eagles games. SAppx397-401, 600-01, 1924a, 1940, 1948. Monaco paid other relatives for receiving compound medications (or for recruiting others to do so) by checks drawn on his SJM/SMJ Consultants LLC account. SAppx472, 475-82, 529-30, 1780-86, 1808, 1915-16. Jason later paid a heavy price for his corrupt bargain, losing his license, pleading guilty, and cooperating. SAppx370-74.

To make even more money, Monaco gave his family's demographic and insurance information to Zappala, who found another corrupt medical provider (Dr. Michael Goldis) to sign prescriptions. SAppx94-101. In return for $4,000 in payments from Zappala, Goldis signed prescriptions without seeing the patients or determining medical necessity. SAppx551-58, 1232-48. (In some cases, Zappala paid Goldis's office assistant, Aaron Jones, to forge Goldis's signature, including on the prescription for Jason. SAppx97-98, 451, 552, 1232.) Goldis lost his license, pleaded guilty to making false statements in health care matters, and cooperated. SAppx559-63.

Zappala and Monaco became nervous about a brewing investigation. Monaco took two steps to cover their tracks. First, he convened a meeting hosted by Scott and Sondre at which he touted the medications as part of a multi-level marketing opportunity and had Meshell Mansor, a nurse

practitioner, sign prescriptions after physically examining those present (who, again, were paid to receive prescriptions). SAppx101-03, 464-66, 522-23, 666-67, 683-84. But Mansor's prescriptions duplicated those written for the same patients just one month earlier. *Compare*, *e.g.*, SAppx1234 (supplement for Scott that Goldis signed on May 4, 2015), *and* SAppx1228 (supplement for Steven Lerner that Jason signed on May 29, 2015), *with* SAppx2104 (supplement for Scott that Mansor signed on June 4, 2015), *and* SAppx2106 (supplement for Steven Lerner that Mansor faxed on June 4, 2015).

Second, Monaco called Scott and Sondre and asked to meet them *in* person, concerned the FBI might be monitoring his calls. Monaco asked them to stress the multi-level marketing angle. SAppx484, 533-34.

## II. PROCEDURAL HISTORY

### A. The Indictment.

A federal grand jury returned a 33-count indictment naming Monaco, Oswari, Goldis, and Jones. SAppx2157. Monaco was named in 18 of those counts. Count 1 charged that Monaco, Goldis, Oswari, and Jones conspired with each other between 2014 and 2016 to commit wire fraud and health care fraud, contrary to 18 U.S.C. §§ 1343, 1347, in violation of 18 U.S.C. § 1349. SAppx2157-65. Counts 2-9 and 14 charged Monaco with health care fraud, in violation of 18 U.S.C. § 1347. SAppx2165-66. Counts 15-22 charged Monaco with wire fraud, in violation of 18 U.S.C. § 1343. SAppx2167-68. Count 23 (the only count arising from the ARML kickback scheme) charged that Monaco conspired with Oswari between 2013 and 2016 to pay or receive kickbacks in

connection with health care services covered by Medicare and Medicaid,

contrary to 42 U.S.C. § 1320a-7b(b)(1)(A), 7b(b)(2)(B), and to use the facilities

of interstate commerce to promote commercial bribery, contrary to N.J.S.A.

2C:21-10 and 18 U.S.C. § 1952(a)(2), in violation of 18 U.S.C. § 371.

SAppx2168-73. Monaco pleaded not guilty. Dkt. 7.

### B.    The Trial.

A jury trial commenced on April 5, 2022, before the Honorable Robert B.

Kugler, U.S.D.J. SAppx1. Only Count 23 pertained to the ARML Kickback

Scheme. The Compound Medicine Scheme supported the other 17 counts—a

conspiracy count (Count 1) and the 16 substantive counts depicted below:

| Oswari | | | | |
|---|---|---|---|---|
| Count | Date | Patient | Pharmacy | Record Cites |
| 2 | 3/23/15 | Maria Rabinowitz | CRD | SAppx209-10, 1007 |
| 3 | 3/16/15 | Gary Rabinowitz | HP | SAppx211, 285-86, 1008 |
| 4 | 5/1/2014 | Todd Jesse | CRD | SAppx212, 1009 |
| 5 | 12/23/2015 | J.S. | CRD | SAppx199-200, 1010 |
| 6 | 7/29/2015 | M.R. | CRD | SAppx88, 205-06, 1011 |
| 7 | 12/10/2015 | M.R. | CRD | SAppx205-06, 1012 |
| 8 | 7/28/2015 | V.J. | CRD | SAppx206-07, 1013 |
| 19 | 12/29/2015 | Maria Rabinowitz | CRD | SAppx210-11, 1014 |
| 20 | 12/29/2015 | Gary Rabinowitz | CRD | SAppx211-12, 1205 |

| Jason | | | | |
|---|---|---|---|---|
| Count | Date | Patient | Pharmacy | Record Cites |
| 15 | 6/1/2015 | Esha Kaplan | CRD | SAppx393-94, 432, 450-51, 1222 |
| 16 | 6/1/2015 | Linda Lerner | CRD | SAppx387-88, 674-75, 1223 |
| 17 | 6/1/2015 | Seth Diamond | CRD | SAppx394-95, 1224 |
| 18 | 6/29/2015 | Steve Lerner | CRD | SAppx388-91, 688-90, 1225 |

| Goldis | | | | |
|---|---|---|---|---|
| Count | Date | Patient | Pharmacy | Record Cites |
| 14 | 6/1/2015 | Leann Norris | CRD | SAppx106, 557-58, 1224 |
| 21 | 7/28/2015 | Scott Chacker | CRD | SAppx104, 473-74, 553-54, 1235 |
| 22 | 12/2/2015 | Scott Chacker | CRD | SAppx104-05, 477-78, 554-55, 1236 |

The evidence supporting Count 3 was particularly damning. Rabinowitz had Oswari sign prescriptions for compound medications for her parents, neither of whom was Oswari's patient. SAppx211, 282, 286-87; *see* SAppx2098 (Monaco texts Rabinowitz, "Did u p[u]t in for your mom and dad[?]"). The prescription Oswari signed for her father (Gary) had the words "stretch marks" written in the diagnosis field. SAppx1008. Although Rabinowitz's father did not have stretch marks, she wrote those words "[b]ecause Steve said that was the only diagnosis that would cover that particular cream." SAppx286, 299.

### 1. The Evidentiary Ruling.

Just before the Government rested, Monaco asked to have Julie Wong, whom the Government had decided not to call, SAppx604-05, declared

unavailable so he could introduce a written summary of the FBI's interview of her, SAppx611-18; *see* Appx0061 (FBI-302). Monaco claimed statements attributed to Wong in the 302 tended to impeach Rabinowitz's and Zappala's testimony that Monaco paid Rabinowitz. SAppx612, 623, 628. After hearing testimony on defense counsel's paltry efforts to subpoena Wong, SAppx629-38, and argument from counsel, SAppx638-43, Judge Kugler declined to admit the 302, SAppx643-46; *see infra* Argument, Point I.

### 2.    The Defense Case.

Monaco called several character witnesses, SAppx656-63, called the Lerners, SAppx663-691, and also testified, SApppx692-795. With respect to the ARML Kickback scheme, he claimed he told Rabinowitz and Oswari that Rabinowitz could not perform office work for Oswari and did not know they had ignored his instructions. SAppx706, 715. He insisted he never intended to break the law, denied bribing Oswari, and called Oswari a liar. SAppx752-53, 760. As for the Compound Medicine scheme, Monaco claimed Oswari, Jason, and Zappala all lied in an effort to seek leniency, even though they truthfully admitted their own misconduct, SAppx755, 759-60, 783, 787-88.

Significantly, Monaco *admitted* he paid Rabinowitz to identify patients amenable to compound medications, claiming those payments were one-off rewards or bonuses, not bribes. SAppx722-24. But when confronted with text messages and financial records, Monaco admitted he told Rabinowitz he was waiting for Zappala to pay him before paying Rabinowitz. SAppx761-70. Monaco denied that the payments were tied to the number of prescriptions

written while simultaneously claiming he wanted to see how they had done the previous month before paying Rabinowitz. SAppx764-65. As Monaco put it, "I didn't pay Dena every month, but if we did better, what's wrong with giving her a little bit more for helping me remind Dr. Oswari[?]" SAppx765. Monaco refused to admit Rabinowitz performed office work for Oswari (in violation of ARML's compliance policies), despite his having paid her to "be his eyes and ears" in Oswari's office on compound medications. SAppx756-57.

### 3.    The Deliberations And Verdict

The jury retired to deliberate on April 13, 2022, at 3:10 p.m. SAppx965. At 2:35 p.m. the next day, the jury announced it could not reach unanimous agreement and asked how long it had to deliberate if one juror refused to analyze the evidence "because there are plea agreements." SAppx971. Without objection, Judge Kugler reread the part of his instructions about jurors' duty to deliberate. SAppx975 (largely quoting SAppx869). Half an hour later, the jury again announced it could not reach agreement because of the actions of a single juror who was "not using an open mind at all." SAppx976. After interviewing the foreperson privately, Judge Kugler reported that the jury apparently had reached unanimous agreement on one count but that the juror singled out in the prior notes, who seemed to be deliberating properly, would not change his mind. SAppx979. Judge Kugler rejected Monaco's request to take a verdict on one count and declare a mistrial on the rest and, instead, instructed the jury to continue deliberations, which had lasted only a single day. SAppx982-93.

The jury returned to deliberate at 4:10 p.m. At 4:45 p.m., the jury announced that it would like to continue deliberating the following Tuesday. SAppx983. Judge Kugler then excused a juror (not the one who was singled out in the first jury note) who had preexisting vacation plans, substituted in an alternate, and instructed the jurors they would have to begin their deliberations anew when they returned the following week. SAppx984-85.

By the time the jury returned the morning of Tuesday April 19, 2022, a second juror (again, not the one who was singled out in the first jury note) was excused due to a death in the family. After seating a second alternate, Judge Kugler instructed the jury to begin deliberating anew. SAppx989-90. The newly constituted jury retired to deliberate at 9:08 a.m. SAppx990. Two hours later, it unanimously convicted Monaco on all counts. SAppx990-1001, 2179-96.

### C.    The PSR

Using the 2021 Guidelines Manual, the Probation Office calculated Monaco's advisory Guidelines range as follows:

| | |
|---|---|
| **Base Offense Level**<br>[U.S.S.G. §§ 2X1.1(a) & 2B1.1(a)(1)] | 7 |
| **Loss of $ 4,692,945.30**<br>[U.S.S.G. § 2B1.1(b)(1)(J)] | +18 |
| **Loss to a government health insurance<br>program exceeding $1 million**<br>[U.S.S.G. § 2B1.1(b)(7)(B)(i)] | +2 |
| **Use of sophisticated means**<br>[U.S.S.G. § 2B1.1(b)(10)] | +2 |
| **Role in the offense**<br>[U.S.S.G. § 3B1.1(a)] | +4 |

| | |
|---|---|
| **Abuse of Trust/Use of special skill** [U.S.S.G. § 3B1.3] | +2 |
| **Obstruction of Justice** [U.S.S.G. § 3C1.1] | +2 |
| **Total Offense Level:** | **37** |

PSR ¶¶ 99-107, 121.[3] With a Criminal History Category of I, Monaco's advisory Guidelines range was 210 to 262 months' imprisonment. PSR ¶ 157. Monaco lodged objections to these calculations, which the Probation Office largely rejected. PSR at pp.45-47.

### D. Sentencing Submissions.

Monaco contested the loss amount on two grounds: (1) there was evidence at trial that a few of the prescriptions, even if written in return for corrupt payments, were medically necessary, and (2) Zappala was solely responsible for losses from Dr. Goldis's prescriptions. Appx0907-08. Monaco also reraised his objections to the other enhancements. Appx0900-07, 910-12. He requested a large downward variance from the advisory Guidelines range, Appx0913-30, arguing that "[e]ven a sentence of five to seven years would be disproportionate to Mr. Monaco's conduct relative to other cases," Appx0928.

The Government defended the PSR's Guidelines recommendations. SAppx2197. It argued that all insurance payments made as a result of the scheme constituted "loss" under § 2B1.1(b)(1) given trial evidence showing the prescriptions were written without regard to medical necessity and the

---

[3] This chart focuses solely on the Compound Prescription Scheme (Counts 1-8 and 14-22), which alone drove the final offense level and is the exclusive focus of Monaco's sentencing claims. DB40-47.

undisputed trial evidence proving Express Scripts would not have paid a claim had it known the prescriber had been paid to write it. SAppx2208-14 (citing SAppx2155). The Government defended the other enhancements, too. SAppx2214-30. And the Government asked for a sentence within the advisory Guidelines range. SAppx2230-42.

### E.    Sentencing

On October 3, 2022, Monaco appeared for sentencing. Appx0724. Judge Kugler overruled Monaco's challenges to the loss amount. Pointing to trial proofs that Express Scripts would not have paid claims for prescriptions had it known they resulted from corrupt payments, Judge Kugler found that all such claims were part of the loss. And he rejected Monaco's insistence on an offset for the few prescriptions for which there was testimony that a prescription might have benefited the patient. Appx0730-31, 0767-68. Judge Kugler also agreed with the Government that Monaco both qualified for a four-level aggravating role enhancement, Appx0751-52 and merited a two-level increase for obstruction of justice for his willful perjury at trial, Appx0772-74. Judge Kugler, however, agreed with Monaco that the record did not support any loss from the ARML kickback scheme, Appx0770-71, which did not affect the 18-level enhancement under § 2B1.1(b)(1)(J). And Judge Kugler sustained Monaco's objection to the two-level enhancement for abuse of trust. Appx0758. With a final offense level of 35, and Criminal History Category I, Monaco's advisory Guidelines range was 168 to 210 months' imprisonment. Appx0774, 0787.

After hearing from the Government, defense counsel, and Monaco personally, Appx0775-97, Judge Kugler discussed the 18 U.S.C. § 3553(a) factors. The PSR adequately covered the nature and circumstances of the offense. Appx0797. As for the history and characteristics of the defendant, Judge Kugler found "much positive here," given that Monaco had no criminal record, was a college graduate, and had a solid employment history. Judge Kugler also acknowledged "a very impressive outpouring of letters" from family, friends, and coworkers, that Monaco's parents were unwell, that he had a wife and two children, and that he "ha[d] not only destroyed his career," but "devastated his family," which happens in many criminal cases. Appx0798-99.

Judge Kugler rejected Monaco's claim that he was remorseful. Examining Monaco's sentencing letter and his verbal allocution, Judge Kugler found that Monaco no doubt was sorry about the consequences of his actions. "But when you come before the Court and you want the Court to believe that you're remorseful, you need to acknowledge that you've committed a serious crime. He has never done that." Appx0799; *accord* Appx0800 ("I think he understands the consequences, the severe consequences of what he did. I don't think he understands or agrees that he's committed a serious crime.").

Judge Kugler was "unimpressed with [Monaco's] volunteer work that didn't begin until three months after conviction and consists of six hours a week." Appx0800. And despite Monaco's wealth (a self-reported net worth of $2 million), Judge Kugler heard "not one word about" the money "he stole, not

18

one word about efforts to pay it back. And that's because I don't think he believes he committed a crime." *Id.*

Judge Kugler said "[t]his is a serious crime…. There were two different crimes, two different schemes. Let's be clear here, it was fraud. It was theft." *Id.* Judge Kugler acknowledged the need for specific deterrence, given Monaco's refusal to acknowledge he had committed a crime, and the "acute" need for general deterrence given that "[h]ealthcare fraud is a huge problem in this country," as evidenced by the "over 40 people guilty, hundreds more implicated who were not prosecuted" in this case alone. *Id.*

Finally, Judge Kugler rejected Monaco's unwarranted disparity argument, explaining that the other defendants in this case were not similarly situated because they "pled guilty, many with a cooperation agreement," and "have different loss amounts and other different factors that drove those sentences in those cases." *Id.* As for the defendants in the unrelated white collar cases Monaco had discussed, Judge Kugler did not "have the benefit of having read the presentence investigation reports in those cases," did not "know what the offense levels, Criminal History Categories were," and didn't "know the facts of those cases." Appx0802.

Judge Kugler believed "that a sentence within the Guidelines is necessary" given the seriousness of the case, the serious crimes, and the need for specific and general deterrence. Appx0802. Judge Kugler sentenced Monaco to 168 months' imprisonment on Counts 1 and 15-22 and concurrent 60-month sentences on Counts 2-8, 14, and 23. Appx0803; *see* Appx0003. Judge Kugler

also imposed three years of supervised release and ordered Monaco to pay $4,692,945.30 in restitution. Appx0803; *see* Appx0004-9.

 Final judgment was entered on October 4, 2022. Dkt. 172. Monaco filed his notice of appeal three days later. Dkt. 179; *see* Appx0010.

## SUMMARY OF ARGUMENT

Monaco brings one claim of trial error and several claims of sentencing error. Each alleges that an experienced Senior District Judge abused his discretion or clearly erred. The deferential standard of review compels affirmance.

I.    To set up his only claim of trial error, DB25-38, Monaco now portrays Wong as a "key" and "pivotal" witness, DB7. But Judge Kugler did not abuse his discretion in excluding as inadmissible hearsay a 302 recounting Wong's statements. The written 302 is itself hearsay, and Monaco advances no exception covering it. Further, Wong was not unavailable under Rule 804(a)(5), as Monaco made insufficient efforts to subpoena her. Finally, the 302 lacked sufficient guarantees of trustworthiness as it contains an agent's summary of Wong's recollection of events three years after the fact, a recollection three trial witnesses contradicted. In any event, any error in excluding the 302 was clearly harmless—or, as Judge Kugler put it, "[a] snowflake in a blizzard."

II.    Judge Kugler did not clearly err in finding a loss amount of $4.6 million given trial evidence amply supporting that amount. Nor did he clearly err in imposing an aggravating role and sophisticated means enhancements. And Judge Kugler did not commit plain procedural error in considering and rejecting Monaco's efforts to compare his case to other fraud cases. Finally, this Court presumes a within-range sentence is substantively reasonable, and Monaco hasn't come close to showing that no reasonable sentencing judge would have imposed a 168-month sentence for the reasons Judge Kugler gave.

# ARGUMENT

## I.  Judge Kugler Did Not Abuse His Discretion By Excluding An FBI-302 Summarizing Julie Wong's Out-Of-Court Assertions. Even If He Did, Any Error Was Harmless.

> **Standard of Review**: Abuse of discretion. *U.S. v. Green*, 617 F.3d 233, 239 (3d Cir. 2010).

Monaco claims Judge Kugler abused his discretion by refusing to admit an FBI-302 summarizing an interview with Julie Wong, which Monaco claimed would impeach Zappala's and Rabinowitz's general credibility and support his defense. DB25-39; *see* DB7-17. But the 302 is double hearsay: (1) the agent's written out-of-court statements regarding (2) Wong's oral out-of-court assertions. Monaco focuses only on the second layer of hearsay: what Wong apparently said. By ignoring the first layer (what the agent actually wrote), Monaco has left this Court with no choice but to affirm. Besides, Judge Kugler properly excluded the 302 under Federal Rules of Evidence 804(b)(3) and 807. Finally, any error was clearly harmless.

### A.  Background.

During its opening statement, the Government said it would call (among other witnesses) Julie Wong, who would testify she both knew of the cash payments to Oswari and received payments herself from Zappala to identify patients with insurance plans that would pay for compound medications. SAppx35-36. As discussed previously, Zappala testified that he paid Wong, whereas Monaco paid Oswari through Rabinowitz, SAppx77-79, which Rabinowitz corroborated directly, SAppx274-76, and Oswari indirectly, SAppx236.

22

Six days into trial, however, the Government decided not to call Wong, SAppx604-05, explaining that Oswari's and Rabinowitz's testimony rendered her unnecessary, SAppx619. The next day, Monaco told Judge Kugler he had "been trying for the last three weeks to subpoena" Wong, wanted her declared unavailable, and asked to introduce, for their truth, statements attributed to her in the FBI-302. SAppx611-18. According to that 302, Wong said Zappala "paid both Wong and Rabinowitz once per month." Appx0063 (cleaned up). Monaco claimed this impeached Rabinowitz's testimony that he (not Zappala) paid her monthly and Zappala's testimony that he only paid Wong (not Rabinowitz too). SAppx612, 623, 628.[4]  Monaco offered the 302 under Federal Rules of Evidence 804(b)(3) and 807. SAppx614.

Judge Kugler had defense counsel explain his efforts to contact Wong. SAppx629-32. He also conducted a Rule 104 hearing at which Monaco's process server testified about his single, unsuccessful effort to subpoena Wong on the Sunday *before* trial commenced, when Monaco thought Wong would be a Government witness. SAppx634-38. Judge Kugler then entertained argument from counsel. SAppx638-43. The Government opposed the application because Monaco had made insufficient efforts to subpoena Wong and her statements were neither trustworthy nor necessary given the trial testimony. SAppx643.

---

[4]  Contrary to Monaco's claim, DB7, the 302's content played no role in the decision not to call her. After all, in previewing her testimony, the Government hewed to those facts about which Wong was competent to testify: that Zappala paid her to get prescriptions and that Rabinowitz gave Oswari money. Wong's professed unawareness that Monaco was paying Rabinowitz is hardly exculpatory given that Wong wasn't privy to their closed-door meetings.

Judge Kugler denied the application. *Id.* As for Rule 804(b)(3), he assumed that Wong's statement was against her penal or pecuniary interest insofar as she admitted being paid for prescriptions. SAppx644-45. But he concluded Monaco had made insufficient efforts to secure her presence at trial, especially since he hadn't tried to subpoena her after learning the previous day the Government wouldn't be calling her. SAppx645. As for Rule 807, Judge Kugler did not address whether the 302 was the most probative evidence on the point for which it was offered. *See* Fed. R. Evid. 807(a)(2). Instead, he found Wong's statements lacked sufficient guarantees of trustworthiness under Rule 807(a)(1) because several other witnesses had admitted they initially lied to the FBI. SAppx646. Judge Kugler also deemed Wong's statements a "[s]nowflake in a blizzard," SAppx643, as no one disputed Zappala was the source of the payments to Rabinowitz and Wong. SAppx646; *accord* SAppx623 ("[Monaco]'s the messenger. Where is the money coming from? Follow the money.").

> **B.   Analysis.**

Judge Kugler did not abuse his discretion in excluding the 302 because (1) Monaco failed to offer a hearsay exception covering both layers of hearsay in the 302, (2) Wong was not "unavailable," and (3) the 302 lacked the requisite guarantees of trustworthiness.

> **1.   Monaco Fails To Offer Any Hearsay Exception Covering The FBI Agent's Out-Of-Court Assertions.**

"Hearsay is not admissible unless" permitted by rule or statute. Fed. R. Evid. 802. "Hearsay" is a "statement" that "(1) the declarant does not make while testifying at the current trial or hearing, and (2) a party offers in evidence

to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). A writing is a "statement" for purposes of this rule. Fed. R. Evid. 801(a). When a writing contains assertions from multiple declarants, the proponent must offer a valid hearsay exception as to each one. Fed. R. Evid. 805. The proponent of evidence that would otherwise be barred by the hearsay rule … carries the burden of proving an exception applies. *See Lippay v. Christos*, 996 F.2d 1490, 1497 (3d Cir. 1993).

An FBI-302 is a "statement" that contains out-of-court assertions from two declarants: the authoring FBI agent and the witness whose statements are summarized. *See Copperweld Steel Co. v. Demag-Mannesmann-Bohler*, 578 F.2d 953, 964 n.17 (3d Cir. 1978) ("the memorandum was in fact double hearsay[:] that of Mr. Holmquist as stated or interpreted by that of Mr. Seamans"); *see also U.S. v. Ortiz*, 125 F.3d 630, 632 (8th Cir. 1997) ("The DEA report presents an instance of double hearsay: the report itself, and the informant's statements contained in the report."). Thus, "the report is inadmissible unless each level of hearsay falls within an exception to the hearsay rule." *Ortiz*, 125 F.3d at 632 (cleaned up). Here, having sought to introduce for its truth a 302 (hearsay) to prove the truth of Wong's statements therein (also hearsay), Monaco had to offer an exception covering each layer of hearsay. He failed to do so.

Monaco focuses entirely on the "inner layer." DB25-39 (arguing that Wong's assertions satisfied two separate hearsay exceptions). But he ignores the outer layer, the assertions by the authoring agent to the effect that "this is what Wong told me." Thus, "the final link (that is, the actual preparation of the

written report some period of time later by the FBI agent) remains unsatisfied." *In re High Fructose Corn Syrup Antitrust Litig.*, 156 F. Supp. 2d 1017, 1026 (C.D. Ill. 2001), *rev'd on other grounds,* 295 F.3d 651 (7th Cir. 2002); *see Ortiz*, 125 F.3d at 632 (DEA report was inadmissible hearsay even if statements inside it satisfied an exception).

Monaco's failure to address the "outer layer" on appeal waives the issue. Fed. R. App. P. 28(a)(8)(A); *Kost v. Kozakiewicz*, 1 F.3d 176, 182-83 (3d Cir. 1993). And it provides an alternative basis for affirming Judge Kugler's decision to exclude the 302, as this Court "may affirm the District Court on any grounds supported by the record." *Mancini v. Northampton Cnty.*, 836 F.3d 308, 313 (3d Cir. 2016) (cleaned up); *see ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293-94 (3d Cir. 2012) (upholding exclusion of evidence on alternative grounds).

Besides, Monaco couldn't have offered a hearsay exception covering the report itself even had he tried. Law enforcement reports are not admissible as official records in criminal actions. Fed. R. Evid. 803(8)(A)(ii); *see Ortiz*, 125 F.3d at 632 ("We need not address the admissibility of the informant's statements under Rule 804(b)(3) because the report itself is inadmissible under Rule 803(8)(C)."); *accord U.S. v. Mackey*, 117 F.3d 24, 28 (1st Cir. 1997) ("In line with the advisory committee note to Rule 803(8), decisions in this and other circuits squarely hold that hearsay statements by third persons such as

Munichiello are not admissible under this exception merely because they appear within public records.") (citing cases).[5]

### 2. Judge Kugler Did Not Abuse His Discretion In Finding That Wong Was Available.

Monaco claims Judge Kugler should have declared Wong unavailable. DB25-33. But he fails to show an abuse of discretion, which "occurs only where the district court's decision is arbitrary, fanciful, or clearly unreasonable—in short, where no reasonable person would adopt the district court's view." *Green*, 617 F.3d at 239 (cleaned up).

Monaco invoked the "statements against interest" exception codified in Rule 804(b)(3). That applies only if the declarant is "unavailable." Fed. R. Evid. 804 ("Hearsay Exceptions; Declarant Unavailable."). Monaco also invoked Rule 807, the "residual" hearsay exception. That rule requires that the proffered hearsay be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2). A proponent cannot satisfy Rule 807(a)(2) if the declarant is available. *See U.S. v. Nucera*, 67 F.4th 146, 170 (3d Cir. 2023) ("Stroye was available to testify, and his in-court testimony about who assaulted him would

---

[5] Monaco suggests Judge Kugler, *sua sponte*, could have heard testimony from the authoring agent, DB33 n.6, but he never says that he would have called the agent to obviate the "outer layer" hearsay issue. To the contrary, he repeatedly insists the 302 itself should have been admitted. DB12, 25, 33, 34, 38 & n.9. That's improper regardless of what a different judge did in a different case for an indigent defendant whose witnesses were beyond the court's subpoena power. DB33 n.6 (citing *U.S. v. Musaibli*, Crim. No. 18-20495, 2022 WL 17832696 (E.D. Mich. Dec. 21, 2022)).

have been more probative on that point than the hearsay statement would have been. Accordingly, Stroye's statement was not admissible under Rule 807."). Thus, if Wong was available to testify, that would compel affirmance of both the Rule 804(b)(3) and the Rule 807 rulings, even though Judge Kugler did not reach Rule 807(a)**(2)**. *See Mancini*, 836 F.3d at 313 (this Court "may affirm the District Court on any grounds supported by the record").

Here, as Judge Kugler found, Wong was an available witness under the hearsay rules. "A declarant is considered to be unavailable as a witness if the declarant … is absent from the trial … and the statement's proponent has not been able, *by process or other reasonable means*, to procure … the declarant's attendance or testimony[.]" Fed. R. Evid. 804(a)(5)(B) (emphasis added). "[I]t is the proponent of the statement offered under Rule 804 who bears the burden of proving the unavailability of the declarant." *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 165 (3d Cir. 1995). And Monaco did not carry his burden.

"No precise formulation determines whether the proponent of testimony has made a good faith effort to procure the witness's live testimony." *U.S. v. Taveras*, 436 F. Supp. 2d 493, 509 (E.D.N.Y. 2006), *vacated in part on other grounds sub nom. U.S. v. Pepin*, 514 F.3d 193 (2d Cir. 2008). But at a minimum, the "proponent must … establish that reasonable efforts were undertaken to secure the declarant's attendance at the hearing," which "include service of a subpoena on the declarant to testify at the hearing … or some other showing of a good faith effort to secure the declarant's attendance." *Williams v. United Dairy Farmers*, 188 F.R.D. 266, 272 (S.D. Ohio 1999).

Judge Kugler did not abuse his discretion in finding that Monaco hadn't

"establish[ed] that reasonable efforts were undertaken to secure [Wong's]

presence." After summarizing defense counsel's pretrial effort to visit Wong's

residence and call her cell phone prior to trial, Judge Kugler explained:

> Then, the process server visited once on April 2nd. A male
> answered the door. We have no evidence whatsoever that the
> process server even asked this male who he was.
>
> ...
>
> These two attempts are not reasonable attempts to secure her
> presence at court. The defense has known since at least 2:00 p.m.
> yesterday that the government was not going to call her as a
> witness. I'm surprised that they didn't make efforts after 2:00 p.m.
> yesterday and all night long, if she's such an important witness, to
> secure her appearance here today by way of a subpoena, but they
> didn't.

SAppx644. It was hardly arbitrary or irrational for Judge Kugler to find these

efforts insufficient, especially where Monaco took no action after learning

Wong would not be called, and made no record of any efforts to subpoena her

between the time Judge Kugler ruled, SAppx646, and when Monaco rested a

day later, SAppx814; *see Unicolors, Inc. v. Urb. Outfitters, Inc.*, 686 F. App'x 422,

425 (9th Cir. 2017) (unpublished) (no abuse of discretion where "Urban failed to

use reasonable means to procure Rho's attendance; it did not seek to determine

whether Unicolors would make Rho available as a witness until two weeks

before trial and only began attempting to serve Rho four days before trial."); *cf.*

*Yith v. Maxim*, No. 22-15154, 2023 WL 1462838, at *2 (9th Cir. Feb. 2, 2023)

(unpublished) ("Appellees made a 'good-faith effort' to secure Meas's presence

by: (1) serving her with a trial subpoena at her home, (2) sending her an email about her duty to attend the trial, (3) offering to pay for her travel expenses and a *per diem*, and (4) reminding her of possible contempt sanctions for refusal to comply with the subpoena.") (citation omitted). *See generally U.S. v. Kizzee*, 877 F.3d 650, 661 (5th Cir. 2017) (finding that witness the Government had subpoenaed but declined to call was not "unavailable" under Rule 804(a)).

Judge Kugler also could have cited Monaco's failure to:

- leave a subpoena at Wong's residence and tender mileage and witness fees, SAppx634-38; *see U.S. v. Cox*, 54 F.4th 502, 515 (7th Cir. 2022) ("Cox had previously tried to serve Kilcline three times. Each attempt was technically improper due to the lack of witness and mileage fees.");

- subpoena Wong at her place of employment, even though the 302 contained her employer's address, Appx0061; *see Butler v. Indianapolis Metro. Police Dep't*, Civil No. 07-1103, 2009 WL 2092416, at *3 (S.D. Ind. July 13, 2009) (refusing to find witness unavailable under Rule 804 where "there has been no effort to locate her address or place of employment"); and

- seek an adjournment of the trial so that his process server could make additional efforts to subpoena Wong. *E.g.*, *U.S. v. Olaniyi-Oke*, 199 F.3d 767, 771 (5th Cir. 1999) (defendant sought continuance to secure witness). Although Monaco faults Judge Kugler for not taking this step on his own, DB30, n.5, "["a] party who wants a continuance must make a proper motion for one," *U.S. v. Steffen*, 641 F.2d 591, 595 (8th Cir. 1981).

Monaco's arguments to the contrary are unavailing. First, he notes that a defendant may have a lower burden than the Government given that a defendant has a Sixth Amendment right to present a defense and the Confrontation Clause does not apply when a defendant introduces hearsay. DB26-27 (citing cases). But Judge Kugler did not hold Monaco to any

heightened standard. He applied Rule 804(a)(5) and found Monaco's efforts unreasonable. That was within his discretion.

Second, Monaco claims his efforts exceeded those of the proponents in some of the cases he cites. DB28 (citing cases). But even were that true, that would not mean Judge Kugler abused his discretion. The hallmark of the abuse-of-discretion standard is that two judges reasonably may reach different conclusions on similar facts—even under Rule 807. *See U.S. v. Wright*, 363 F.3d 237, 246 (3d Cir. 2004) ("That the *Copperweld* trial judge did not commit clear error in finding that the statements at issue there possessed sufficient indicia of reliability hardly shows that the trial judge in this case erred in finding that Plant's statements did not.").

Third, Monaco emphasizes that the Government had Wong on its witness list. DB28-29. But Monaco not only tried to contact Wong two weeks before trial, SAppx629-32, he tried to subpoena her the Sunday before trial started, SAppx634-38. As Monaco *before* trial hedged against the risk the Government might not call Wong, he cannot blame the Government for his inaction after he learned she would not be called *during* trial.

Particularly offensive is Monaco's suggestion that the Government purposely waited until after a four-day break to announce it would not call Wong just to thwart his ability to subpoena her during that four-day period. DB29 ("Even assuming these representations were not purposefully misleading and strategic, they gave Monaco's trial counsel firm reason to believe that Wong's appearance had already been secured and was certain."). Never mind

that "baseless allegations of prosecutorial misconduct are not helpful to either the defendants or the profession." *U.S. v. Caballero*, 277 F.3d 1235, 1250 (10th Cir. 2002). Monaco's "firm reason to believe" cannot be squared with his effort to serve Wong with a subpoena before trial, when he believed Wong would be a Government witness. So "[his] attempt to blame the Government is an excuse for complete inaction." *U.S. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 803 F. Supp. 740, 748 (S.D.N.Y. 1992).

### 3.    The 302 Lacked Sufficient Guarantees of Trustworthiness.

The 302 also lacked sufficient guarantees of trustworthiness. *See* Fed. R. 804(b)(3)(B) and 807(a)(1); *U.S. v. Hao Sun*, 354 F. App'x 295, 304 (10th Cir. 2009) (unpublished) ("For the same reasons that Sun Liutao's statements lack sufficient trustworthiness under Rule 804(b)(3), they also lack trustworthiness under Federal Rule of Evidence 807."). *See generally U.S. v. Wilson*, 281 F. App'x 96, 99 (3d Cir. 2008) (not precedential) (listing seven factors to consider). The 302 was unreliable for the reason Judge Kugler invoked and for other reasons.

As Judge Kugler noted, witnesses in this case didn't come clean when first confronted by the Government. SAppx613, 646. That was true for **Jason**, SAppx414-15 (admitting he initially lied to the FBI and also urged Sienkiwiecz to lie); **Oswari**, *compare* SAppx2244 (302: denying he instructed others to tell people his wife was the office manager), *and* SAppx243-44 (cross-examination: doesn't recall saying that to FBI),*with* SAppx165, 169-70 (Hindermeyer testifies she received that instruction from Oswari); **Scott**, SAppx2252 (302: "When SCOTT told the FBI during a previous interview that STEVE LERNER was

paid commissions for his wife and daughter, SCOTT wasn't being truthful."); and **Sondre**, *compare* SAppx2256 (302: parroting Monaco's line that payments were only for recruiting others into the venture), *with* SAppx540-41 (testifying that payments were for prescriptions and that she didn't recall not mentioning that fact to FBI). This Court has refused to find clear error when another district judge relied on even generalized experience in refusing to admit hearsay under Rule 807. *See Wright*, 363 F.3d at 246 ("Although it is not in the best interests of persons implicated in criminal investigations to lie to their attorneys, the trial judge noted that it is not unusual for them to do so."). There certainly was no clear error here given Judge Kugler's case-specific experience.

It's irrelevant that Judge Kugler accepted a 302 as sufficiently trustworthy at an unrelated sentencing. DB30-31. Perhaps that case had no similar pattern of obstruction. Besides, the evidence rules don't apply at sentencing, Fed. R. Evid. 1101(d)(3), where evidence must satisfy U.S.S.G. § 6A1.3(a)'s low threshold. And it takes chutzpah for Monaco to lampoon Judge Kugler for finding Wong's 302 unreliable when Monaco himself urged family members to mislead the FBI. SAppx2253 (Monaco told Scott to avoid telling FBI that people got paid for prescriptions and to stress the multi-level marketing story, which led Scott to infer that "MONACO wanted [him] to lie").

But even if Judge Kugler erred in relying on this ground alone, there are other reasons why the 302 was insufficiently trustworthy. First, the 302 is an agent's summary of Wong's interview, ***not statements that Wong herself adopted***. Appx0061-65; s*ee U.S. v. Stadtmauer*, 620 F.3d 238, 267 n.35 (3d Cir. 2010)

("Several of our sister circuit courts have affirmed the exclusion, under Rule 613, of interview memoranda prepared by law enforcement that the witness had not adopted.") (citing cases); *see also U.S. v. Adames*, 56 F.3d 737, 745 & n.4 (7th Cir. 1995) (proper way to complete impeachment where witness hasn't adopted statements in 302 is to call the authoring agent to testify). Monaco should not be in a better position just because he wanted to use a 302 to impeach Zappala and Rabinowitz. *Compare U.S. v. Diaz-Osuna*, Crim. No. 13-13, 2016 WL 9450414, at *3 (S.D. Miss. Apr. 16, 2016) ("The Court properly prohibited the defendant from asking FBI Agent-witnesses what inmates told them during interviews as the statements were not made under oath[.]"), *with U.S. v. Bradley*, 145 F.3d 889, 894-95 (7th Cir. 1998) (interview report reliable where interviewee reviewed the detective's summary and signed the bottom of each page).

Second, nothing in the 302 suggests that Wong personally observed Zappala hand money to Rabinowitz. *See Nucera*, 67 F.4th at 171 (doubting victim's ability to perceive who struck him where he had been pepper-sprayed and struck from behind); *Upstate Shredding, LLC v. Northeastern Ferrous, Inc.*, Civil No. 12-1015, 2016 WL 865299, at *13 (N.D.N.Y. Mar. 2, 2016) ("[T]he 302 Report does not show that the Whistleblower had personal knowledge that the trucks were loaded with dirt and that Northeastern made payments to Plaintiffs' employees to inaccurately record the amount of dirt.").

Notably, the 302 recounts that Wong saw Rabinowitz meet with Monaco behind closed doors and that Wong knew Rabinowitz was funneling money to Oswari. Appx0063. The additional assertion, that Rabinowitz's money came

from Zappala, appears to have been either a mistaken assumption born of the fact that Wong received her payments from Zappala or a shorthand reference to the fact that Zappala was the ultimate source of Rabinowitz's money. That is confirmed by Rabinowitz's cross-examination. She explained that Wong got involved in the scheme because she saw Rabinowitz with an envelope filled with cash after meeting Monaco and asked how she could get in on the action. Rabinowitz told Wong to talk to Steve (Monaco) and Rich (Zappala). When Monaco asked why she had said "Steve **and Rich**" when Steve was the only one paying her, Rabinowitz responded, "Because I knew [Steve] got his money from Rich." SAppx300.

Third, far from being corroborated, DB33, Wong's assertion that Zappala paid Rabinowitz contradicts the sworn trial testimony of Zappala, Oswari, and Rabinowitz, SAppx77-79, 236, 274-76, all of whom were cross-examined, *see U.S. v. Simmons*, 70 F.4th 1086, 1090 (8th Cir. 2023) (affirming unexplained refusal to admit letter under Rule 807 where it "was not written under oath and contradicted the CI's sworn testimony").

In sum, this Court recently found that Judge Kugler did not abuse his discretion in refusing to admit an available assault victim's statement pointing to someone other than the defendant as the perpetrator. *Nucera*, 67 F.4th at 170. Thus, it's hard to see how he abused his discretion in excluding statements by an available declarant contradicting the sworn testimony of three trial witnesses on a far less consequential point.

### C.     Any Error Was Plainly Harmless.

Even if Judge Kugler should have admitted the entire 302, *but see Williamson v. U.S.*, 512 U.S. 594, 600-01 (1994) (admissibility requires statement-by-statement analysis), "it is highly probable that the error did not contribute to the judgment," *U.S. v. Helbling*, 209 F.3d 226, 241 (3d Cir. 2000) (cleaned up). That doesn't require "disproving every reasonable probability of prejudice." *U.S. v. Mathis*, 264 F.3d 321, 342 (3d Cir. 2001). The analysis "begin[s] with the guilty verdict the jury has already rendered," *id.* at 343, weighing the strength of the Government's case against the probative value of the excluded evidence, *see U.S. v. Greenspan*, 923 F.3d 138, 150 (3d Cir. 2019) (finding exclusion of evidence that would have supported defendant's trial testimony harmless where "[t]he entire scheme reeked" so badly that "[t]he only reasonable explanation was cash for blood").

As already explained, *see supra* pp.4-10, the evidence against Monaco on the compound medication scheme was overwhelming. Zappala, Oswari, and Rabinowitz testified consistently about the formation of the scheme, including Monaco's central role in it. Monaco's own family members (Jason, Scott, and Sondre) testified that he paid them to receive compound medicines and advised them to pay others to receive them. That corroborated the testimony of Zappala, Oswari, and Rabinowitz about how the scheme operated. Particularly devastating were the text messages and financial records showing Monaco waiting for Zappala to pay him his share of the prior month's commissions before Monaco visited Rabinowitz to pay her. To top it all off, Monaco feared the FBI might be listening to his call with Scott and Sondre, demonstrating his

consciousness of guilt. As Judge Kugler observed at sentencing, "[i]t was a tough case for anybody." Appx0743.

Against all of that, Monaco wanted the jury to hear that Wong said (1) Zappala paid Rabinowitz and Wong and (2) she didn't know if Monaco paid Rabinowitz. He claims that would have impeached Rabinowitz's testimony that Monaco paid her and Zappala's testimony that he paid only Wong, while Monaco took care of Rabinowitz. DB36-37. According to Monaco, Wong "told the FBI that *the* source of the cash payments to Oswari and his staff was Zappala, not Monaco, and created significant uncertainty regarding Monaco's involvement." DB12 (emphasis added); *accord* DB37.

Monaco's "argument … falls prey to the logical fallacy of the inverse—the incorrect assumption that if P implies Q, then not-P implies not-Q." *U.S. v. Davenport*, 775 F.3d 605, 610 (3d Cir. 2015) (citations omitted). Wong's uncertainty about whether Monaco paid Rabinowitz hardly equates to an affirmative assertion by her that Monaco didn't pay Rabinowitz. Nor does it establish that only Zappala paid Oswari.

Second, using the 302 to establish that Monaco didn't pay Rabinowitz would have been pointless as Monaco *admitted* he paid Rabinowitz. SAppx761-62. Granted, Monaco denied those payments were bribes, characterizing them instead as rewards for Rabinowitz's help in reminding Oswari to push compound medicines. SAppx764-66. But that was a very thin needle to thread.

Monaco tries to sweep aside his damning admission and ludicrous explanation on the grounds that the hearsay ruling forced him "to take the stand

to testify on his own behalf." DB16 (citation omitted). But Monaco announced he would testify *before* Judge Kugler ruled the 302 inadmissible. SAppx627. Besides, a defendant cannot claim that an evidentiary error forced him to waive his Fifth Amendment right not to testify. *See U.S. v. Paladino*, 401 F.3d 471, 477 (7th Cir. 2005) (Posner, J.).

Third, the 302 reinforces the Government's case. Wong said Monaco met behind closed doors with Rabinowitz, who was happy afterwards. Appx0062. Those clandestine meetings show consciousness of guilt and reinforce Rabinowitz's testimony that she received cash from Monaco. *See U.S. v. Kemp*, 500 F.3d 257, 297 (3d Cir. 2007) ("evidence of … consciousness of guilt was of high probative value to the government's case").

Further, the impeachment Monaco hoped to gain would have had no value if Wong had simply assumed that Zappala was paying Rabinowitz or if Wong was referring to Zappala as the ultimate source of the money. That's why Judge Kugler characterized Wong's statements as a "[s]nowflake in a blizzard," SAppx643, as no one disputed Zappala was the source of the payments to Rabinowitz and Wong, SAppx646; *accord* SAppx623 ("[Monaco]'s the messenger. Where is the money coming from? Follow the money.").

Monaco nonetheless seizes on a single juror's actions—during the first full day of deliberations—to claim this was a close case. Proceeding from that premise, he argues the impeachment value from Wong's 302 might have caused the juror who initially fixated on "plea agreements" to stick to his guns, which would have prompted a hung jury. DB38-39. But Monaco relies on a case where

an evidentiary error at a second trial *following a mistrial* could not be deemed harmless under Rule 52(a). DB39 (citing *U.S. v. Paguio*, 114 F.3d 928, 934 (9th Cir. 1997)). (Never mind that the excluded evidence in *Paguio*, if credited, would have "exonerated" Paguio, whereas Wong's statements had no such effect.) But "[a] jury may hang for any number of reasons, including the idiosyncratic views of a single juror." *U.S. v. Newton,* 369 F.3d 659, 680 (2d Cir. 2004). "Thus, while a prior hung jury may support a finding that an error committed with respect to a very close issue during a retrial is not harmless, it does not compel such a conclusion." *Id.* (cleaned up); *accord Johnson v. Lamas*, 850 F.3d 119, 137 n.24 (3d Cir. 2017) (rejecting claim that error at second trial must have bene prejudicial because of hung jury at first trial).

Here, of course, there was no mistrial. And the reconstituted jury that ultimately convicted Monaco—which included the juror who overcame his "idiosyncratic views"—took just two hours to reach its verdict. SAppx990. So it is wrong to claim that this was a close case when "the idiosyncratic views of a single juror" did ***not*** produce a mistrial. *See Newton,* 369 F.3d at 680 (deeming a constitutional error at a second trial following a mistrial harmless beyond a reasonable doubt because the evidence was so strong).[6]

In sum, any error in excluding Wong's statements was plainly harmless.

---

[6] Monaco's assertion that admitting the 302 at trial would have "nearly halved the loss amount" is specious. DB38 n.9. He doesn't explain how a claim of *trial* error allows a reviewing court to consider what might have occurred at *sentencing*. Besides, nothing stopped him from invoking the 302 at sentencing, and he doesn't mention it in his claim contesting the loss amount. DB40-42. That's a waiver. *See U.S. v. Shaw*, 891 F.3d 441, 455 n.17 (3d Cir. 2018).

II.    **Monaco's 168-Month Sentence Is Procedurally and Substantively Reasonable.**

> **Standard of Review: Clear error for the contested Guidelines rulings, *U.S. v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc), plain error for the unpreserved claim of procedural error, *U.S. v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014 (en banc), and abuse of discretion for the substantive reasonableness claim, *U.S. v. Tomko*, 562 F.3d 558, 564-65 (3d Cir. 2009) (en banc).**

Monaco claims Judge Kugler committed three errors in calculating the advisory Guidelines range, failed to meaningfully consider his unwarranted disparity argument, and imposed a substantively unreasonable sentence. DB39-54. Each claim lacks merit.

A.    **Judge Kugler Did Not Clearly Err In Calculating The Advisory Guidelines Range.**

Following the Supreme Court's decision in *U.S. v. Booker*, 543 U.S. 220 (2005), district courts must follow a three-step sentencing process. *See U.S. v. Fisher*, 502 F.3d 293, 307-08 (3d Cir. 2007). At step one, they "must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*." *U.S. v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). Monaco challenges the calculation of his final offense level on three grounds. None has merit.

1.    **Loss Amount.**

Monaco complains that Judge Kugler: (1) ignored evidence that some prescriptions were medically necessary, and (2) improperly included in the loss amount the prescriptions signed by Goldis and Jones. DB39-42. He fails to show clear error.

The Guidelines prescribe an 18-level enhancement for a loss of more than $3.5 million but less than $9.5 million. U.S.S.G. § 2B1.1(b)(1)(J). "Loss" is the "reasonably foreseeable pecuniary harm that resulted from the offense," *i.e.*, the "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i), (iv). The district court "need only make a reasonable estimate of the loss … based on available information." U.S.S.G. § 2B1.1 cmt. n.3(C). The "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence," so the "court's loss determination is entitled to appropriate deference." *Id.* This Court, therefore, reviews the loss calculation for clear error, *U.S. v. Dullum*, 560 F.3d 133, 137 (3d Cir. 2009), and will reverse only if the factual findings are "completely devoid of a credible evidentiary basis," *U.S. v. Vitillo*, 490 F.3d 314, 330 (3d Cir. 2007) (cleaned up).

Judge Kugler did not clearly err in finding a loss amount of $4.6 million, Appx0767, well above the $3.5 million threshold necessary to trigger an 18-level enhancement. That finding had ample support in: (1) the stipulation in which Monaco agreed Express Scripts would not have paid for a prescription had it been told the prescriber had been bribed to sign it or had made no determination of medical necessity (SAppx2155); (2) Oswari's testimony that he signed approximately 300 prescriptions because he was bribed and without making a determination of medical necessity (SAppx195-205); (3) Jason's testimony to the same effect (SAppx387-92); (4) Zappala's testimony that Goldis, with Monaco's assent, wrote prescriptions for people who were not his patients in

return for bribes (SAppx94-101); and (5) a modified version of the spreadsheet admitted at trial showing Express Scripts reimbursements totaling $4.6 million in losses. (SAppx573-78, 649-51, 2049). *See* SAppx2208-14 & n11.

Monaco nonetheless claims that Judge Kugler erroneously "failed to consider record evidence that prescriptions written by Oswari were medically necessary." DB40; *accord* DB40-41 (arguing that an implicit determination of medical necessity was made for "certain family members and friends of Monaco"). But Judge Kugler *did* consider that so-called evidence; he simply found it woefully insufficient to outweigh the compelling "conclusion that's easily drawn from this scheme[;]" *i.e.*, "it wasn't about good medicine or any medicine. This was all about making money. And Dr. Oswari was very clear about that. He did this for the money in this case," Appx0767-68; *see U.S. v. Gladden*, ___ F.4th ___, 2023 WL 5281836, at *12 (11th Cir. Aug. 17, 2023) ("the district court did not clearly err in finding that the claims were not medically necessary"); *U.S. v. Edet*, No. 08-10287, 2009 WL 552123, at *2 (5th Cir. Mar. 5, 2009) (unreported) ("[T]he district court could reasonably infer that … Dr. McGriff signed them because he received kickbacks, not because the beneficiaries had a medical need for K0011 power wheelchairs.").

More fundamentally, there would have been no reversible error even had there been compelling evidence that some of the prescriptions were medically necessary. First, the trial stipulation specifically provided that the insurer would not have reimbursed even a medically necessary prescription that had been induced by a bribe. SAppx2155. That being so, Monaco was not entitled to any

offset as a matter of law. *See U.S. v. Echols*, 574 F. App'x 350, 360 (5th Cir. 2014) (unpublished) ("There was no evidence that Dr. Echols provided legitimate medical services either to the home healthcare companies or to the people on whose behalf fraudulent Medicare claims were submitted by the home healthcare companies.").

Second, once the Government satisfied its burden to show a provable loss, the burden shifted to Monaco to prove offsets against the loss amount large enough to affect the enhancement. *U.S. v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008). But Monaco only pointed to a few instances in which a prescriber opined *post hoc* that a particular patient had a condition that might benefit from medication, *e.g.*, SAppx228, 443-44, without suggesting (much less proving) that a compound medication costing **$20,000** was the most appropriate treatment. Indeed, the patient received an extremely expensive compound medication precisely because the provider had been bribed to prescribe it.

Nor has Monaco established that the total amount of any medically necessary prescriptions adds up to the $1.1 million necessary to take him below the $3.5 million threshold triggering the 18-level increase. *See U.S. v. Opitz*, 704 F. App'x 66, 69 (3d Cir. 2017) (not precedential) (where Optiz "provided no evidence from which that [offset] amount could be calculated," he "did not rebut the loss amount"). So a remand would be pointless. *See Jimenez*, 513 F.3d at 87 ("excluding the $132,051 in interest from the total loss of $2,729,192 would have resulted in the same 13-level enhancement for losses between $2.5 million and $5 million").

43

Equally meritless is Monaco's claim that Judge Kugler ignored evidence that Monaco wasn't involved in the allegedly "separate scheme" among Zappala, Goldis, and Jones that produced $2 million of the $4.6 million in losses. DB42. Properly applying relevant conduct principles, Appx0760, Judge Kugler was able to "find easily by a preponderance of the evidence that it was reasonably foreseeable to Mr. Monaco that Mr. Zappala was submitting prescriptions on his own to Dr. Goldis and for which Mr. Monaco wasn't getting paid," Appx0767.

That was hardly clear error. Zappala told Monaco he had found another corrupt medical provider (Goldis) to write prescriptions, and Monaco promptly gave Zappala patient information for members of his family (and their friends), which Zappala transferred to Goldis. SAppx95-101, 549-63. As Zappala never said that Goldis would write prescriptions just for the patients Monaco had identified, and as Monaco knew from the commission-splitting arrangement that Zappala was submitting his own patient information, *e.g.*, SAppx72, Monaco easily could have foreseen that Zappala separately was providing patient information to Goldis, *see U.S. v. Sorokin*, 570 F. App'x 217, 219 (3d Cir. 2014) (not precedential) (no clear error where "Sorokin and Kismat agreed to undertake a scheme stretching from June through October of 2010 involving the use of stolen credit and debit card information to obtain items of value, and that the entirety of Kismat's fraudulent activity was pursuant to that scheme"); *U.S. v. Bright*, 353 F.3d 1114, 1119 (9th Cir. 2004) ("Here, Chandler allegedly siphoned off $25,000 through his and Bright's fraudulent scheme. That

Chandler may not have shared this money with Bright or told Bright which victims supplied it does not mean that Chandler was involved in a separate venture.").

### 2.    Aggravating Role.

Monaco next complains about the four-level aggravating role enhancement. DB43-45. Again, he fails to show clear error.

A four-level enhancement applies where "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). "[A]n 'organizer' is a person who generates a coherent functional structure for coordinated criminal activity," whereas "a 'leader' is a person with high-level directive power or influence over criminal activity." *U.S. v. Adair*, 38 F.4th 341, 354 (3d Cir. 2022). A leader or organizer "must have a greater degree of operational control over criminal activity" than a § 3B1.1(b) "manager" or "supervisor." *Id.* at 353.

Here, Judge Kugler found Monaco qualified for the four-level enhancement. He cited Monaco's key role in the Oswari aspect of the scheme, his co-equal role with Zappala in operating the compound scheme, his role in recruiting Jason and the other family members and friends, and his role in orchestrating the cover-up prescriptions written by Mansor. Appx0751-52. That was hardly clear error given the trial record. SAppx64-67, 72-79, 82-93, 101-03 (Zappala); SAppx186-94, 247 (Oswari); SAppx375-79, 443-44 (Jason). To the contrary, as Monaco "made high-level decisions essential to [scheme's] continued operation," *Adair*, 38 F.4th at 354, he was clearly a "leader."

45

Monaco nonetheless claims "[t]he record evidence firmly established that Zappala, not Monaco, was the 'organizer' or 'leader' of the Compound Medication Scheme." DB43. "But … there can be multiple leaders or organizers for coordinated criminal activity." *U.S. v. Rodriguez*, 40 F.4th 117, 121 (3d Cir. 2022), as Judge Kugler recognized, Appx0751 ("I think they had equally important roles in this."). Monaco's remaining quibbles with the weight Judge Kugler assigned to various facts do not come close to establishing clear error. *E.g.*, *U.S. v. Yancy*, 725 F.3d 596, 599 (6th Cir. 2013).

Monaco footnotes that the Government stipulated to a three-level aggravating role enhancement for Zappala. DB45 n.11. But Judge Kugler correctly held that the stipulation didn't bind him, so the Government's view of Zappala's role didn't compel an identical enhancement for Monaco. Appx0751; *accord* Appx0736. Equally meritless is Monaco's other footnoted claim—that Judge Kugler's decision not to admit Wong's 302 at trial somehow precluded Monaco from using the 302 at sentencing. DB44 n.`0. As already explained, *see supra* n.6, Monaco chose not to offer the 302 even though the Federal Rules of Evidence don't apply at sentencing. He cannot "now transform that choice into judicial error." *U.S. v. Strothers*, 77 F.3d 1389, 1393 (D.C. Cir. 1996). At any rate, the information in the 302 hardly compelled a finding that Monaco had a lesser role. *See U.S. v. Ilarraza*, 963 F.3d 1, 14 (1st Cir. 2020) (finding no clear error where "a reasonable factfinder could have viewed the appellant's role in one of two different ways — either as an organizer of Torres's activities or simply as a facilitator").

### 3.   Sophisticated Means.

Monaco next challenges Judge Kugler's imposition of a two-level sophisticated means enhancement. DB45-47. Again, he fails to show clear error.

A two-point enhancement applies if an offense "involve[s] sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). It applies to conduct that is "especially complex or especially intricate." *Id.*, cmt.9(B). That can include hiding assets or transactions or using fictitious entities, corporate shells, or offshore financial accounts, *id.*, but "an offense can easily warrant the sophisticated means enhancement absent the use of those tactics," *U.S. v. Fountain*, 792 F.3d 310, 319 (3d Cir. 2015).

Here, Judge Kugler applied the enhancement. Appx0743-44. He cited the length of the scheme (three years), that it involved three sub-schemes (Oswari, Goldis, and the Chackers), the use of LLCs to disguise or conceal the illicit payments, the many people involved, and Monaco's efforts to conceal the fraud by perpetrating the Mansor-signed cover-up prescriptions and making a check payable to Jason's wife and telling him to say (falsely) it was for his son's bris. That was hardly clear error on this record.

In fact, Judge Kugler's analysis is far more robust than the one in the case Monaco himself cites, where a panel of this Court summarily affirmed a sophisticated means enhancement. DB45 (citing *U.S. v. Smith*, No. 19-2063, 2021 WL 4129523, at *3 (3d Cir. Sept. 10, 2021) (not precedential) ("The District Court's determination here was not clearly erroneous. The District Court commented on the duration of the scheme, its nationwide scope, the

47

number of people involved, the work that went into creating counterfeit tickets.")).

Monaco again claims there was no evidence he participated in the Goldis sub-scheme. DB46. That's incorrect and irrelevant. Zappala testified that when he informed Monaco he had found yet another corrupt provider to sign prescriptions, Monaco readily supplied Zappala with patient insurance information for the Chackers, the Lerners, and for Jason's friend (Sienkiwiecz), SAppx98, and Goldis signed those prescriptions because he was paid to do so, SAppx559. True, Monaco denied he authorized Zappala to give that information to Goldis. SAppx786. But Judge Kugler imposed a two-level obstruction enhancement in part because of Monaco's false testimony about this aspect of the scheme:

> Monaco testified he did not supply the insurance and demographic information to Zappala to pass on to Goldis. He claimed, and it was hard to follow this testimony, but he claimed that this was some kind of a test for insurance coverage. Zappala testified to the opposite, and the jury obviously believed Zappala in this. It was material.

Appx0773. Having (wisely) chosen not to challenge that finding on appeal, Monaco can't plausibly claim that Judge Kugler nonetheless should have accepted his self-serving denial at sentencing. Besides, the sophisticated means enhancement hardly turned on Monaco's participation in the Goldis sub-scheme. The length of the overall scheme and the various concealment efforts alone sustained it. *See Fountain*, 792 F.3d at 319-20.

## B.    Judge Kugler Did Not Commit Plain Procedural Error By Considering And Rejecting Monaco's Unwarranted Disparity Argument.

Monaco next claims that Judge Kugler committed procedural error by devoting insufficient attention to his unwarranted disparity argument. DB48-49. He fails to show error, much less plain error affecting substantial rights.

At the third step of the sentencing process, courts must engage in "a true, considered exercise of discretion ... including a recognition of, and response to, the parties' non-frivolous arguments" and consideration of the 18 U.S.C. § 3553(a) factors. *U.S. v. Jackson*, 467 F.3d 834, 841 (3d Cir. 2006). District courts need not discuss arguments that are lacking in merit, *U.S. v. Cooper*, 437 F.3d 324, 329 (3d Cir. 2006), or provide a complete and comprehensive explication of sentencing law, *U.S. v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006). Where the defendant failed to preserve his challenge to a district court's consideration of his sentencing arguments, this Court reviews only for plain error. *Flores-Mejia*, 759 F.3d at 255.

Monaco forfeited his challenge. As Monaco notes, he presented Judge Kugler with a list of sentences in other white collar cases and argued that giving him a within-range sentence (or even a sentence exceeding 7 years) would create unwarranted disparity. Appx0927-29. Judge Kugler acknowledged that argument but rejected it because Monaco hadn't done enough to show that those defendants were similarly situated. Appx0801-02. Neither then nor after pronouncement of sentence did Monaco object to the adequacy of Judge

Kugler's explanation. Appx0801-02 (ruling); Appx0802-10 (imposition of sentence). So Monaco must show plain error. *See Flores-Mejia*, 759 F.3d at 255.

Monaco cannot show any procedural error, much less plain error affecting substantial rights. Judge Kugler didn't *ignore* the argument; he acknowledged it and commented that Monaco hadn't done enough to show that he was presenting an "apples to apples" comparison. Appx0801-02. This Court has held that a defendant arguing *substantive* unreasonableness due to unwarranted disparities "bears the burden of demonstrating similarity by showing that other defendants' circumstances *exactly paralleled* his," and that "a court should not consider sentences imposed on defendants in other cases in the absence of such a showing by a party." *U.S. v. Lacerda*, 958 F.3d 196, 215 (3d Cir. 2020) (cleaned up). That being so, it was hardly procedural error for Judge Kugler to acknowledge Monaco's disparity argument but reject it because he hadn't met the burden *Lacerda* imposes.

Even now, Monaco doesn't claim he established below "that [the] other defendants' circumstances exactly paralleled his[.]" *Id.* at 215. And for good reason. Only two of the parentheticals following the cases in his sentencing brief identify the loss amount and many of the cases involved defendants who pleaded guilty. Appx0927-28. As Judge Kugler had no obligation to mine the cases for similarities, summarily rejecting Monaco's unwarranted disparity argument was entirely proper. Indeed, other Circuits allow "a district court [to] pass over in silence a defendant's argument that the court failed to consider disparities when imposing a guideline-range sentence." *U.S. v. Buncich*, 20 F.4th

1167, 1176 (7th Cir. 2021); *accord U.S. v. Gantt*, 679 F.3d 1240, 1248-49 (10th Cir. 2012) ("when a court considers what the guidelines sentence (or sentencing range) is, it necessarily considers whether there is a disparity between the defendant's sentence and the sentences imposed on others for the same offense."). Here, Judge Kugler imposed a Guidelines range sentence but didn't "pass over in silence" Monaco's disparity argument.

Finally, Monaco doesn't explain how more robust consideration of his argument would have led to a lower sentence. Instead, pretending his claim is preserved, he simply assumes that the allegedly inadequate discussion requires a remand. DB49 (relying on pre-*Flores-Mejia* precedent). Monaco's failure even to try to satisfy his Rule 52(b) burden compels affirmance. *Lacerda*, 958 F.3d at 211 n.3 (where "Lacerda … has not attempted to show plain error entitling him to review of these unpreserved issues, this Court "decline[s] to address these unpreserved issues in this opinion.").

### C.    Monaco Has Not Shown That His Bottom-Of-The-Range Sentence Is Substantively Unreasonable.

Monaco finally argues that his 168-month sentence, at the bottom of the advisory Guidelines range, is substantively unreasonable. DB49-54. But he fails to establish that no rational sentencing judge would have imposed that same sentence for the reasons Judge Kugler articulated.

On substantive reasonableness review, a district court's decision is "accord[ed] great deference" and will be upheld where the sentence is "premised upon appropriate and judicious consideration of the relevant factors," *U.S. v. Lessner*, 498 F.3d 185, 204 (3d Cir. 2007) (citation omitted),

because "the trial court [is] in the best position to determine the appropriate sentence," *U.S. v. Greenidge*, 495 F.3d 85, 102 (3d Cir. 2007) (citation omitted). This Court presumes a sentence within the advisory Guidelines range is substantively reasonable, *U.S. v. Handerhan*, 739 F.3d 114, 119-20 (3d Cir. 2014), and will not reverse a sentence as substantively unreasonable "unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided," *Tomko*, 562 F.3d at 568. The party challenging the sentence bears the burden of making that showing. *U.S. v. King*, 454 F.3d 187, 194 (3d Cir. 2006). Monaco fails to show his sentence is substantively unreasonable.

Judge Kugler sat through a two-week trial where he saw how Monaco: perpetrated a massive health care fraud that caused $4.6 million in losses to insurers and others; perjured himself multiple times; and refused to express true remorse for his conduct. Judge Kugler stressed the seriousness of the offense (equating it to outright theft) and the need for specific and general deterrence, while acknowledging Monaco's many positive characteristics. In the end, he determined that a sentence at the bottom of the advisory Guidelines range was appropriate. Appx0797-803. That was not an abuse of discretion. *E.g.*, *U.S. v. Kluger*, 722 F.3d 549, 552 (3d Cir. 2013) (affirming within-range, 144-month sentence imposed on first time offender convicted of insider trading despite Kluger's complaint that the sentence was "draconian").

Monaco devotes his entire substantive reasonableness challenge to comparing his sentence with the sentences imposed on defendants sentenced for

white collar crimes generally, DB50-51, and on defendants convicted in the same Compound Prescription Scheme specifically, DB51-54. As for the former, this Court rejected that argument in *Lacerda*. Lacerda "presented this Court with a table of cases showing a range of sentences for other fraud cases and argues that his sentence, though at the bottom of his Guidelines range, is still '23 times greater than the median sentence for his type of offense.'" 958 F. at 215 (citation omitted). But because Lacerda failed to meet his "burden of showing that other defendants' circumstances exactly paralleled his," this Court rejected his comparisons, applied the presumption of reasonableness, and affirmed a within-range **324-month** sentence for a fraud that cased a $2.5-million loss. *Id.* This Court should follow suit here.

Monaco also compares his sentence to the sentences imposed on other defendants convicted in this compounding scheme, including the sentence of probation that Zappala received. DB51-54. But as Monaco acknowledged just two pages earlier, DB49, "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case," *U.S. v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). Besides, the coconspirators Monaco identifies (Zappala, Oswari, and Goldis) pleaded guilty, cooperated, had different loss amounts, or some combination of the three.

That wasn't lost on Judge Kugler, who could not "really compare Mr. Monaco to the other defendants in this case who have pled guilty, many with a cooperation agreement. They have different loss amounts and other different

factors that drove those sentences in those cases." Appx0801; *see Parker*, 462 F.3d at 278 ("Here, the Court specifically distinguished its reduction of Michael Parker's sentence on the grounds that Michael had assisted in convicting his co-defendants"); *accord U.S. v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("[A] sentencing difference is not a forbidden 'disparity' if it is justified by legitimate considerations, such as rewards for cooperation."), *abrogated on other grounds by U.S. v. Statham*, 581 F.3d 548 (7th Cir. 2009).

In contrast to Zappala, Oswari, and Goldis, Monaco went to trial, repeatedly perjured himself, and refused to express remorse. In no way was he similarly situated to his coconspirators, all of whom accepted responsibility and none of whom committed perjury. *See U.S. v. Weicksel*, 375 F. App'x 261, 265 (3d Cir. 2010) (not precedential) (rejecting argument premised on § 3553(a)(6) where "Beers cooperated with the Government and testified in its case against Weicksel. In addition, Beers demonstrated understanding and accepted responsibility for his actions, whereas Weicksel displayed neither acknowledgment nor remorse.").

## CONCLUSION

This Court should affirm the judgment in all respects.

Respectfully submitted,

VIKAS KHANNA
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515

By:   s/ STEVEN G. SANDERS
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ 07102-2535
(973) 645-2846

Date:   September 12, 2023

# CERTIFICATE OF COMPLIANCE

I hereby certify as an Assistant United States Attorney for the District of New Jersey that:

(1)    this brief contains 12,959 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and thus does not exceed the 13,000-word limit prescribed by Fed. R. App. P. 32(a)(7)(B)(i);

(2)    this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using a Microsoft WORD for Microsoft 365 word-processing system and it is in a proportionally spaced typeface, namely 14-point Calisto-MT;

(3)    the text of the electronic PDF brief is identical to the text of the paper copies of the brief;

(4)    The electronic PDF brief was prepared on a computer that is automatically protected by a continuously updated version of Trellix Endpoint Security 10.7, and no virus was detected; and

(5)    I am admitted to practice before this Court.


_____s/ Steven G. Sanders_____
Assistant U.S. Attorney


Dated:   September 12, 2023

## CERTIFICATION OF FILING AND SERVICE

I hereby certify that on September 12, 2023, I caused the Brief and Supplemental Appendix for Appellee to be electronically filed with the Clerk of the United States Court of Appeals for the Third Circuit through the Court's CM/ECF system, and by personally causing to be deposited, with the United States Postal Service as postage-prepaid first-class mail, seven paper copies of the Brief and Supplemental Appendix.

I also certify that on September 12, 2023, I personally caused the Brief and Supplemental Appendix for Appellee to be served on counsel for Appellant, Eric T. Kanefsky, Esq., through the notice of docketing activity generated by this Court's CM/ECF system.

s/ Steven G. Sanders
Assistant U.S. Attorney

Dated: September 12, 2023