## Case No. 22-2895

### UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
*Appellee,*

v.

STEVEN J. MONACO,
*Appellant.*

———————————————————

*On appeal from Judgment in the*
*United States District Court for the District of New Jersey*
*Case No. 1:19-cr-00716-RBK*
*Sat Below: Robert B. Kugler, U.S.D.J.*

———————————————————

### REPLY BRIEF OF APPELLANT STEVEN J. MONACO

Eric T. Kanefsky, Esq.*
Kevin J. Musiakiewicz, Esq.
Philip Morrow, Esq.

**CALCAGNI & KANEFSKY LLP**
One Newark Center
1085 Raymond Blvd., 14th Floor
Newark, New Jersey 07102
T. 862.397.1796
eric@ck-litigation.com
*Attorneys for Appellant Steven J. Monaco*

*\*Application for admission forthcoming*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................1

I.  The District Court Erred in Refusing to Admit Wong's Exculpatory
    Statements ....................................................................................................1

A. Monaco Did Not Waive the Issue................................................................1

B. The District Court Abused its Discretion in Finding that Wong Was
   Available ......................................................................................................5

C. The 302 Was Sufficiently Trustworthy .......................................................8

D. The District Court's Exclusion of Wong's Exculpatory Statements Was
   Not a Harmless Error .................................................................................12

II.  The District Court Erred in Imposing a 14-year Custodial Sentence............15

A. The District Court Erred in Determining the Loss Amount.........................15

   1. The Goldis Scheme.................................................................................16

   2. The Oswari Scheme................................................................................19

   3. The Mansor Prescriptions ......................................................................20

B. The District Court's Application of a 4-Point Aggravating Role
   Enhancement Was Clear Error ...................................................................21

C. The District Court's Application of a 2-Point Sophisticated Means
   Enhancement Was Clear Error 302 Was Sufficiently Trustworthy ............23

D.  The Sentence Imposed Is Unreasonable ...................................................25

1.  The Sentenced Imposed is Procedurally Unreasonable ...........................25

2.  The Sentence Imposed Is Substantively Unreasonable...........................26

CONCLUSION ........................................................................................29

COMBINED CERTIFICATIONS..........................................................30

# <u>TABLE OF AUTHORITIES</u>

<span style="text-align:center">C<small>ASES</small></span>

*Butler v. Indianapolis Metro. Police Dep't*, No. 1:07-CV-1103, 2009 WL 2092416, (S.D. Ind. July 13, 2009) ..................................................................5

*In re Drake*, 786 F. Supp. 229 (E.D.N.Y. 1992) ......................................8

*Unicolors, Inc. v. Urb. Outfitters, Inc.*, 686 F. App'x 422 (9th Cir. 2017) ..............6

*United States v. Abreu*, 32 F.4th 271 (3d Cir. 2022) ..................................3

*United States v. Arthur*, 949 F.2d 211 (6th Cir. 1991) ..............................9

*United States v. Begin,* 696 F.3d 405 (3d Cir. 2012)..............................25

*United States v. Berrios*, 676 F.3d 118 (3d Cir. 2012) ...........................8

*United States v. Caldwell*, 760 F.3d 267 (3d Cir. 2014)...........................8

*United States v. Cox*, 54 F.4th 502 (7th Cir. 2022) .................................6

*United States v. Dickler*, 64 F.3d 818 (3d Cir. 1995) .............................18

*United States v. Dupree*, 617 F.3d 724, 731 (3d Cir. 2010) ......................3

*United States v. Edet*, No. 08-10287, 2009 WL 552123 (5th Cir. Mar. 5, 2009)....19

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004)..............15

*United States v. Flenoid*, 949 F.2d 970 (8th Cir. 1991)...........................5

*United States v. Flores-Mejia*, 759 F.3d 253 (3d Cir. 2014) ....................25

*United States v. Fountain,* 792 F.3d 310 (3d Cir. 2015) .........................23

*United States v. Friedman*, 658 F.3d 342 (3d Cir. 2011) ........................12

*United States v. Gozes-Wagner*, 977 F.3d 323 (5th Cir. 2020) ..............28

*United States v. Green*, 617 F.3d 233 (3d Cir. 2010) .............................6

*United States v. Grober*, 595 F. Supp. 2d 382 (D.N.J. 2008) ..................................28

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ..............................15

*United States v. Hilliard*, 11 F.3d 618 (6th Cir. 1993) .............................................12

*United States v. Keltner*, 147 F.3d 662 (8th Cir. 1998). ...........................................9

*United States v. Kizzee*, 877 F.3d 650 (5th Cir. 2017).................................................6

*United States v. Lacerda*, 958 F.3d 196 (3d Cir. 2020)................................... 25, 27

*United States v. Lopapa*, 537 F. App'x 108 (3d Cir. 2013)...................................24

*United States v. Lowery*, 135 F.3d 957 (5th Cir. 1998)...........................................14

*United States v. Lyon*, 567 F.2d 777 (8th Cir. 1977) .................................................2

*United States v. Mackey*, 117 F.3d 24 (1st Cir. 1997) ...............................................2

*United States v. Mathis*, 264 F.3d 321 (3d Cir. 2001) ..................................... 12, 15

*United States v. Musaibli*, 647 F. Supp. 3d 571 (E.D. Mich. 2022).......................10

*United States v. Nagle*, 803 F.3d 167 (3d Cir. 2015)...............................................17

*United States v. Nygren*, No. 1:16-CR-00106, 2018 WL 1733980
   (D. Me. Apr. 10, 2018) ..........................................................................................24

*United States v. Paguio*, 114 F.3d 928 (9th Cir. 1997) ...........................................14

*United States v. Parker*, 462 F.3d 273 (3d Cir. 2006)............................................26

*United States v. Ring*, 811 F. Supp. 2d 359 (D.D.C. 2011)...................................28

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997).......................................19

*United States v. Schaefer*, 291 F.3d 932 (7th Cir. 2002)........................................19

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (en banc) ............................28

*United States v. Wright*, 363 F.3d 237 (3d Cir. 2004)...............................................9

*Williams v. United Dairy Farmers*, 188 F.R.D. 266 (S.D. Ohio 1999)....................6

<u>OTHER AUTHORITIES</u>

U.S.S.G. § 2B1.1 cmt. n.3(A)(i), (iv) ........................................................17

U.S.S.G. § 2B1.1 cmt. n.3(C) ..................................................................17

U.S.S.G. § 2B1.1(b)(10)(C) cmt.9(B)......................................................23

U.S.S.G. § 3B1.3.......................................................................................26

U.S.S.G. § 4C1.1.......................................................................................23

U.S.S.G., Ch. 5, Pt. A...............................................................................16

<u>RULES</u>

Fed. R. Evid. 803(6)...................................................................................4

Fed. R. Evid. 803(8)(A)(ii) ........................................................................4

Fed. R. Evid. Rule 804(b)(3)(B) ................................................................8

# INTRODUCTION

Beyond the Government's feeble procedural arguments lies a conviction and sentence of Defendant Steven J. Monaco ("Monaco") that cannot withstand this Court's scrutiny.[1] By improperly excluding exculpatory statements on crucial issues from the only independent witness, the district court deprived Monaco of the ability to present the most formidable component of his defense and add to the doubt that pervaded the jury. And by disregarding the totality of the evidentiary record and the Guidelines, the district court imposed a 14-year custodial sentence that is grossly disproportionate to the probationary sentence imposed on a co-defendant who was *above* Monaco in the hierarchy of the scheme and unjustifiable. The conviction and the sentence should be vacated.

# ARGUMENT

## I.    The District Court Erred in Refusing to Admit Wong's Exculpatory Statements.

### A.    Monaco Did Not Waive the Issue.

Recognizing the strength of Monaco's position regarding the district court's refusal to admit Wong's exculpatory statements into evidence, the Government implores the Court to ignore the merits based on a purported procedural flaw. The

---

[1] This Reply Brief uses the same defined terms as the Merits Brief and the following abbreviations for citations: Monaco's Appendix-"Appx"; the Government's Supplemental Appendix-"SAppx;" the Government's Brief-"GB"; Monaco's Merits Brief-"MB"; and the Presentence Report-"PSR."

Government contends that Monaco "waived" his ability to challenge the issue in its entirety because he failed to address the "outer layer" of the hearsay—"the assertions by the authoring agent to the effect that 'this is what Wong told me.'" GB at 25-26. This contention is meritless.

The "outer layer" of the hearsay was never addressed below because it was not an issue in dispute. As confirmed by the hearing transcript, one of the FBI agents who prepared the 302 was in the courtroom (Appx0446-0448) and had already testified on behalf of the Government. (Appx0418-0427). Thus, it was always understood that if the district court would have held that Wong's exculpatory statements were admissible under Rules 804 or 807, the agent would have been called to testify as to his first-hand account of Wong's statements and eliminated the "outer layer." *See United States v. Lyon*, 567 F.2d 777, 784 (8th Cir. 1977) (affirming ruling allowing FBI agent to read interview report statements admissible under residual exception into the record); *United States v. Mackey*, 117 F.3d 24, 29 (1st Cir. 1997) ("If Munichiello's statement to the FBI agent was itself admissible under some hearsay exception, then the statement could have been proved straightforwardly by calling the FBI agent").

That is why the sole focus of the Rule 104 hearing was the admissibility of Wong's exculpatory statements contained in the 302 and the "outer layer" was never even mentioned. Monaco's trial counsel argued only for admission of Wong's

exculpatory statements pursuant to Rules 804 and 807 (Appx0446-0448); the Government argued only that Monaco had not satisfied the elements necessary for admission of Wong's statements under Rules 804 and 807 (Appx0476-0477); and the district court only heard "argument in support of [Monaco's] application under Rules 804 and 807 to have the FBI 302 report read into evidence concerning what Juile Wong has said about getting paid by Zappala." (Appx0472).

The balance of the Government's argument fares no better. The suggestion that Monaco "never says that he would have called the authoring agent to obviate the 'outer layer' hearsay issue" (GB at 27 n.5) is disingenuous. Monaco's trial counsel specifically requested permission to have Wong's exculpatory statement read into record "through the FBI agent." (Appx0446). As such, the issue of introducing the exculpatory statements via the testimony of the authoring agent was preserved and has not been waived. *See United States v. Abreu*, 32 F.4th 271, 275 (3d Cir. 2022) (The "ultimate question is whether the parties 'g[a]ve the District Court the opportunity to consider the argument.'") (quoting *United States v. Dupree*, 617 F.3d 724, 731 (3d Cir. 2010)).

The same is true with respect to the Government's suggestion that Monaco "repeatedly insists the 302 itself should have been admitted." GB at 27 n.5. Monaco's trial counsel sought the admission of only "part of [Wong's] 302 statement to the FBI," (Appx0446), not the 302 itself. And while Monaco's merits

brief periodically refers to "the 302" as a matter of convenience, the "Statement of Issues Presented" and the substantive arguments are limited to the admission of Wong's exculpatory statements under Rules 804 and 807.  *See* MB at 2 (including whether the district court erred "by refusing to admit ***the exculpatory statement of [Wong]*** into evidence under Federal Rule of Evidence 804" and "by refusing to admit ***the exculpatory statement of Wong*** into evidence under Rule 807" in the "Statement of Issues Presented") (emphasis added); *id.* at 25-35 (detailing the reasons why the district court erred in refusing to admit Wong's statements under Rules 804 and 807).

Finally, though "[l]aw enforcement reports are not admissible as ***official records*** in criminal cases" (GB at 26 (emphasis added)) because Rule 803(8) includes prohibitions against the admission in criminal cases of records setting out "a matter observed by law enforcement personnel" or "factual findings from a legal authorized "investigation," Fed. R. Evid. 803(8)(A)(ii), there is no distinction between civil and criminal cases with respect to the ***business records*** exception. *See* Fed. R. Evid. 803(6).  Therefore, Monaco certainly could have offered a hearsay exception covering the 302 itself if the district court were to have held that Wong's exculpatory statements were admissible under Rules 804 and/or 807 and the authoring agent was not permitted to testify.

4

**B.    The District Court Abused its Discretion in Finding that Wong Was Available.**

The Government's arguments with respect to Wong's availability under Rules 804(b)(3) and 807 suffer from the same flaws that plague the district court's ruling. *First*, the Government grossly understates Monaco's pre-trial efforts to secure Wong's live testimony. As acknowledged by the Government, Monaco's trial counsel visited Wong's last known address and left his business card with a message for her to call, called the telephone number for Wong appearing on the 302 and left a message, ***and*** engaged a process server, who attempted to personally serve Wong and spoke to the gentleman who answered the door as to her whereabouts. (Appx0445-0446, Appx 0452-0453, Appx 0463-0466, Appx 0468-0472).   These efforts alone were eminently reasonable under the circumstances, including Wong's purposeful evasion.  *See United States v. Flenoid*, 949 F.2d 970, 972 (8th Cir. 1991) ("A good faith attempt to locate and subpoena the witness satisfies the proponent's obligation to demonstrate that the witness is unavailable.").

They also exceed the efforts deemed reasonable in the litany of cases cited in Monaco's initial brief, *see* MB at 28-29, and far surpass those of the movants in many of the cases by the Government. *See*, *e.g.*, *Butler v. Indianapolis Metro. Police Dep't*, No. 1:07-CV-1103, 2009 WL 2092416, at *3 (S.D. Ind. July 13, 2009) (only evidence offered to show unavailability was "attorney's unsworn account of his efforts to contact [the witness] by telephone"); *Williams v. United Dairy Farmers*,

188 F.R.D. 266, 273 (S.D. Ohio 1999) (inability to secure witness's appearance for hearing in 1998 was insufficient to demonstrate witness's unavailability for trial in 1999).[2]  Measuring Moanco's actions to secure Wong's appearance against these decisions further underscores why the district court's ruling that Monaco's pre-trial efforts were "not reasonable" (Appx0478), was arbitrary.  *See United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010).

*Second*, the Government ignores that it repeatedly gave Monaco good reason to believe that Wong's appearance was certain and imminent.  The Government referenced Wong on its pre-trial witness list, identified Wong as a key witness and previewed her testimony for the jury in its opening statement (Appx0080-0081, Appx0087-0088), and advised the district court and Monaco's trial counsel that Wong would eventually be called on its case-in-chief. (Appx0341-0343).  It was only after a four-day recess and at the very close of its case that the Government

---

[2] Many of the other cases cited do not support the Government's position and are clearly distinguishable.  *See, e.g.*, *United States v. Cox*, 54 F.4th 502, 515-16 (7th Cir. 2022) (addressing timeliness of request for court-ordered subpoena under F.R.C.P. 17(b), not whether witness was unavailable under Rule 804); *Unicolors, Inc. v. Urb. Outfitters, Inc.*, 686 F. App'x 422, 425 (9th Cir. 2017) (party seeking to declare witness unavailable learned of unavailability before trial whereas, here, Monaco did not learn Wong was unavailable until the close of the Government's case); *United States v. Kizzee*, 877 F.3d 650, 660-62 (5th Cir. 2017) (government's introduction of inculpatory witness statement through testimony of detective was improper because the government conceded that it had "subpoenaed [the witness], but ***elected*** not to call him") (emphasis added).

finally informed the district court that it was not going to call her at all. (Appx0440-0441).[3]  Had Monaco's trial counsel known about the Government's intent not to call Wong sooner, he certainly would have made every effort secure her appearance. (Appx0446) (identifying Wong as "the reason" Monaco decided to go to trial).

*Third*, the Government—like the district court—places entirely too much emphasis on the failure of Monaco's trial counsel to take efforts to secure Wong's appearance between learning about the Government's decision not to call Wong late on Monday afternoon and the resumption of the trial on the following Tuesday morning.  (Appx0478-0480).  It was unreasonable for the district court to expect Monaco's counsel to have had the time or wherewithal to hunt for Wong in the middle of a federal jury trial he was handling alone and on the eve of presenting the defense of his client.

The combination of these circumstances—Monaco's diligent pre-trial efforts to secure Wong, the Government's consistent and unequivocal assurances that Wong would be called as a witness deep into the trial, and the district court's inexplicable focus on Monaco's trial counsel's failure to chase down an elusive witness within a

---

[3] While the Government disputes that this abrupt change in course was strategic, the Government concluded its presentation of the Oswari scheme—the only scheme with respect to which Wong was relevant—on the third day of trial (Appx0341) but did not reveal that Wong would not be called until the end of the fourth day. (Appx0440).  Therefore, the Government had to have decided not to call Wong at least one day earlier and that time could have been used to undertake further efforts to locate Wong.

period of twelve or so hours—firmly establish that the district court's finding that Wong was available was an abuse of its discretion.

### C.    The 302 Was Sufficiently Trustworthy.

The Government's attempt to remedy and overcome the defects plaguing the district court's ruling that the 302 was not sufficiently trustworthy under Rule 804(b)(3) or Rule 807 is misguided and futile.

As emphasized in Monaco's initial brief, Rule 804(b)(3)(B) "does not require that the information within the statement be clearly corroborated; it requires only that," when measured by the "totality of circumstances," there "be corroborating circumstances that clearly indicate trustworthiness of the statement itself." *United States v. Caldwell*, 760 F.3d 267, 289 (3d Cir. 2014) (internal citation omitted).  The merits brief also highlights significant indicia of trustworthiness, including that:

(1)    Wong had *no* relationship with Monaco (Appx0062) and, therefore, no reason or incentive to lie to the FBI to protect him.  *See Caldwell*, 760 F.3d at 289-90 (lack of relationship between declarant and defendant is an important factor).

(2)    Wong's statements in the 302—such as her admission that she had accepted payments from Zappala in exchange for preparing scripts to be signed by Oswari without Oswari having ever conduct[ed] an examination (Appx0062)— were "self-inculpatory." *United States v. Berrios*, 676 F.3d 118, 129 (3d Cir. 2012) (citation omitted).

(3)    The 302 contains a high degree of specificity.  *See In re Drake*, 786 F. Supp. 229, 234-35 (E.D.N.Y. 1992).

(4)     Many of the statements in the 302 were corroborated by
        evidence already in the trial record.  *See United States v.*
        *Keltner*, 147 F.3d 662, 670-71 (8th Cir. 1998).

Notwithstanding this clear, controlling authority, the district court failed to even consider, much less analyze, any of these corroborating circumstances. Instead, it found the 302 to be untrustworthy based solely on the irrational assumption that Wong must have lied to the FBI because other witnesses testified that they failed to tell investigators the truth.  (Appx0480) ("[M]any of the witnesses who have testified have acknowledged that they lied to the FBI in their initial statements.").

Rather than refute the import of the district court's failure to consider the corroborating circumstances, the Government doubles down on the sole basis for the court's decision, detailing the "lies" that *other* witnesses purportedly told the FBI agents and citing *United States v. Wright*, 363 F.3d 237 (3d Cir. 2004) for the proposition that a court may rely "on even generalized experience in refusing to admit hearsay under Rule 807."  GB at 33.

But the law is clear that a court abuses its discretion "when it refuses to allow into evidence statements that are corroborated by other substantial evidence." *United States v. Arthur*, 949 F.2d 211, 216-17 (6th Cir. 1991).  And *Wright*—the only case cited by the Government in support of its principal position—confirms the importance of analyzing all the relevant circumstances.  In *Wright*, the Third Circuit

affirmed the district court's finding that the declarant's statement to his attorney was not sufficiently trustworthy because, unlike Judge Kugler, the district court judge had considered all the relevant circumstances and concluded that the sole corroborating circumstance was outweighed by many others, including that (i) there was no penalty for the declarant lying to his attorney, (ii) the declarant had an incentive to lie, (iii) the statements were self-serving, and (iv) as a public figure, the declarant was concerned about his reputation. *See* 363 F.3d at 245-46.

The "other reasons" offered by the Government to demonstrate "why the 302 was insufficiently trustworthy" (GB at 33) are also unavailing. While the Government attacks the trustworthiness of "the agent's summary of Wong's interview," *id*., the district court specifically stated that it did not "doubt that the FBI agent accurately wrote down what [Wong] said" and that the accuracy of the agent's summary was not "going to be an issue." (Appx0449). That conclusion further supports the trustworthiness of the 302. Moreover, any concerns about the trustworthiness of the authorizing agent's account could have been addressed by examining the agent under oath. *See United States v. Musaibli*, 647 F. Supp. 3d 571, 579-81 (E.D. Mich. 2022) (admission of 302s "would serve the interests of justice by allowing defendant to put before the jury the evidentiary record to support his defenses" and compelling authoring agents to testify as to their veracity).

The notion that Wong's statements lack trustworthiness because "nothing in

the 302 suggests that Wong personally observed Zappala hand money to Rabinowitz" (GB at 34) is simply untenable.  By virtue of having served as Oswari's receptionist and played an integral part in the scheme, Wong was able to provide the FBI with a detailed, first-hand account of relevant events and information. (Appx0061-0062). Thus, her statement that Zappala paid Rabinowitz is sufficiently reliable and compelling.  More importantly, the notion that the portions of Wong's statements that Monaco wished to introduce are not sufficiently trustworthy is belied by the fact that the Government itself had planned to call Wong as a key witness on its case-in-chief and elicit testimony consistent with other statements in the 302. *Compare* Appx0062 (Wong stating in 302 that Zappala agreed to pay her $200 for every prescription that went through, and that she got Dr. Oswari to sign compound scripts) *with* Appx0080-0081 (Government telling the jury in opening statement that it would hear from Wong, who "was also paid by Richard Zappala to do something similar to" Dena Rabinowitz and "if patients agreed, would get the prescription signed by Dr. Oswari").

Finally, the mere fact that Wong's assertion that Zappala paid Rabinowitz is inconsistent with some of sworn trial testimony of some of the Government's witnesses (*see* GB at 35) does not render the statement or the 302 untrustworthy.  If that were the standard, an out-of-court statement offered by a criminal defendant would almost never be deemed trustworthy.  Moreover, excluding Wong's

statements as untrustworthy because they did not align with the testimony of the Government's witnesses intrudes upon the jury's role in assessing credibility. *See, e.g., United States v. Hilliard*, 11 F.3d 618, 619 (6th Cir. 1993) ("the district court usurped a role best left to the jury by improperly assessing the credibility, rather than the reliability, of Wade's [out-of-court] statement").

### D.    The District Court's Exclusion of Wong's Exculpatory Statements Was Not a Harmless Error.

While the Government may not be "require[d] to 'disprov[e] every reasonable probability of prejudice'" to establish that the district court's error was harmless, GB at 36 (quoting *United States v. Mathis*, 264 F.3d 321, 342 (3d Cir. 2001)), it bears a very heavy burden. An error in an evidentiary ruling is harmless only "when 'it is highly probable that the error did not affect the result.'" *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011) (internal citation omitted). And "'high probability' requires that [the court] have a sure conviction that the error did not prejudice the defendants." *Mathis*, 264 F.3d at 342 (internal citation omitted).

Measured by this standard, the prejudice resulting from the district court's decision is clear and profound and the Government's arguments to overcome its devastating impact are unconvincing.

*First*, the Government ignores significant weaknesses in its case, including that the testimony of all its witnesses suffered from an inherent and obvious bias. Zappala, Oswari, Chacker, and Goldis had pled guilty and agreed to cooperate.

(Appx0148-0151, Appx0156-0157, Appx0161-0166, Appx0204-0208, Appx0246-0253, Appx0345-0349, Appx0353-0354, Appx0359-0360, Appx0407-0411). Rabinowitz cooperated because the FBI told her that "they had evidence that she was involved" and she "got immunity" to testify against Monaco. (Appx0320-0321, Appx0330). Chacker's parents were motivated to corroborate their son's testimony and enhance the value of his cooperation. (Appx0382-0383, Appx0387-0388). And the FBI agents testified solely to substantiate the alleged loss amounts attributable to Monaco. (Appx0420-0426, Appx0437-0440).

*Second*, the Government grossly understates the significance of Wong's statements. While they may not establish with absolute certainty that "Monaco didn't pay Rabinowitz" or that "only Zappala paid Oswari," GB at 37, they are materially inconsistent with, and would have impeached the credibility of, pivotal testimony of the Government's key witnesses. For example, the testimony of Zappala and Rabinowitz that ***Monaco*** was responsible for paying Rabinowitz (Appx0108, Appx0301-0302) is directly contradicted by Wong's statement that the payments to both her and Rabinowitz (and, in turn, Oswari) were made by ***Zappala***. (Appx0063). Likewise, the testimony of Oswari and Rabinowitz that ***Monaco*** instructed them as to how to fill out the scripts (Appx0220-0221, Appx0315-0316) is directly contradicted by Wong's statement that ***Zappala*** provided her with pre-prepared prescription forms. (Appx0062).

*Third*, the fact that Monaco had announced that he would testify before the district court made its evidentiary ruling is irrelevant. He did not have to take the stand. What matters is that the district court left him no choice but to provide the jury with his own uncorroborated account. *See United States v. Lowery*, 135 F.3d 957, 959-60 (5th Cir. 1998) (exclusion of potentially exculpatory evidence was not "insubstantial" because it "tied" defendant's hands and "left [him] little more than the ability to make unsubstantiated and . . . unprovable claims on the witness stand").

*Fourth*, even assuming that *United States v. Paguio*, 114 F.3d 928, 934-35 (9th Cir. 1997) were meaningfully distinguishable, there is no denying that this case was a close call and that Wong's statements could have made a difference considering that the jury initially could not reach a unanimous verdict precisely because one juror, who had participated in deliberations and discussed the evidence, was "'sway[ed]'" by "the fact that there are plea agreements" (Appx0685, Appx0693, Appx0721 (Court Ex. C-2)), and that Wong provided the only truly independent account of keys and events.

*Fifth*, and most importantly, whether the district court's decision was harmless cannot be viewed in isolation. And given that (i) the Government built its case on the testimony of cooperators, (ii) Wong's statements directly contradicted the testimony of key witnesses on critical issues, (iii) Wong's credibility was not tarnished by the palpable bias plaguing the other witnesses, (iv) the Government

made a conscious decision not to call Wong despite previewing her testimony in its opening statement and repeatedly promising her appearance, and (v) significant doubt had already pervaded the jury room, it is impossible to say with any degree of certainty, much less "sure conviction," that the district court's error did not prejudice Monaco.  *See Mathis*, 264 F.3d at 342.

## II.     The District Court Erred in Imposing a 14-Year Custodial Sentence.

### A.     The District Court Erred in Determining the Loss Amount.

The extraordinary weight afforded the loss amount in sentencing a white-collar defendant has been the subject of significant criticism because it often yields irrational results.  *See*, *e.g.*, *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account . . . and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("[T]he guidelines provisions for theft and fraud place excessive weight on this single factor . . . [.]  In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.").

There is perhaps no better example than this case. The loss amount of $4,692,945.30 attributed to Monaco is 13 times greater than the $350,000 in commissions that he was paid (Appx0437-0439), yet it accounts for an 18-level enhancement, *see* PSR ¶ 58, and a ten-fold increase in the Guidelines range. *See* U.S.S.G., Ch. 5, Pt. A (Sentencing Table). The disproportionality is even more pronounced when one considers that he played a relatively minor role in an extraordinarily large compounding scheme. (Appx0112-0114, Appx0435) (Rexall paid over $26 million in commissions to Hickman, its "master distributor").

As if that were not irrational enough, the loss amount upon which Monaco's fate was ultimately determined is the product of grave errors. By attributing every dollar—and all the blame—to Monaco without regard for whether there was sufficient evidentiary support for its conclusions, the district court adopted a figure that is grossly inflated and cannot be substantiated.

### 1. The Goldis Scheme

It is no mystery why the Government expends significant energy defending the district court's attribution of the entire Goldis scheme loss amount to Monaco. The losses related to the Goldis scheme ($2,030,243) represent nearly half (approximately 43%) of the entire loss amount. But the Government's arguments are unpersuasive.

First and foremost, the Government applies the wrong standard of review. As this Court has made clear, plenary review—not clear error—is the governing standard "[w]hen the calculation of the correct Guidelines range turns on an interpretation of 'what constitutes loss' under the Guidelines[.]" *United States v. Nagle*, 803 F.3d 167, 179 (3d Cir. 2015); *see also* U.S.S.G. § 2B1.1 cmt n. 3(A)(i) ("actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense").

Regardless of what standard is applied, the record evidence demonstrates that Monaco could not have reasonably foreseen the lion's share of the losses, *see* U.S.S.G. § 2B1.1 cmt. n.3(A)(i), (iv), and that the district court did not "make a reasonable estimate of the loss . . . based on available information." U.S.S.G. § 2B1.1 cmt. n.3(C).  Goldis testified that he dealt with only Zappala and "[did] not recognize" Monaco in the courtroom. (Appx0398, Appx0401-0407, Appx0411); Zappala admitted to obtaining patient information from sources independent of Monaco without Monaco's knowledge and to concealing his payments to Goldis. (Appx0158-0159).  Zappala also stated that he does not believe that he ever even told Monaco that he was paying Goldis (or any other doctor) to write scripts. (Appx0181).  And the district court acknowledged that Monaco "wasn't getting paid" from the Goldis scheme.  (Appx0767).

17

In fact, the Government specifically charged Monaco with—and Monaco was specifically convicted of—healthcare or wire fraud with respect to scripts written as part of the Goldis scheme for only *two* individuals. (Appx0047-0049 (Count 14: "MICHAEL GOLDIS signed a Compounding 1 prescription for *Individual 13*, who was not his patient. STEVEN MONACO recruited Individual 13.") (emphasis added), Appx0048-0050 (Counts 21 and 22: charging STEVEN MONACO and MICHAEL GOLDIS with wire fraud based on "[f]ax transmission of prescription for *Individual 18*").[4] Thus, there is, at most, evidence to suggest that the $22,508.16 in losses related to those individuals[5] were the result of Monaco's offense conduct. *See United States v. Dickler*, 64 F.3d 818, 830-31 (3d Cir. 1995) (relevant conduct for loss calculation must be criminal).

By disregarding the lack of evidence to support the attribution to Monaco of $2,007,734.84 of the $2,030,243 in losses related to the Goldis scheme, the district court overstated his total loss amount by nearly $2 million, which, in turn, subjected him to an 18-level rather than a 16-level enhancement.

---

[4] Count 1 charges Monaco, Oswari, Goldis, and Jones with conspiracy to commit health care fraud and wire fraud but does not differentiate between the Oswari and Goldis schemes. (Appx0039-0047).

[5] The loss associated with Individual 13 is $7,486. (SAppx1244). The losses associated with Individual 18 are $7,486.68 and $7,535.48. (SAppx1235-1236).

### 2.    The Oswari Scheme

The Government's position with respect to the loss amount related to the Oswari scheme suffers from at two fundamental flaws. *First*, it is not enough for the district court to have inferred or presumed that all the scripts written by Oswari were not medically necessary simply because monies were allegedly paid in exchange for those scripts. *See* GB at 42 (citing *U.S. v. Edet*, No. 08-10287, 2009 WL 552123, at *2 (5th Cir. Mar. 5, 2009) for proposition that a court can "reasonably infer" there was no medical need). Rather, "the burden is on the government to establish what services were not medically necessary." *United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997). Thus, contrary to the district court's conclusion, it was "necessary that the Government disprove there's a medical necessity" (Appx0767-0778), and the failure to assess medical necessity on a claim-by-claim basis requires a reversal. *See United States v. Schaefer*, 291 F.3d 932, 941-43 (7th Cir. 2002) (noting "significant gap between loss that flows from the counts of conviction" and PSR loss adopted by the district court and reversing loss calculation where court failed to make explicit findings that all losses were result of criminal conduct).

*Second*, the Government ignores evidence that scripts written by Oswari were medically necessary, including Oswari's testimony that he "believe[d] . . . some of the compound medicine was medically necessary" (Appx0254-0255), that the pain

medications served as an option for patients who had "tried opioids and weren't doing well on them" (*id.*), and that money was not his primary motivation for writing the scripts. (Appx0267).[6]

### 3.     The Mansor Prescriptions

The prescriptions written by nurse practitioner, Meshell Mansor ("Mansor"), represent another instance in which the district court and the Government have ignored the absence of any supporting evidence.  As the Government notes, the losses related to prescriptions written by Mansor were attributed Monaco on the theory that they were "duplicative" of prior prescriptions written for the same patients and written without regard for medical necessity.  But the examples cited by the Government do not corroborate that theory.  *See* GB at 10.  The first script for Scott Chacker was for a "general wellness" supplement and antifungal gel (SAppx1234) whereas the second script included a compound for "scar therapy." (SAppx2104).  Likewise, the first script for Steven Lerner was a "general wellness" supplement (SAppx1228) whereas the second script was for an "antifungal gel." (SAppx2106).

---

[6] While the Government maintained that Oswari was being paid $100 per script and that he wrote 300 scripts, Oswari estimated that he received only $5,000, or just one-sixth of the $30,000 he should have received if he had been paid for every script. (Appx0253-0254).

Zappala's own testimony also belies that theory. Zappala admitted that he engaged Mansor to examine certain patients and write additional scripts, and that he did not disclose to Mansor that he was committing fraud or tell her what scripts to write. (Appx0183). In fact, he specifically told Mansor what scripts had already been written "so it wouldn't be duplicative," (Appx0184), and he left it to Mansor to independently determine what, if any, medications were "medically necessary." (Appx0185).

The foregoing errors further underscore the district court's capricious approach to sentencing.

## B.   The District Court's Application of a 4-Point Aggravating Role Enhancement Was Clear Error.

The district court applied a four-point aggravating role enhancement because: (i) Oswari testified that "Monaco was the driving force of the scheme," (ii) Monaco had a "private relationship" with some individuals "involved in this thing," and (iii) Monaco purportedly told Zappala to "set up the Mansor exams which were a fraud from the beginning." (Appx0751-0752). Each of these bases are refuted by the record.

Monaco was not "the driving force" for the Oswari scheme. It was Zappala who, among other acts indicative of a leader or organizer: (i) negotiated the deal to sell for Rexall and recruited Monaco to work underneath him (Appx0110-0115,

Appx0154-0155, Appx0160)[7]; (ii) retained the entire commission for prescriptions he originated and "half" of the commission for prescriptions originated by Monaco (Appx0101); (iii) came up with the idea to pay Rabinowitz for prescriptions (Appx0218-0219); (iv) organized entire schemes with other doctors (Goldis, Alexander, and Hassman) without Monaco's knowledge (Appx 0158-0159, Appx0411, Appx0413-0414, Appx0158-0160); (v) was the entry point and conduit for all payments (Appx0438); and (vi) ultimately received approximately five times more in commissions than Monaco.  (Appx0436-0439).

Monaco was not primarily responsible for engaging or directing Mansor.  As previously set forth, Zappala testified that he engaged Mansor to examine certain patients and issue additional scripts.  (Appx0183-0185).

And Monaco merely followed Zappala's instructions in identifying a handful of individuals with whom he had a "private relationship" who had insurance that would cover the compound medications so that Zappala could arrange for scripts to be written by Goldis and Jones.  (Appx0582-0583).

The district court's disregard for this critical evidence is clear error, the impact of which cannot be overstated.  By arbitrarily applying the 4-point aggravating role enhancement, the district court also denied Monaco the ability to obtain a 2-point

---

[7] In Zappala's own words, Hickman clued him in on the scheme and he "passed it down the line" to Monaco.  (Appx0120).

reduction for "Zero-Point Offenders" under the new guideline. *See* U.S.S.G. § 4C1.1 (precluding first-time offenders from a 2-level reduction if they received an aggravating role adjustment). Thus, the net effect of this error alone was a guideline calculation that is *six* levels higher than it should be.

### C. The District Court's Application of a 2-Point Sophisticated Means Enhancement Was Clear Error.

The Government's attempt to justify the district court's application of the two-point sophisticated means enhancement is similarly unavailing.

The record does not support a finding that there was anything "especially complex" about the schemes, U.S.S.G. § 2B1.1(b)(10)(C) cmt.9(B), or atypical about Monaco's offense conduct. *United States v. Fountain,* 792 F.3d 310, 319 (3d Cir. 2015) (defendant's conduct must be demonstrative of "'a greater level of planning or concealment than a typical fraud of its kind'") (internal citation omitted). To the contrary:

- Payments in exchange for prescriptions is one of the most common types of healthcare frauds. *See id.*

- Monaco did not use multiple entities or bank accounts. The record confirms that Monaco closed his account at TD Bank and transferred the entire balance to a new PNC Bank account. (SAppx1632-16322, SAppx 1851-54 (account closeout check from TD Bank dated 8/8/15 deposited at PNC Bank that same day)). Thus, he only held one account at a time. Monaco likewise had only one limited liability company, the name of which he changed from SJM Medical Sales LLC to SMJ Medical Consultants LLC when he switched from the sale of

medical devices to the sale of compound medications. (SAppx1630).

- Making out a check to Jason Chacker's wife is hardly a sophisticated act of concealment. *See United States v. Nygren*, No. 1:16-CR-00106, 2018 WL 1733980, at *7 (D. Me. Apr. 10, 2018) ("Exactly how payments directly to the spouse constitute a sophisticated means of tax evasion is not explained.").

- And duration alone does not equal "complexity."

The record also does not support a finding that Monaco took "extensive actions to conceal the scheme," such as using "shell" companies, "falsified documents," or "fictitious identities." *United States v. Lopapa*, 537 F. App'x 108, 111 (3d Cir. 2013) (internal citations omitted). Monaco utilized his own initials in the names of his entities and identified himself as the owner of those entities in government filings (SAppx1628-1631); received 1099s documenting, and paid taxes on, all the commissions he earned (Appx0556); and personally signed checks made out to the Chackers. (SAppx1636, SAppx1806, SAppx1948).[8] Those and other overt acts belie any effort to conceal.

---

[8] As previously established, it was Zappala who arranged for and directed the involvement of Mansor. (Appx0183).

**D.    The Sentence Imposed Is Unreasonable.**

**1.    The Sentence Imposed Is Procedurally Unreasonable.**

Contrary the Government's assertions, the district court did not acknowledge and reject Monaco's unwarranted disparity argument, much less determine that Monaco failed to meet his burden under *United States v. Lacerda*, 958 F.3d 196 (3d Cir. 2020).  *See* GB at 49-50.  The district court refused to consider that argument at all simply because it did not have first-hand knowledge of the other cases beyond the parallel circumstances presented by Monaco.  (Appx0801-0802).  And because the district court failed to give "meaningful consideration" to this argument, a remand for resentencing is required.  *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014); *see also United States v. Begin,* 696 F.3d 405, 413-14 (3d Cir. 2012) (remanding matter where district court did not address "federal-federal disparity argument").

Moreover, even assuming the district court did meaningfully consider the disparity argument and Monaco "forfeited" his right to challenge it despite having detailed his position and the comparable cases in both his sentencing submission and at the sentencing hearing (Appx0787-0792, Appx0927-0930), Monaco has established that the district court's summary rejection of the argument was plain error.  As Monaco emphasized in his merits brief, had the district court considered that the sentences imposed upon defendants who were similarly situated in many

material respects—*e.g.*, convicted at trial of protracted healthcare fraud schemes involving millions in losses—were three to five times less than the sentence ultimately imposed on Monaco, it would necessarily had to have rendered an exponentially lesser sentence to avoid unwarranted disparity. *See* MB at 50-51.

### 2.    The Sentence Imposed Is Substantively Unreasonable.

There is a reason the Government places so much emphasis on its waiver argument—a 14-year custodial sentence for a first-time offender is substantively unreasonable by every measure and completely irrational when compared to the sentences imposed on the co-defendants in this very case. *See United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006) ("[A] sentencing court may reasonably consider the sentencing disparity of co-defendants in the application of [the § 3353(a)] factors."). Despite having presided over all the Rexall-related cases, "sat through a two-week trial" in this matter (GB at 52) and sentenced each of the co-conspirators involved in the Oswari and Goldis schemes, the district court rendered a decision that is irreconcilable.

As previously emphasized, Oswari and Goldis were licensed professionals who issued the scripts that directly resulted in the losses. In fact, they both agreed to accept a two-level enhancement under U.S.S.G. § 3B1.3 because they "abused a position of trust and used a special skill in a manner that significantly facilitated the commission of the offense." *See United States v. Monaco, et al.*, No. 19-CR-716

(D.N.J.), Dkt. Nos. 34 and 53. They were also responsible for substantial losses. A loss of $1,905,812.06, or nearly half the amount attributed to Monaco, was attributed to Oswari and a loss of nearly $1 million ($992,326.62) was attributed Goldis. *See* PSR ¶ 52(b). Yet Moanco's sentence was nearly ***fifteen times greater*** than their sentences. *Compare* Appx0003 (Monaco: 168 months) *with* Appx0831 (Oswari: 15 months), Appx0824 (Goldis: 10 months).

Perhaps more to the point, the 14-year sentence is indisputably arbitrary and unjust when it is compared to the incredibly charitable sentence given to Zappala. Zappala's conduct was further reaching and far more egregious than Monaco's conduct. Most notably, Zappala negotiated the deal with Rexall's "master distributor," Appx0110-0115, Appx0154-0155, Appx0160, received nearly five times as much in commissions—$1.5 million versus $350,000—as Monaco, Appx0437-Appx0439, and was engaged in an entirely separate scheme with Drs. Hassman and Alexander. Appx0155-0161.

At the very least, Monaco and Zappala played "equally important roles," Appx0751, and were "exactly paralleled" in many ways material determining an appropriate sentence, *Lacerda*, 958 F.3d at 215, including that they were both first-time offenders and shared the same exact loss amount. PSR ¶ 52(e). And while the district court placed considerable importance on the fact that Monaco went to trial whereas Zappala (and the other co-defendants) did not, (Appx 0801) (indicating that

the court could not "really compare Mr. Monaco to the other defendants in this case who have pled guilty"), that is not a valid reason for any measurable disparity, let alone imposing a probationary sentence on one defendant and a 14-year prison term on another, when, according to the district court, they were equal partners in the same crime. *See United States v. Gozes-Wagner*, 977 F.3d 323, 334-35 (5th Cir. 2020) ("[A] defendant cannot be punished by a more severe sentence because he unsuccessfully exercises his constitutional right to stand trial[.]") (internal citation and quotations omitted); *United States v. Grober*, 595 F. Supp. 2d 382, 398 (D.N.J. 2008) (a system "punish[ing] way below the guidelines mandate if the defendant pleads guilty . . . imposes a very severe trial penalty"); *United States v. Ring*, 811 F. Supp. 2d 359, 365 (D.D.C. 2011) ("Taken at face value," the government's argument that the defendant was not similarly situated to his co-conspirators "because 'he is the only lobbyist who went to trial and chose not to plead guilty and cooperate with the United States'" could "have a noticeable chilling effect on the exercise of one's right to a jury trial[.]").

Under these circumstances, "no reasonable sentencing court" would have imposed a 14-year sentence on Monaco for the reasons the district court provided. *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (en banc).

## <u>CONCLUSION</u>

For the reasons set forth in the Merits Brief and this reply, this Court should vacate the judgment of conviction and remand for a new trial, or, alternatively, vacate the sentence and remand for re-sentencing.

Respectfully submitted,

*/s/ Kevin J. Musiakiewicz*
Eric T. Kanefsky, Esq. (NJ Atty ID: 024292002)*
Kevin J. Musiakiewicz, Esq. (NJ Atty ID: 035801997)
Philip Morrow, Esq. (NJ Atty ID: 296162019)
**CALCAGNI & KANEFSKY LLP**
One Newark Center
1085 Raymond Blvd., 14th Floor
Newark, New Jersey 07102
T. 862.397.1796
eric@ck-litigation.com
*Attorneys for Appellant Steven J. Monaco*

*\*Application for admission forthcoming*

November 2, 2023

29

## COMBINED CERTIFICATIONS

1.      This reply brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B)(ii), because it contains 6,470 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f). This reply brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5), (6), because it has been prepared in a proportionally spaced typeface using Word for Microsoft Office 365 in 14-point Times New Roman type style.

2.      Kevin Musiakiewicz and Philip Morrow, two of the attorneys whose names appear on this reply brief, are members of the bar of this Court.

3.      The text of this electronic reply brief is identical to the text in the paper copies.

4.      A virus detection program, (the Internxt Virus Scanner), has been run on the electronic version of this reply brief, and no virus has been detected.

5.      By filing this reply brief electronically, I will be causing all counsel of record to be severed electronically through this Court's electronic-filing system.


Dated: November 2, 2023                         */s/ Philip Morrow*
                                        Philip Morrow, Esq.